No. 25-2635

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————

**EDMOND M. BUTCH, CHARLES R. WYATT, DANIEL A. HENRY, and ROBERT H. CROW, on behalf of themselves and all other persons similarly situated; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC; and ALUMINUM TRADES COUNCIL OF WENATCHEE, WASHINGTON AFL-CIO,**

*Plaintiffs-Appellees,*

*v.*

**ALCOA USA CORP.; RETIREES GROUP BENEFIT PLAN FOR CERTAIN HOURLY EMPLOYEES OF ALCOA USA CORP.; and OPTIONAL LIFE INSURANCE PLAN,**

*Defendants-Appellants.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, No. 3:19-cv-258-RLY-CSW

———————

## DEFENDANTS-APPELLANTS'
## MOTION TO STAY INJUNCTION PENDING APPEAL

———————

David T. Raimer
  *Counsel of Record*
Bijan M. Aboutorabi
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001-2113
(202) 879-3939
dtraimer@jonesday.com

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................ 3

    A.   Factual Background. .......................................................... 3

    B.   This Case. ........................................................................... 4

ARGUMENT ..................................................................................... 8

    I.   THE EQUITIES LOPSIDEDLY FAVOR A STAY. ............................. 8

    II.   ALCOA IS LIKELY TO PREVAIL ON APPEAL. ........................... 11

        A.   Alcoa Is Likely to Prevail on Appeal Regarding the Main Class. ............................................................ 12

            1.   The 2019 CBA did not promise life-insurance benefits to existing retirees. ............. 13

            2.   The district court's interpretation flouted the general labor-law rule. ............................... 17

            3.   The 2013 Retiree Life Insurance SPD reflects the general rule. .................................... 18

        B.   Alcoa Is Likely to Prevail on Appeal Regarding the Subclass. ................................................................ 22

CONCLUSION ................................................................................ 27

CERTIFICATES OF COMPLIANCE AND SERVICE ......................... 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*,
404 U.S. 157 (1971) ............................................................ 12, 14, 18

*Bidlack v. Wheelabrator Corp.*,
993 F.2d 603 (7th Cir. 1993) (en banc) ......................................... 2, 26

*Binks Mfg. Co. v. Nat'l Presto Indus.*,
709 F.2d 1109 (7th Cir. 1986) ...................................................... 16

*Bland v. Fiatallis N. Am., Inc.*,
401 F.3d 779 (7th Cir. 2005) ........................................................ 26

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ......................................................... 8

*Common Cause Ind. v. Lawson*,
978 F.3d 1036 (7th Cir. 2020) (per curiam) ...................................... 8

*ConFold Pac., Inc. v. Polaris Indus.*,
433 F.3d 952 (7th Cir. 2006) ......................................................... 3

*Deutsche Bank Nat'l Tr. Co. v. Cornish*,
759 F. App'x 503 (7th Cir. 2019) ................................................... 9

*FreemantleMedia-Ltd. v. Colmar, Ltd.*,
2001 WL 1360432 (N.D. Ill. Nov. 5, 2001) ..................................... 11

*Int'l Union of United Auto., Aerospace & Agric. Implement
    Workers v. Rockford Powertrain, Inc.*,
350 F.3d 698 (7th Cir. 2003) .................................................. 25, 26

*Iowa Utils. Bd. v. FCC*,
109 F.3d 418 (8th Cir. 1996) ......................................................... 8

ii

*Jones v. Am. Gen. Life & Acc. Ins. Co.*,
370 F.3d 1065 (11th Cir. 2004).........................................................24

*M & G Polymers USA, LLC v. Tackett*,
574 U.S. 427 (2015)....................................................*passim*

*Minn. Mining & Mfg. Co. v. Pribyl*,
259 F.3d 587 (7th Cir. 2001).........................................................11

*Stone v. Signode Indus. Grp.*,
943 F.3d 381 (7th Cir. 2019)....................................................*passim*

*United Mine Workers v. Brushy Creek Coal Co.*,
505 F.3d 764 (7th Cir. 2007).........................................................24

## STATUTES

29 U.S.C. § 1022 ...........................................................................4

29 U.S.C. § 1022(b) ......................................................................19

29 U.S.C. § 1024 .....................................................................4, 19

## OTHER AUTHORITIES

29 C.F.R. § 2520.104b-2 ............................................................4, 19

Fed. R. App. P. 8............................................................................9

Fed. R. Civ. P. 62............................................................................9

## INTRODUCTION

In the proceedings below, the district court entered an injunction that will require Alcoa USA Corp. ("Alcoa") to expend well over a million dollars in effectively unrecoverable funds for the benefit of class members who *will not be injured* by the issuance of a stay.  Despite acknowledging this reality, the district court declined to stay its injunction pending appeal, choosing instead to leave in place a decision that repeatedly ignored or outright inverted basic principles of labor and benefits law. Particularly since Alcoa is willing to post a bond to obtain the relief to which it would be *automatically entitled* had the district court awarded damages rather than a pay-money injunction, there is no reason to deny it the stay it seeks.

This case concerns the legality of Alcoa's 2019 decision to cease providing company-paid and voluntary retiree life-insurance benefits to certain former employees.  The district court concluded that the termination of company-paid life insurance for employees *who had already retired* unambiguously violated a *then-current* collective bargaining agreement ("CBA")—departing from the "general rule" that, for retiree-benefits purposes, a CBA "covers only those who retire while

it is still in effect." *Stone v. Signode Indus. Grp.*, 943 F.3d 381, 388 (7th Cir. 2019). The district court further concluded that terminating voluntary life insurance unambiguously violated those retirees' vested rights under a single CBA that expired in 1996—despite the presumption that, for welfare benefits, a CBA "ceases to obligate the employer when [its] term … is up." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (en banc). Based on these conclusions, the district court permanently enjoined Alcoa to reinstate benefits for living class members and to make payouts to the beneficiaries of those who have died. For two reasons, this Court should stay that injunction pending appeal.

*First*, for the reasons detailed above, the unalloyed equities favor a stay. As the district court *agreed*, Alcoa faces undisputed irreparable harm from having to reinstate life-insurance coverage for still-living class members—to say nothing of the nearly $1.5 million dollars it will have to pay out to the beneficiaries of deceased participants. Conversely, as the district court also found, class members would not be harmed by the issuance of a stay: their purely monetary injuries can be fully redressed through the payment of interest should they prevail on appeal.

*Second*, this Court is likely to reverse the decision below. Absent a

contractual obligation, employers "'are generally free'" to "'modify[] or terminate welfare plans'" at will.  *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434-35 (2015).  Because the 2019 benefits terminations did not violate any contractual obligations under any CBAs—much less any *unambiguous* obligations—Alcoa is likely to prevail on appeal.  At minimum, Alcoa's obligations are ambiguous such that the summary-judgment rulings below cannot stand.  *See ConFold Pac., Inc. v. Polaris Indus.*, 433 F.3d 952, 956 (7th Cir. 2006).

## BACKGROUND

### A.     Factual Background.

Over the decades, Alcoa and the Plaintiff unions[1] have entered into numerous CBAs that governed terms and conditions of employment at various Alcoa facilities.  Each CBA covered one or more facilities, lasted several years, terminated pursuant to its general durational clause, and was generally succeeded by a new CBA.  MSA.046-47; MSA.065-68.

Some historic facilities no longer operate, so they do not have active

---

[1] The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") and the Aluminum Trades Council of Wenatchee, Washington AFL-CIO ("ATC").

employees or any current CBA, but the parties' collective-bargaining relationship continues at active facilities. MSA.067; MSA.093. In particular, on September 19, 2019, Alcoa and the USW entered a CBA covering USW-represented "employees" at facilities in Massena, New York, and Warrick, Indiana. MSA.002; MSA.009. That CBA (like previous Alcoa CBAs) promised that Alcoa would provide covered employees with life insurance and other welfare benefits, including after they retired. MSA.012. (In 2023, the parties agreed to renew and extend most terms of that CBA. MSA.105 n.6.)

All benefits plans that Alcoa sponsors, for both active workers and retirees, are governed by ERISA, and Alcoa has produced and distributed summary plan descriptions ("SPDs") as ERISA requires. 29 U.S.C. §§ 1022, 1024; 29 C.F.R. § 2520.104b-2. The 2019 CBA (also like previous Alcoa CBAs) cross-referenced and "incorporated" certain SPDs (referred to as "[s]eparate booklets"), rather than "describing th[e] benefits" in the CBA itself. MSA.012.

## B.    This Case.

This case involves two types of life-insurance benefits—company-paid and voluntary—historically provided by Alcoa. All full-time, active

hourly employees were enrolled in company-paid life insurance; prior to 1978, some employees had the option to supplement their company-paid coverage by purchasing voluntary life insurance at their own expense. MSA.029.

In December 2019, Alcoa exercised its "right to amend or terminate" a welfare-benefits plan "in whole or in part at any time," by terminating life-insurance benefits "provided to participants who retired under a collective bargaining agreement [with] an expiration date prior to December 31, 2019." MSA.070. In response, the unions and several Alcoa retirees (collectively, "Plaintiffs") filed this suit as a putative class action on behalf of two classes: (1) a Main Class of retirees whose company-paid life insurance benefits had been terminated, who collectively had retired from at 26 different Alcoa facilities; and (2) a Subclass of retirees whose voluntary-life-insurance benefits had been terminated. *See* MSA.095-97.

Plaintiffs advanced markedly different legal theories for the two classes. For the Main Class, they claimed that the *current* 2019 Massena/Warrick CBA (and eventually its 2023 replacement) required Alcoa to maintain their company-paid life insurance benefits for its

duration.  MSA105.  For the Subclass, Plaintiffs asserted a *lifetime* right to voluntary life insurance granted by *past* CBAs "which were in effect when Subclass Members retired."  *E.g.*, MSA.045.

After certifying both classes, D.Ct. ECF No. 117, the district court held, on cross-motions for summary judgment, that Alcoa violated unambiguous contractual obligations to both classes.[2]  Regarding the Main Class, the court reasoned that the 2019 Massena/Warrick CBA "unambiguously" promised life insurance benefits to "eligible retirees"— which it construed to include even *existing* retirees, so long as they were described as "eligible" for company-paid life insurance in a Retiree Life Insurance SPD from 2013.  MSA.105-13.  For the Subclass, the district court relied on one 1993 SPD, incorporated into one Alcoa-USW 1993 CBA, which stated that, after life-insurance amounts were reduced in certain ways as retirees aged, the reduced amounts would be "continued

---

[2] Summary judgment also reshaped the classes, in two respects. First, the court decertified all class members who, before class certification, had cashed a check offered by Alcoa in settlement of "any claims for life insurance coverage."  MSA.101-102; MSA.128.  Second, after the district court confirmed that its Subclass summary-judgment ruling applied to nine facilities, the Subclass definition was conformed to those facilities.  *See* MSA.122; MSA.130-39.

for life"; from that "for life" language, the district court concluded that voluntary-life-insurance benefits unambiguously vested, including for Subclass members who retired after the 1993 CBA. MSA.113-22 & nn.11, 13. Eventually, the district court entered final judgment for Plaintiffs, MSA.151, and issued a separate permanent injunction requiring Alcoa to: (1) "promptly reinstate and maintain" the benefits terminated in 2019; and (2) for class members who died in the interim, "pay the beneficiaries the life insurance benefits they would have received" (plus prejudgment interest compounded monthly). MSA.149.

Alcoa sought a stay pending appeal, MSA.152, which the district court denied on November 11, 2025, MSA.161-78. The district court affirmatively found that, absent a stay, "Alcoa will experience irreparable harm" by having to "pay insurance premiums to reinstate" coverages, which "would not be recoverable" after appeal. MSA.175-76. By contrast, it found "that Plaintiffs will not be substantially harmed" by a stay. MSA.176. Nonetheless, the district court denied relief because it believed (largely for the reasons in its merits opinion) that Alcoa was unlikely to prevail on appeal, which also disposed of the public-interest factor. MSA.165-75; MSA.177.

# ARGUMENT

This Court analyzes four factors when considering a stay request:

> (1) the likelihood the applicant will succeed on the merits of the appeal; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties; and (4) the public interest.

*Common Cause Ind. v. Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020) (per curiam).  As described below, both the equities and the merits overwhelmingly support a stay here.

## I.  THE EQUITIES LOPSIDEDLY FAVOR A STAY.

The district court correctly found that "Alcoa will experience irreparable harm" if required "to pay insurance premiums to reinstate life insurance coverage," because "those payments would not be recoverable" from the insurer should Alcoa prevail on appeal.  MSA.175-76; *see California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (unrecoverable economic losses are irreparable harm); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (same).  Alcoa estimates this obligation will cost $269,397 in annual premiums and fees.  MSA.156.

The injunction further requires Alcoa to pay nearly $1.5 million in death benefits directly to the beneficiaries of deceased class members.  MSA.149; MSA.160.  The district court saw this harm as "reparable"—

because, if Alcoa prevails on appeal, the beneficiaries "would all owe the money back to Alcoa" and Alcoa could "file suit to retrieve the funds." MSA.176-77. But such proceedings—which could require the filing of well over 100 individual actions, *see* D.Ct. ECF No. 173-17 at 3, 5; MSA.156—plainly would be "inconvenient and costly" for Alcoa and the beneficiaries alike. MSA.176. At minimum, this tilts the equitable balance of harms in favor of a stay. *See* MSA.176-77.

Further, this obligation—enjoining Alcoa to make a one-time, lump-sum, life-insurance payout to beneficiaries of each deceased class member—is not meaningfully different from the payment of damages.[3] And a party may stay a damages judgment *as of right* by posting a bond. Fed. R. Civ. P. 62(b); *Deutsche Bank Nat'l Tr. Co. v. Cornish*, 759 F. App'x 503, 506-10 (7th Cir. 2019). That the district court framed its pay-money order as an injunction, rather than damages, is no reason to treat Alcoa any differently here. While a bond is not invariably required to stay an injunction, Fed. R. App. P. 8(a)(2)(E); Fed. R. Civ. P. 62(d), Alcoa is fully willing to post one sufficient to cover the death-benefit amounts for class

---

[3] Indeed, Plaintiffs originally sought this relief as damages (in the alternative). D.Ct. ECF No. 200 at 1-2; D.Ct. ECF No. 44 at 23-24.

members who have died or may die while this appeal is pending, as well as the premiums it would otherwise pay for insurance, MSA.156-58; MSA.160.[4]  To be clear, Alcoa does not believe that such a bond is necessary here (there is no dispute that Alcoa is good for the money).  But this policy embodied in the federal rules highlights the absence of any equitable justification for making Alcoa dispense these damages-in-all-but-name *now*, before appellate review.

Conversely, as the district court also correctly found, "Plaintiffs will not be substantially harmed if a stay of the injunction is granted." MSA.177.  A life-insurance payout is a one-time sum paid to a beneficiary on the insured's death.  If this Court stays but affirms, Alcoa will simply pay any past-due benefits (plus interest) to the beneficiaries of any class members who died before reinstatement.  "[E]veryone entitled to the insurance benefit will still receive it if Alcoa is unsuccessful on appeal." MSA.176.

Finally, to the extent implicated, the public interest favors a stay because "the public has no interest in enforcing agreements that do not

---

[4] Though not discussed by the district court, Alcoa made the same offer below.  *See* D.Ct. ECF No. 239 at 7 n.2.

exist." *FreemantleMedia-Ltd. v. Colmar, Ltd.*, 2001 WL 1360432, at *2 (N.D. Ill. Nov. 5, 2001). And, as discussed below, the district court's summary-judgment rationales are unlikely to be affirmed by this Court.

## II.  ALCOA IS LIKELY TO PREVAIL ON APPEAL.

This Court will likely conclude that summary judgment should have been granted for Alcoa on its cross-motion, or (at worst) that summary judgment was improper because Alcoa's obligations were ambiguous. Courts "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Tackett*, 574 U.S. at 435. A straightforward application of ordinary contract-interpretation and labor-law principles shows that Alcoa did not violate any contractual obligations (much less unambiguous ones) when it eliminated life-insurance benefits for class members in 2019.[5]

---

[5] This Court reviews summary judgments *de novo*, *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 600 (7th Cir. 2001), as it also does for "legal" "issues of contract interpretation" "underlying the grant of a permanent injunction," *Stone*, 943 F.3d at 384.

**A.    Alcoa Is Likely to Prevail on Appeal Regarding the Main Class.**

Usually, when an employer is alleged to have broken a promise to provide welfare benefits, the argument is that the CBA that covered the former employees when they retired created vested rights surviving that CBA's expiration.  Such claims typically look backwards—to the CBA in effect at retirement—due to a basic labor-law distinction.  "[F]uture retirement benefits of active workers" fall within collective-bargaining obligations concerning "the 'terms and conditions of employment'" for "'employees'" in the bargaining unit.  *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 164, 180 (1971).  Consequently, future-retiree benefits for current "employees" are "a well-established statutory" (or "mandatory") "subject of bargaining."  *Id.* at 180.

By contrast, the "benefits of already retired employees" are not a core subject of collective bargaining—because, when bargaining takes place, such persons are definitionally "not 'employees'" or "members of the bargaining unit" whom the union has any "duty to represent."  *Id.* at 164-65, 181 n.20.  If a union and employer *choose* to bargain over existing-retiree benefits (as a "permissive" subject), that decision is voluntary on both sides.  *Id.* at 181 & n.20.  Hence the "general rule" that retiree-

benefits promises in a CBA "cover[] only those who retire while it is still in effect"—i.e., those who were "employees" when the CBA was negotiated and became retirees while still covered. *Stone*, 943 F.3d at 388.

Here, for the Main Class, Plaintiffs did not bring the usual, backward-looking claim. Instead, they claimed that the 2019 Massena/Warrick CBA—which took effect *after* every Main Class member retired—nonetheless promised these existing retirees company-paid life-insurance benefits for its duration. The district court found that this unusual theory was not just right, but *unambiguously* right, despite the absence of any language suggesting it. This Court is not likely to affirm that extraordinary conclusion. At minimum, there is ambiguity that precludes summary judgment.

## 1.   The 2019 CBA did not promise life-insurance benefits to existing retirees.

By its plain text, the 2019 CBA unambiguously did not promise life-insurance benefits to preexisting retirees. The CBA began by reciting (in the "Recognition" clause) that its "provisions … shall apply *solely* to those *employees* of [Alcoa] at its plants located at Warrick, Indiana; and Massena, New York, for whom the [USW]" was "the exclusive bargaining agency." MSA.009. The main body of the CBA then exhaustively

13

prescribed terms and conditions for those employees at those plants. MSA.003-006.

Alcoa's life-insurance and other welfare-benefits promises were set forth in Article XXIII ("Group Insurance"). MSA.012. As relevant here, it stated that Alcoa "will provide … Life Insurance" (and other benefits) to "eligible active employees" and "will also provide Medical and Prescription Drug Benefits to eligible retirees, surviving spouses, and their eligible dependents and Life Insurance to eligible retirees." MSA.012.

Again, "[a]s a general rule, an agreement like this one covers only those who retire while it is still in effect." *Stone*, 943 F.3d at 388. Nothing in the CBA suggests that Article XXIII did not adhere to that general rule. Indeed, under the CBA's self-defined scope, Article XXIII "appl[ied] solely to" USW "employees" at the Warrick and Massena plants. MSA.009. As a matter of law, that description includes currently-active "employees" at those facilities who would retire during the 2019 CBA—and excludes already-retired former employees from those facilities or others. *Pittsburgh Plate*, 404 U.S. at 172.

There is one relevant asterisk, but it does not help Plaintiffs. In a

14

nine-page letter attached to the back of the CBA, Alcoa *expressly* agreed that, for certain "post-May 31, 1993 retirees," it would "maintain its program of *medical and prescription drug benefits*" "through December 31, 2023." MSA.016. (emphasis added). This "Retiree Health Care Letter" has been a fixture of Alcoa-USW CBAs for many years, as one result of the parties' unique history of bargaining about healthcare. *E.g.*, MSA.048-53. It demonstrates that these parties know very well how to depart from the general rule in order to secure existing-retiree welfare benefits for the term of a later CBA. It also demonstrates that—when they have done so—they have done so expressly, in a purpose-built document (notably outside the main body of the CBA), defining clearly what existing-retiree benefits were guaranteed, to whom, for how long, and so on. MSA.016-24. If these same parties had intended the 2019 CBA to similarly guarantee *life-insurance* benefits to existing retirees, they would have similarly said so. They did not. There is no analogous life-insurance letter promising life-insurance benefits to existing retirees.

The only hook for a promise like this would be Article XXIII's provision of such benefits to "eligible retirees." But the Retiree Health Care Letter makes it even more obvious that Article XXIII does not speak

to existing retirees; if it did, the Retiree Health Care Letter would be superfluous—after all, Article XXIII already promises "Medical and Prescription Drug Benefits" to "eligible retirees" (the same term the district court used to infer a promise to provide life insurance to existing retirees). MSA.012. This is additional confirmation (if any were needed) that Article XXIII follows the "general rule" that "an agreement like this one covers only those who retire while it is still in effect," i.e., future retirees covered by the CBA. *Stone*, 943 F.3d at 388. Article XXIII cannot reasonably be read so as to "neutraliz[e]" the parties' separate, explicit, detailed agreement regarding medical benefits for existing retirees. *Binks Mfg. Co. v. Nat'l Presto Indus.*, 709 F.2d 1109, 1116 (7th Cir. 1986) (internal quotation marks omitted).

In short, the 2019 Massena/Warrick CBA unambiguously did not guarantee retiree life-insurance benefits to the Main Class of existing retirees from a much broader range of Alcoa facilities. Consistent with black-letter labor law, Article XXIII exclusively addressed future retirees who were "employees" when the CBA was adopted. Separately, the appended Retiree Health Care Letter guaranteed *healthcare* benefits for existing retirees for the duration of the current CBA. Nothing in the 2019

CBA, however, did the same for life-insurance benefits, so Alcoa did not violate the CBA when it eliminated those benefits.

### 2. The district court's interpretation flouted the general labor-law rule.

Eschewing that straightforward interpretation, the district court—from the outset—leapt over basic labor-law principles to read Article XXIII as applying to *all* retirees, no matter when or from what facilities they retired.  MSA.106-07.  The court saw "no indication" of a narrower interpretation, MSA.107, only because it did not even pause to consider the CBA's self-defined scope; the "general rule" that a CBA "covers only those who retire" while it is in effect, *Stone*, 943 F.3d at 388; or the bedrock collective-bargaining principles from which that rule follows.

When the district court later discussed those vital contextual clues, it only confirmed why its own interpretation was a nonstarter.  Consider its elaborate, two-page effort to explain how Alcoa's reading of Article XXIII "would violate federal labor law" by "shunt[ing]" workers "outside the scope of the contract" the moment they retired.  MSA.111-13.  *Of course*, active workers who retire during a CBA remain covered by its benefits clauses for its duration; but that is *because* those workers were "employees" *when the CBA was negotiated*, and "future retirement

benefits of active workers" are a mandatory subject. *Pittsburgh Plate*, 404 U.S. at 180. That contrasts with existing retirees—like the Main Class members—who were "not members of the bargaining unit" at all for any CBA negotiated after their retirement. *Id.* at 181 n.20. As explained, that settled law is precisely why the "general rule" is what it is, and why Alcoa's reading here is the natural one.

Similarly, when the district court acknowledged the Recognition clause as a "wrinkle" for its atextual interpretation, it concluded that the clause meant only that the 2019 CBA did not cover *non-union* employees. MSA.113. Again, that misses the point. Certainly, the CBA would not cover non-union employees, but for *precisely* the same reason it did not cover existing retirees: neither group is in the bargaining unit. *Pittsburgh Plate*, 404 U.S. at 164-65, 181 n.20.

### 3. The 2013 Retiree Life Insurance SPD reflects the general rule.

The district court went further astray by turning to a 2013 Life Insurance SPD addressed to existing retirees—a most unlikely guarantor of benefits—and equating the population previously described as "eligible" for benefits under that document with "eligible retirees" under the 2019 CBA. To whatever extent the 2019 CBA "incorporated" that SPD,

18

MSA.107 n.7, it supports Alcoa's reading, not the district court's.

To start, the district court ignored important legal context. Under ERISA (completely independent of labor law), employers must periodically produce SPDs summarizing any benefits plans they provide (whether or not any CBA requires it), including the plans' "requirements respecting eligibility for participation and benefits." 29 U.S.C. § 1022(b); *id.* § 1024; 29 C.F.R. § 2520.104b-2. Thus, in 2013, Alcoa prepared an SPD addressed to the then-existing retirees to whom it was providing coverage, and that SPD described the plan's then-existing eligibility requirements. *See* MSA.76.

However, the question here is not whether Main Class members were "eligible" to participate in 2013. *Contra* MSA.107-08. The question here is whether *removing* their eligibility in December 2019 violated the recently signed Massena/Warrick CBA. *See* MSA.070; *Tackett*, 574 U.S. 434-35 (employers "'generally free'" to revise welfare-benefits plans). To whatever extent the 2013 SPD bears on *that* question, it does not support any departure from the general rule that existing retirees are not covered by the 2019 CBA.

The plain text of the 2013 Retiree SPD states that the plan has been

"incorporated in and made a part of" *numerous* "collective bargaining agreements."  MSA.074; *see* MSA.082 (noting "[t]he plan is maintained pursuant to one or more collective bargaining agreements").  In this way, it contrasts with other SPDs, geared toward then-active employees, which identified themselves as "part of" a single specific CBA.  *E.g.*, MSA.027.  This contrast makes sense, given the general rule that each CBA covered active employees, including after their retirement.  Active workers at the same facility were always covered by the same CBA.  But the retiree-focused SPD was addressed to participants who had already retired—at different times, from different facilities, and under different CBAs.

In that context, the SPD also makes clear that—for each *individual* retiree—the relevant CBA is the one that last "covered" that individual "as an active employee" at retirement.  *See* MSA.076 ("You are eligible for company-provided life insurance if you were [1] an hourly employee who retired on or after June 1, 1993 … and are covered under the Alcoa Retirement Plan, Plan II, and [2] *covered by a collective bargaining agreement that contains this plan as part of the agreement*." (emphasis added)); MSA.081 ("You are eligible … if you are a retiree who, *as an*

*active employee, was covered by a collective bargaining agreement* between Alcoa and [the participating] unions listed on the following page." (emphasis added)). That too perfectly tracks the general rule that each particular CBA covered those who retired (as active employees) while it was in effect—not those who retired under other CBAs. *Stone*, 943 F.3d at 388.

In sum—as Alcoa explained below—"the 2013 Retiree Life SPD," on its own terms, "is incorporated into whatever CBA covered each retiree when they retired," which for Main Class members is definitionally "***not*** the 2019 CBA" because they "all retired before [that] CBA went into effect." MSA.094. Insofar as the district court believed otherwise, it was simply wrong. *See* MSA.107-08 & n.7. The 2013 SPD takes the general rule for granted and thus lends no support to any interpretation of the 2019 CBA that discards that rule.[6]

---

[6] For similar reasons, there is no substance to any concern that the 2013 Retiree Life Insurance SPD "must provide retirement benefits" to existing retirees, lest it be "duplicative" of a separate SPD, issued in 2020, which described then-active employees' benefits and also discussed would happen to those benefits when they retired. MSA.108-09; *see* D.Ct. ECF No. 173-29 (2020 Active Employee SPD). The two SPDs were written at different times, addressed different target audiences, and told each audience what they needed to know about their benefits. To the extent

### B.    Alcoa Is Likely to Prevail on Appeal Regarding the Subclass.

Alcoa is also likely to prevail on appeal as to the Subclass.  Although CBA obligations generally terminate with the CBA, *see Tackett*, 574 U.S. at 441-42, the district court held that Alcoa unambiguously "agreed to provide … voluntary life insurance benefits to the sub-class [members] for the rest of [their] lives."  MSA.115.  The district court based that conclusion solely on insurance-amounts schedules in one 1993 SPD (incorporated into the 1993 Alcoa-USW CBA), which provided that insurance would be reduced as retirees aged until reaching a level where they would be "continued for life."  MSA.115.[7]  Reading that language to

---

of any overlap for employees who retired under the 2019 CBA, there is nothing superfluous (or otherwise troublesome) about one summary document describing retiree benefits from a pre-retirement perspective and another doing so from a post-retirement perspective.

[7] Notably, it is undisputed the same language does not appear in any post-1996 SPDs or CBAs.  *See* MSA.169.  The district court's stay-denial order states that the district court "found" that the language was "an implied term" of all later CBAs, MSA.175, but the summary-judgment order had no such reasoning.  Instead, it expressly stated that "the 1993 agreement" alone "is all that is necessary to resolve the sub-class," MSA.116 n.13, including "any sub-class members" who "retired after [that] agreement expired," MSA.114 n.11.  How that could be is a mystery, since the Subclass claim relied on "the CBAs … in effect when Subclass Members [individually] retired."  MSA.045.

vest lifetime benefits rights is not reasonable, let alone unambiguously correct.

The relevant 1993 SPD language appears in a passage describing "how … coverage works" after "you're retired and age 65 or over." MSA.038.   It explains that, for those who enrolled in voluntary life insurance before September 1, 1965:

> Life insurance is reduced at age 65 by 10%, and reduced 10% each year thereafter until it reaches 50% of the amount in effect before age 65.  The reduced amounts are continued for life;
> …
> Your payments are based on $.60 per thousand per month for the reduced amount of coverage in effect.

MSA.038.   A parallel provision addresses those who enrolled after September 1, 1965:

> Life insurance is reduced at age 65 by 75%.  The reduced amounts are continued for life.
> …
> Your payments are based on $.60 per thousand per month for the reduced amount of insurance in effect.

MSA.038.

That "continued for life" language is far too weak a basis to infer vested-for-life rights to voluntary-life-insurance benefits.  *See Tackett*, 574 U.S. at 441 ("courts should not construe ambiguous writings to create

lifetime promises").  Indeed, in context, these passages express no intent to guarantee *the plan* for life or to restrain Alcoa from exercising its rights under ERISA to modify or terminate the plan.  *See id.* at 434-45.  Instead, they merely describe terms of the plan itself—schedules by which, as retirees age, life-insurance amounts and corresponding premiums are reduced, until a point where the reductions level off and they "continue[] for life" at that level.  That does not speak to whether the plan must continue to exist; it merely explains what will happen (i.e., "how … coverage" will "work[]") *assuming the plan remains in place.  See United Mine Workers v. Brushy Creek Coal Co.*, 505 F.3d 764, 767 (7th Cir. 2007) ("Terminable benefits for life are benefits that go on regardless of the age of the worker or how long ago he retired, but that cease if the plan conferring those benefits ends."); *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1070-71 (11th Cir. 2004) (language stating, "'[i]f you retire … you get to keep … your Group Insurance'" and "'[you] will continue to be covered after [you] reach age 65" "merely describes the period of time during which [retirees] were eligible to receive the group life benefit, so long as the Plan continued to exist").

Even if this "continued for life" language could reasonably be read

as vesting benefits, the SPD contains language "reserv[ing] rights that are inconsistent with vesting," *Stone*, 943 F.3d at 387, thus resolving any ambiguity against vesting. It states that, "if … the plan is discontinued," or "[t]he plan ends," "you may convert your … optional coverage[] to a personal policy." MSA.041.[8] If benefits were guaranteed for life, the SPD would not have told retirees that the plan might "end[]" or be "discontinued" and that they could then seek a personal policy. MSA.041. *See Int'l Union of United Auto., Aerospace & Agric. Implement Workers v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703-04 (7th Cir. 2003) (holding that an agreement did not vest benefits despite a "lifetime benefits clause" because it was tempered by "plan termination and reservation of rights clauses").

At minimum, the district court erred by ruling that the "continued for life" language singlehandedly rendered vesting *unambiguous*. As this Court's cases reflect, provisions referring to "life" or a beneficiary's

---

[8] Given its conviction that the plan could not "end" as to voluntary life insurance, the district court insisted that this clause must apply exclusively to other forms of "optional coverage" in the 1993 SPD. MSA.120. But it expressly applies to "*any* of the optional coverages," which includes voluntary life insurance. MSA.036 (emphasis added); *see* MSA.029.

"lifetime" can sometimes create *ambiguity* about vesting. *See, e.g.*, *Bidlack*, 993 F.2d at 608 (finding "a promise to retired employees that they … will be covered for the rest of their lives" ambiguous on vesting); *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 780 (7th Cir. 2005) (reversing summary judgment, finding "lifetime" language ambiguous on vesting). But the district court stretched those cases far past the breaking point. As it reasoned, once "some language" (apparently any language) "that suggests lifetime benefits" has been located, only an express reservation-of-rights clause can prevent benefits from *unambiguously* vesting. MSA.119-21; *see* MSA.172. None of this Court's cases supports that magic-words rule, which is unsurprising because it makes no sense. "[P]lan termination clause[s]," like those present here, also conflict with vesting. *Rockford Powertrain*, 350 F.3d at 703. And "lifetime benefits" constructions are disfavored, even for facially "ambiguous writings." *Tackett*, 574 U.S. at 441. Thus, if the district court were correct that this case "falls comfortably within the *Bland*-type," it should have, at worst, found the 1993 CBA ambiguous and denied any summary judgment. MSA.120.

26

## CONCLUSION

This Court should stay the injunction pending appeal.

Dated:  November 13, 2025

Respectfully submitted,

*/s/ David T. Raimer*
David T. Raimer
   *Counsel of Record*
Bijan M. Aboutorabi
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001-2113
(202) 879-3939
dtraimer@jonesday.com

*Counsel for Defendants-Appellants*

27

## CERTIFICATES OF COMPLIANCE AND SERVICE

Pursuant to Federal Rules of Appellate Procedure 27(d)(1)(E) and 27(d)(2)(A), I certify that the foregoing motion is proportionately spaced, has a type-face of 14 points, and contains 5,199 words, as calculated by Microsoft Word for Microsoft 365.

I certify that on November 13, 2025, I caused the electronic filing of the foregoing motion and the attached Appendix to Appellants' Motion to Stay Injunction Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I further certify that all counsel of record are users of the appellate CM/ECF system and will be served by that system.

Dated:  November 13, 2025                    Respectfully submitted,

*/s/ David T. Raimer*
David T. Raimer

*Counsel for Defendants-Appellants*