No. 25-2635

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**EDMOND M. BUTCH, CHARLES R. WYATT, DANIEL A. HENRY, and ROBERT H. CROW, on behalf of themselves and all other persons similarly situated; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC; and ALUMINUM TRADES COUNCIL OF WENATCHEE, WASHINGTON AFL-CIO,**

*Plaintiffs-Appellees,*

*v.*

**ALCOA USA CORP.; RETIREES GROUP BENEFIT PLAN FOR CERTAIN HOURLY EMPLOYEES OF ALCOA USA CORP.; and OPTIONAL LIFE INSURANCE PLAN,**

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Indiana, No. 3:19-cv-258-RLY-CSW

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

David T. Raimer
  *Counsel of Record*
Bijan M. Aboutorabi
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001-2113
(202) 879-3939
dtraimer@jonesday.com

*Counsel for Defendants-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ___25-2635___

Short Caption: Butch, et al., v. Alcoa USA Corp., et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Alcoa USA Corp.; Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp.; Optional Life

Insurance Plan

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jones Day; K&L Gates LLP; Mark Miller Law Office

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

Alcoa USA Corp. is wholly owned by Alcoa USA Holding Company, which is a direct subsidiary of Alcoa Corporation, which is a publicly held company with no parent corporation.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No publicly held company owns 10% or more of Alcoa Corporation's stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ David T. Raimer    Date: September 19, 2025

Attorney's Printed Name: David T. Raimer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: 51 Louisiana Avenue, NW

Washington, DC 20001-2113

Phone Number: (202) 879-3939    Fax Number: (202) 626-1700

E-Mail Address: dtraimer@jonesday.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As          Clear Form

Appellate Court No: 25-2635

Short Caption: Butch, et al., v. Alcoa USA Corp., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Alcoa USA Corp.; Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp.; Optional Life Insurance Plan

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Jones Day; K&L Gates LLP; Mark Miller Law Office

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        Alcoa USA Corp. is wholly owned by Alcoa USA Holding Company, which is a direct subsidiary of Alcoa Corporation, which is a publicly held company with no parent corporation.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        No publicly held company owns 10% or more of Alcoa Corporation's stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Bijan M. Aboutorabi    Date: 11/13/2025

Attorney's Printed Name: Bijan M. Aboutorabi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 51 Louisiana Avenue, NW

    Washington, DC 20001-2113

Phone Number: (202) 879-3939    Fax Number: (202) 626-1700

E-Mail Address: baboutorabi@jonesday.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................iii

REQUEST FOR ORAL ARGUMENT .....................................viii

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT ........................................ 2

STATEMENT OF THE ISSUES ........................................... 3

STATEMENT OF THE CASE ............................................... 4

    A.    Factual and Legal Background.................................... 4

    B.    This Case. ..................................................................... 8

STANDARD OF REVIEW................................................... 14

SUMMARY OF ARGUMENT .............................................. 15

ARGUMENT ......................................................................... 20

    I.    Alcoa Did Not Breach the 2019 Massena/Warrick CBA by Terminating Company-Paid Life Insurance for the Main Class............................................................................ 21

    A.    The 2019 CBA Unambiguously Did Not Promise Life-Insurance Benefits to Existing Retirees. ........... 22

    B.    The District Court's Contrary Interpretation Is Unreasonable. .......................................................... 27

        1.    The District Court Ignored Fundamental Labor-Law Principles........................................ 27

        2.    The District Court Misinterpreted the Retiree Health Care Letter................................ 29

        3.    The 2013 Retiree Life Insurance SPD Is Irrelevant But Also Reflects the General Rule. .................................................................. 30

    C.    At Minimum, the 2019 CBA Is Ambiguous and Alcoa Was Entitled to Summary Judgment Based on Extrinsic Evidence. ............................................... 35

i

# TABLE OF CONTENTS
(continued)

**Page**

II.   Alcoa Did Not Violate Any Vested Rights of Subclass
      Members by Terminating Voluntary Life Insurance. ......... 42

      A.   The District Court Misread the 1993 CBA. ................ 42

           1.   The 1993 CBA Unambiguously Did Not
                Vest Lifetime Rights to Voluntary Life
                Insurance ............................................................ 42

           2.   At Minimum, the 1993 CBA Did Not
                Unambiguously Vest Lifetime Benefits. ........... 50

      B.   At Minimum, the Absence of the "Continued for
           Life" Language From Post-1996 CBAs Precludes
           Summary Judgment for Subclass Members Who
           Retired Under Such CBAs. ........................................ 53

CONCLUSION ........................................................................ 56

CERTIFICATE OF COMPLIANCE ...................................... 58

CERTIFICATE OF SERVICE ................................................ 59

# TABLE OF AUTHORITIES

**Page**

### CASES

*Alcoa USA Corp. v. Butch*,
No. 22-8017 (7th Cir.) ...................................................... 3, 11

*Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*,
404 U.S. 157 (1971) .................................................... passim

*Bank of Com. v. Hoffman*,
829 F.3d 542 (7th Cir. 2016) ............................................. 29

*Bidlack v. Wheelabrator Corp.*,
993 F.2d 603 (7th Cir. 1993) (en banc) ....................... passim

*Binks Mfg. Co. v. Nat'l Presto Indus.*,
709 F.2d 1109 (7th Cir. 1983) ......................................... 26

*Bland v. Fiatallis N. Am., Inc.*,
401 F.3d 779 (7th Cir. 2005) ........................... 43, 50, 51, 55

*CNH Indus. N.V. v. Reese*,
583 U.S. 133 (2018) (per curiam) ............................... passim

*ConFold Pac., Inc. v. Polaris Indus., Inc.*,
433 F.3d 952 (7th Cir. 2006) ........................................... 37

*Crown Cork & Seal Co. v. Int'l Ass'n of Machinists &
Aerospace Workers*,
501 F.3d 912 (8th Cir. 2007) ........................................... 52

*Curtis v. Alcoa, Inc.*,
No. 3:06-cv-448, 2011 WL 850410 (E.D. Tenn. Mar. 9,
2011) ............................................................................... 6

## TABLE OF AUTHORITIES
(continued)

**Page**

*Fulghum v. Embarq Corp.*,
    785 F.3d 395 (10th Cir. 2015) ............................................................. 48

*Gallo v. Moen Inc.*,
    813 F.3d 265 (6th Cir. 2016) ............................................................... 25

*Grove v. Johnson Controls, Inc.*,
    694 F. App'x 864 (3d Cir. 2017) ................................................... 47, 51

*Hackett v. Xerox Corp. Long-Term Disability Income Plan*,
    315 F.3d 771 (7th Cir. 2003) ........................................................ 21, 48

*Int'l Union of United Auto., Aerospace & Agric. Implement*
    *Workers v. Rockford Powertrain, Inc.*,
    350 F.3d 698 (7th Cir. 2003) ................................................. 47, 51, 53

*Jones v. Am. Gen. Life & Accident Ins. Co.*,
    370 F.3d 1065 (11th Cir. 2004) .......................................................... 45

*Jones v. Hendrix*,
    599 U.S. 465 (2023) ............................................................................ 52

*Lid Elec., Inc. v. IBEW*,
    362 F.3d 940 (7th Cir. 2004) .......................................................... 5, 24

*M&G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015) .................................................................. passim

*Merk v. Jewel Cos.*,
    848 F.2d 761 (7th Cir. 1988) .............................................................. 41

*Minn. Mining & Mfg. Co. v. Pribyl*,
    259 F.3d 587 (7th Cir. 2001) .............................................................. 14

## TABLE OF AUTHORITIES
(continued)

**Page**

*Pabst Brewing Co. v. Corrao,*
   161 F.3d 434 (7th Cir. 1998) ................................................................. 7

*Rossetto v. Pabst Brewing Co.,*
   128 F.3d 538 (7th Cir. 1997) ("*Rossetto I*") ..................................... 6, 41

*Rossetto v. Pabst Brewing Co.,*
   217 F.3d 539 (7th Cir. 2000) ("*Rossetto II*") ..................... 19, 47, 51, 52

*Santaella v. Metro. Life Ins. Co.,*
   123 F.3d 456 (7th Cir. 1997) ............................................................... 14

*Schlaf v. Safeguard Prop., LLC,*
   899 F.3d 459 (7th Cir. 2018) ............................................................... 14

*Schreiber v. Philips Display Components Co.,*
   503 F. App'x 385 (6th Cir. 2012) ........................................................ 25

*Soarus L.L.C. v. Bolson Materials Int'l Corp.,*
   905 F.3d 1009 (7th Cir. 2018) ............................................................. 14

*Stone v. Signode Indus. Grp.,*
   943 F.3d 381 (7th Cir. 2019) ....................................................... passim

*Sullivan v. CUNA Mut. Ins. Soc'y,*
   649 F.3d 553 (7th Cir. 2011) ................................................... 19, 46, 50

*Swaback v. Am. Info. Techs. Corp.,*
   103 F.3d 535 (7th Cir. 1996) ............................................................... 15

*Taracorp, Inc. v. NL Indus.,*
   73 F.3d 738 (7th Cir. 1996) ................................................................. 26

*United Mine Workers v. Brushy Creek Coal Co.,*
   505 F.3d 764 (7th Cir. 2007) ......................................................... 46, 49

# TABLE OF AUTHORITIES
(continued)

**Page**

*USW v. NLRB,*
544 F.3d 841 (7th Cir. 2008) ................................................................. 29

*Vallone v. CNA Fin. Corp.,*
375 F.3d 623 (7th Cir. 2004) ................................................. 46, 50, 52

*Xerox Corp. v. Local 14A, Rochester Reg'l Joint Bd.,*
*Xerographic Div. Workers United,*
128 F.4th 93 (2d Cir. 2025) ................................................................. 50

STATUTES

28 U.S.C. § 1291 ......................................................................................... 3

28 U.S.C. § 1331 ......................................................................................... 3

29 U.S.C. § 157 ........................................................................................... 4

29 U.S.C. § 158 ........................................................................................... 5

29 U.S.C. § 159 ........................................................................................... 4

29 U.S.C. § 185 ...................................................................................... 2, 3

29 U.S.C. § 1022 .................................................................................. 9, 31

29 U.S.C. § 1024 .................................................................................. 9, 31

29 U.S.C. § 1132 .................................................................................... 2, 3

OTHER AUTHORITIES

29 C.F.R. § 2520.104b-2 ..................................................................... 9, 31

Cir. R. 34 ................................................................................................ viii

Fed. R. App. P. 34 ................................................................................. viii

## TABLE OF AUTHORITIES
(continued)

**Page**

Fed. R. Civ. P. 23 .................................................................................... 3

11 Williston on Contracts § 32:15 (4th ed.) ............................................ 30

## REQUEST FOR ORAL ARGUMENT

Defendants-Appellants respectfully request oral argument.  *See* Fed. R. App. P. 34(a); Cir. R. 34(f).  This appeal presents an array of complex legal and factual issues implicating multiple decades of collective-bargaining history between the parties.  Oral argument would substantially aid the Court in its analysis and resolution of those questions.  On December 18, 2025, this Court ordered that "argument in this case will be expedited and heard as soon as the court's calendar allows."  ECF No. 18.

**INTRODUCTION**

In late 2019, Alcoa USA Corp. announced that it would no longer offer life-insurance benefits to certain existing retirees. This case involves the legality of that decision: specifically, whether various collective-bargaining agreements ("CBAs") granted two distinct classes of retirees rights to two distinct types of life insurance. They did not. A straightforward application of basic labor- and contract-law principles indicates that Alcoa was under no legal obligation to continue providing the coverage at issue to either the Main Class or the Subclass.

As for the Main Class, its members claim that a 2019 CBA promised them company-paid life insurance for the duration of its term. Yet "[a]s a general rule," a CBA "covers only those who retire while it is still in effect." *Stone v. Signode Indus. Grp.*, 943 F.3d 381, 388 (7th Cir. 2019). Because each and every member of the Main Class retired *before* the 2019 CBA was even negotiated, the assumption is that it did not guarantee them any rights to anything. And Plaintiffs—two unions and four Alcoa retirees—fail to identify any language indicating that the parties agreed to depart from this default rule.

The Subclass, by contrast, claims that the CBAs in effect *when they*

1

*retired* granted them a vested right to voluntary life insurance that continued after those CBAs expired.  But this position clashes with yet another default rule: contractual obligations "cease, in the ordinary course, upon termination" of a CBA.  *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441-42 (2015) (internal quotation omitted).  And Plaintiffs once again fail to identify any language establishing a departure from this baseline presumption.

In short, no contractual obligation precluded Alcoa from eliminating the life-insurance benefits at issue in this case.  This Court should therefore reverse the judgment below and direct entry of judgment for Alcoa.  Alternatively, the obligations Alcoa allegedly breached were *at least* ambiguous, such that the summary-judgment rulings below for Plaintiffs cannot stand.  At a minimum, then, this Court should vacate the judgment and remand for appropriate proceedings.

## JURISDICTIONAL STATEMENT

Plaintiffs' class action complaint asserted claims under the Labor Management Relations Act (LMRA), 29 U.S.C. § 185 (Counts One and Three), and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), (a)(3) (Counts Two and Four).  The district court

had subject-matter jurisdiction under 28 U.S.C. § 1331, 29 U.S.C. § 185(a), and 29 U.S.C. § 1132(e)(1), (f).

This Court has appellate jurisdiction under 28 U.S.C. § 1291, because this appeal arises from a final judgment disposing of all claims as between all parties. The district court's judgment was entered on August 20, 2025. The notice of appeal was filed on September 17, 2025. No motion for a new trial or for alteration of the judgment, or other motion tolling the time to appeal, has been filed. This is not a direct appeal from a decision of a magistrate judge.

Pursuant to Federal Rule of Civil Procedure 23(f), Alcoa previously petitioned for, and was denied, permission to appeal from the district court's order granting class certification. *See Alcoa USA Corp. v. Butch*, No. 22-8017 (7th Cir.). Otherwise, there have been no prior or related appellate proceedings in this case.

## STATEMENT OF THE ISSUES

**I.** Whether the district court erred by denying Alcoa's cross-motion for summary judgment, and granting Plaintiffs' cross-motion, as to Plaintiffs' claim that the 2019 CBA guaranteed company-paid life insurance to Main Class members, who all retired before that agreement

took effect.

**II.**    Whether the district court erred by denying Alcoa's cross-motion for summary judgment, and granting Plaintiffs' cross-motion, as to Plaintiffs' claim that Subclass members have vested, lifetime rights to voluntary life insurance.

## STATEMENT OF THE CASE

### A.    Factual and Legal Background.

Over the decades, Alcoa and the Plaintiff labor unions[1] have negotiated and entered into many CBAs governing terms and conditions of employment for union-represented employees at various Alcoa facilities.  *See* 29 U.S.C. §§ 157, 159(a).  Each CBA covered one or more facilities, lasted several years, terminated, and was generally succeeded by a new CBA.  JA.450-51; JA.677-80.  While some historic Alcoa facilities no longer operate, the parties' collective-bargaining relationship continues at active facilities.  JA.678-79; JA.829.

These CBA negotiations do not take place on a blank slate.  Federal

---

[1] The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") and the Aluminum Trades Council of Wenatchee, Washington AFL-CIO ("ATC").  All references to Alcoa and the unions include relevant predecessor entities, as appropriate in context.

law guides both the parties' negotiations and the interpretation of any resulting agreements.

1.  **Mandatory and Permissive Subjects**.  At the outset, federal law specifies certain subjects over which employers and unions *must* bargain.  As relevant here, that includes "pension and insurance benefits" for future retirees—i.e., "active employees" who will retire while a CBA is in effect.  *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159 (1971).  Such benefits "are part and parcel of [those employees'] overall compensation," and thus fall squarely within collective-bargaining obligations concerning "the 'terms and conditions of employment'" for employees in the bargaining unit.  *Id.* at 164, 180; *see* 29 U.S.C. § 158(d).  In labor-law parlance, these active-employee/future-retiree benefits are a "mandatory" subject of bargaining.  *Pittsburgh Plate*, 404 U.S. at 159.

By contrast, employers and unions are *not* obliged to bargain over benefits for *existing* retirees—i.e., former employees who have already retired at the time a given CBA is negotiated.  *Id.* at 165-82 & n.20.  Because "[r]etired employees are no longer in [the] bargaining unit," *Lid Elec., Inc. v. IBEW*, 362 F.3d 940, 943 (7th Cir. 2004), their benefits are

5

a merely "permissive" subject of bargaining, *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 540 (7th Cir. 1997) ("*Rossetto I*"). The parties may choose to bargain over such benefits, *Pittsburgh Plate*, 404 U.S. at 176-82 & n.20, or to make them a mandatory subject in future negotiations, *Tackett*, 574 U.S. at 439, but they must agree to do so, *Rossetto I*, 128 F.3d at 540.

While it is thus unusual for parties to bargain over the rights of existing retirees, it is not unheard of. This case provides one such example. In 1993, the USW agreed to a "Cap" on healthcare benefits for certain then-future retirees in exchange for (inter alia) an agreement to make those "post-1993" retirees' healthcare benefits a mandatory subject of bargaining going forward. JA.452; *see also Curtis v. Alcoa, Inc.*, No. 3:06-cv-448, 2011 WL 850410, at *3-16 (E.D. Tenn. Mar. 9, 2011). And since 2006 (when the parties finally agreed to implement the Cap), the parties' CBAs have memorialized that agreement in a document known as the "Retiree Health Care Letter," which guarantees capped healthcare benefits to a defined population of post-1993 retirees from various facilities that were historically subject to the Cap agreement, JA.456-61; *see Curtis*, 2011 WL 850410, at *34.

**2.     Vesting**.  Federal law also dictates the circumstances under which benefits "vest," i.e., when they are guaranteed beyond the expiration of the CBA in which they were initially promised.  *Tackett,* 574 U.S. at 434-35.  Unlike pensions, welfare benefits (such as healthcare and life insurance) do not "vest[]" by statute.  *Id.* at 434.  "[I]f they vest at all, they do so under the terms of a particular contract."  *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998).  Thus, once a CBA has expired, "employers … are generally free" to "modify[] or terminate" such benefits, unless "ordinary principles of contract law" indicate that the CBA at issue provided otherwise.  *Tackett*, 574 U.S. at 434-35 (cleaned up).[2]

---

[2] This Court has long followed this rule.  *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (en banc).  But for much of the period at issue in this litigation, "[e]mployers with national operations [were] subject to multiple and inconsistent rules," *id.* at 620 (Easterbrook, J., dissenting), due to Sixth Circuit precedent that "presume[d] lifetime vesting" of retiree welfare benefits, *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 134 (2018) (per curiam).  In resolving the split, the Supreme Court sided with this Court, explaining that "ordinary principles of contract law" compel the presumption that "'contractual obligations will cease … upon termination of the bargaining agreement.'"  *Tackett*, 574 U.S. at 441-42.  That being the case, courts must "'apply general durational clauses'" to retiree-benefits promises "unless the agreement specifie[s] otherwise."  *Reese,* 583 U.S. at 139-40.

**B.    This Case.**

This case implicates two types of life-insurance benefits historically provided by Alcoa: (1) *company-paid* life insurance and (2) *voluntary* life insurance.  As the label suggests, Alcoa paid the full cost of company-paid life insurance, and all full-time, active hourly employees were enrolled in that coverage.  *E.g.*, JA.126.  For retirees over age 62, benefit amounts ranged between $4,500 and $7,500, depending on the insured's date of retirement.    JA.654.    Eligible employees also had the option to supplement their company-paid life insurance by purchasing voluntary life insurance—unlike the company-paid option, employees paid the "full cost" for that benefit.  JA.132.[3]  For retirees over age 65, payouts for this benefit ranged between $500 and $30,000, depending on the insured's base compensation as an employee and the date of enrollment.  JA.139-41.

While Alcoa's voluntary life insurance program "has been frozen" to new enrollments since 1978, JA.139, Alcoa's CBAs have continued to

---

[3] Alcoa historically provided three different types of optional life insurance: contributory, voluntary, and supplemental.  The only type of optional life insurance implicated by this dispute is voluntary life insurance.  RSA.05 n.5.

promise company-paid life insurance to active employees, *e.g.*, JA.090. And for some time, Alcoa provided these life-insurance benefits to former employees even after the expiration of the CBAs in effect when they retired. As required by ERISA, 29 U.S.C. §§ 1022, 1024; 29 C.F.R. § 2520.104b-2, Alcoa periodically produced and distributed summary plan descriptions ("SPDs") describing this coverage to both active employees and retirees receiving these benefits, *e.g.*, JA.758-824 (2020 Active Employee SPD); JA.647-67 (2013 Retiree Life Insurance SPD).

In December 2019, however, Alcoa exercised its "right to amend or terminate" a welfare-benefits plan "in whole or in part at any time," by eliminating both company-paid and voluntary life insurance for certain existing retirees. JA.687. Significantly, Alcoa did so only for individuals who retired *before* any then-current CBA took effect, i.e., individuals "who retired under a collective bargaining agreement [with] an expiration date prior to December 31, 2019." JA.687.

In response, the unions and several Alcoa retirees (collectively, "Plaintiffs") filed this suit as a putative class action on behalf of two classes. *See* JA.039-64. Both consisted of existing retirees who had been represented by the Plaintiff unions while employed by Alcoa. JA.040.

The Main Class included those for whom Alcoa had terminated company-paid life insurance, while the Subclass was made up of those for whom Alcoa had done the same with respect to voluntary life-insurance. *See* JA.054-55.

Plaintiffs advanced markedly different theories for each of the classes. For the Main Class, Plaintiffs alleged that the *then-current* 2019 CBA covering USW-represented "employees" at facilities in Massena, New York, and Warrick, Indiana required Alcoa to maintain Main Class members' company-paid life insurance benefits for that agreement's duration. JA.049-50; *see* JA.079-102 (2019 Massena/Warrick CBA).[4] For the Subclass, they asserted a vested, "lifetime right" to voluntary life insurance granted by *past* CBAs (all now expired) "which were in effect when Subclass Members retired." *E.g.*, JA.449; JA.059.

In class-certification briefing, *see* D.Ct. ECF No. 101 at 8-9, Plaintiffs revised the Main Class definition to match the population of existing retirees from 26 specified facilities whose *medical* benefits have been covered since 2006 by the Retiree Health Care Letter. *Compare*

---

[4] At the time of this suit, Massena and Warrick were two of only three active Alcoa facilities with employees represented by the USW. JA.679; D.Ct. ECF No. 173-17 at 4.

JA.094-102 (Retiree Health Care Letter), *with* RSA.02-3 (reciting Main Class definition). The district court agreed to the modification, and certified both the Main Class and the Subclass. JA.424-46. At the time, this resulted in a Main Class of approximately 6,082 retirees and a Subclass of approximately 885. D.Ct. ECF No. 173-17 at 3.[5]

The parties subsequently filed and briefed cross-motions for summary judgment on liability. *See generally* D.Ct. ECF Nos. 169, 172. The district court granted Plaintiffs' cross-motion in part, holding that Alcoa violated unambiguous contractual obligations to both classes. RSA.01-35. Regarding the Main Class, the court reasoned that the 2019 Massena/Warrick CBA "unambiguously" promised life insurance benefits to "eligible retirees." RSA.11-19. The court construed that phrase to include individuals who retired *before* the 2019 CBA went into effect, so long as they were described as "eligible" for company-paid life insurance in a Retiree Life Insurance SPD that Alcoa published in 2013. RSA.11-19.[6] For the Subclass, the district court relied on one 1993 SPD,

---

[5] Alcoa unsuccessfully petitioned for permission to appeal the class-certification order. *See Alcoa USA Corp. v. Butch*, No. 22-8017 (7th Cir.).

[6] By the time the district court issued its summary-judgment ruling, the 2019 CBA had expired and a new 2023 CBA had taken its place.

incorporated into one 1993 CBA for six facilities, which stated that, after life-insurance amounts were reduced in certain ways as retirees aged, the reduced amounts would be "continued for life." RSA.19-28. This "for life" language, the court concluded, unambiguously vested a lifetime right to voluntary-life-insurance benefits, including for Subclass members who retired *after* the 1993 CBA expired. RSA.20 n.11; RSA.23 n.13.

The court's summary-judgment ruling occasioned further changes in the classes and parties. First, the court decertified 5,360 retirees— i.e., the vast majority of the class members—because, before certification, they had cashed a check offered by Alcoa in settlement of "any claims for life insurance coverage." RSA.07-08; RSA.28-34.[7] This decertification also led to the later voluntary dismissal (without prejudice) of one of the named plaintiffs who had cashed a settlement check. JA.911. Second, after the district court confirmed that its Subclass summary-judgment ruling applied to retirees from a total of nine facilities, the Subclass

---

Because the relevant terms of the 2023 CBA are substantially the same as those in the 2019 CBA, the district court held that Alcoa was in breach of the 2019 CBA when it terminated these benefits and remained in breach of the 2023 CBA. RSA.11 n.6; RSA.19.

[7] Plaintiffs did not cross-appeal the district court's decertification decision.

definition was amended to conform to that scope.  *See* JA.902-10; JA.912.[8]

After these changes, the summary-judgment rulings disposed of all liability issues on all claims for all remaining parties.  On August 20, 2025, the district court entered final judgment for Plaintiffs, RSA.47, and issued a permanent injunction in a separate order, RSA.44-46.  In that order, it declared that Main Class members are entitled to company-paid retiree life-insurance benefits for the duration of the 2019 CBA and its 2023 replacement, and that Subclass members are entitled to voluntary retiree life-insurance benefits for life.  RSA.44-45.  It then permanently enjoined Alcoa to: (1) "reinstate and maintain" the benefits terminated in 2019; and (2) for class members who died in the interim, "pay the beneficiaries the life insurance benefit they would have received" (plus prejudgment interest compounded monthly).  RSA.45-46.  In a separate opinion, the court addressed the parties' disagreements about the appropriate time periods for compounding interest and the appropriate wording of the injunction as to deceased class members.  RSA.36-43.

---

[8] In 1993 and 1996, Alcoa jointly negotiated multi-facility CBAs with both the USW and another union that the USW later absorbed. JA.450-57.  The district court initially overlooked that other union's parallel CBA and incorporated SPD.  JA.906-08.

Alcoa appealed and moved for a stay of the injunction pending appeal, which the district court denied on November 7, 2025. JA.913-30. Alcoa then sought the same relief from this Court; on December 18, 2025, this Court denied a stay pending appeal but ordered that argument be expedited. ECF No. 18.

## STANDARD OF REVIEW

This Court reviews a "decision on summary judgment *de novo*, viewing all of the facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 600 (7th Cir. 2001); *see also Soarus L.L.C. v. Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018) ("We review questions of contract interpretation *de novo*."). When reviewing cross-motions for summary judgment, this Court "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (internal quotation omitted). In this posture, the denial of Alcoa's cross-motion "has merged into the final judgment," *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997), such that the Court may not only "revers[e the] grant of summary judgment" for Plaintiffs but also "direct

the district court to enter judgment in [Alcoa's] favor," *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 544 (7th Cir. 1996).

## SUMMARY OF ARGUMENT

This case boils down to whether Alcoa's decision to terminate two types of life-insurance benefits for certain existing retirees in 2019 violated the terms of CBAs negotiated between Alcoa and the retirees' former unions. Under the plain terms of those agreements and basic background principles of labor law, it did not. At the least, those agreements are ambiguous such that the district court's entry of summary judgment for Plaintiffs was improper.

**I.** Alcoa acted well within its rights in eliminating company-paid life insurance for the Main Class. Plaintiffs did not argue that the CBAs in effect when the Main Class members retired promised them a continued right to company-paid life insurance. They instead maintain that the 2019 Massena/Warrick CBA guaranteed the Main Class company-paid life insurance for its duration—despite the fact that each member of the Main Class retired *before* that CBA took effect. That position flies in the face of the "general rule" that a CBA "covers only those who retire while it is still in effect." *Stone*, 943 F.3d at 388.

15

No language in the 2019 Massena/Warrick CBA suggests any departure from this general rule as to life-insurance benefits for the Main Class. That CBA's self-defined scope—terms and conditions of employment for "employees" at the Massena and Warrick facilities—definitionally does not include Main Class members, because they were not "employees" when that CBA was negotiated. *Pittsburgh Plate*, 404 U.S. at 164-65, 181 & n.20. And while the 2019 CBA promised life-insurance and other benefits to "eligible retirees," that promise was not addressed to the already-retired Main Class members; rather, following the general rule, it was directed to active workers at Massena and Warrick who would retire while the CBA was in effect.

The 2019 CBA did depart from the general rule in one respect: The incorporated Retiree Health Care Letter guaranteed the Main Class members' *healthcare* benefits for the CBA's duration. But that special side agreement, rooted in decades of healthcare-specific bargaining history, has nothing to do with life insurance. It matters here only to highlight the complete absence of any comparable agreement regarding the life-insurance benefits at issue in this case.

On its face, then, the 2019 CBA unambiguously did not guarantee

life-insurance benefits to Main Class members.  The district court reached the diametrically opposite conclusion—holding that the CBA *unambiguously* promised existing retirees life-insurance benefits—by making a series of grave errors in quick succession.

Lasering in on the CBA' language promising benefits to "eligible retirees," the court initially leapt to the conclusion that "retirees" included *all* Alcoa retirees, no matter when or from what facilities they retired.  This acontextual interpretation required first ignoring, then distorting, bedrock collective-bargaining principles, the CBA's text, and the significance of the Retiree Health Care Letter—the single instance where the CBA actually *did* promise benefits to existing retirees.

After settling on that overbroad definition of "retirees," the district court sought to define "eligible" by referring to a Retiree Life Insurance SPD issued in 2013, which it assumed was "incorporated" in the 2019 CBA such that anyone who was "eligible" under the SPD was promised benefits under the CBA.  In fact, the 2013 SPD is a red herring; the 2019 CBA had no reason to "incorporate" that SPD, absent the question-begging assumption that it covered existing retirees in the first place.  In any event, the SPD's own text reflects the general rule that retirees'

17

benefits are governed by the CBAs under which they retired, not CBAs negotiated after they retired and ceased to be union members.

For these reasons, the only reasonable reading of the 2019 CBA is that it did not promise life-insurance benefits to the Main Class (or other existing retirees). But if any ambiguity existed, the district court should have granted summary judgment to Alcoa based on overwhelming extrinsic evidence showing that the parties did not bargain over existing retirees' life-insurance benefits in the 2019 CBA at issue here. Bargaining over that permissive subject would have required mutual agreement, and no rational factfinder could conclude that Alcoa so agreed.

**II.** Alcoa's termination of voluntary retiree life insurance for the Subclass also did not violate any contractual agreement. For the Subclass, Plaintiffs *did* focus on the CBAs in effect when Subclass members retired. But those CBAs have all expired, and no identified language in them negates the presumption that contractual obligations would "'cease, in the ordinary course, upon termination of the bargaining agreement.'" *Tackett*, 574 U.S. at 441-42.

The district court found that a 1993 CBA unambiguously vested

voluntary life insurance for life, based on language in an incorporated SPD describing schedules by which, as retirees aged, life-insurance amounts and corresponding premiums would reduce until reaching a level "continued for life." The court treated "life" like "a magic word" and inferred vesting as a matter of law from that language alone. *Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553, 557 (7th Cir. 2011).

This was error on multiple levels. First, in context, this SPD language did not mean that Alcoa had to offer the benefits plan in perpetuity; it was simply describing how the benefits worked *assuming* the plan continued in place. Second, even if "continued for life" arguably hinted at vesting, the rest of the SPD made clear that the plan could "end[]" or be "discontinued." Third, even if some ambiguity remained after reading the agreement as a whole, granting *summary judgment* for the Subclass was patent error. The district court invoked a purported "rule" that any "language that *could* be read to provide lifetime benefits" automatically leads to vesting *as a matter of law* unless countered by an *express* "reservation of rights clause." RSA.25-26 (emphasis added). That is not the law: at most, such "suggestive" language creates an "ambiguity" to be resolved at "trial." *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 547

(7th Cir. 2000) ("*Rossetto II*").

Beyond that, the "continued for life" language is present only in CBA-incorporated SPDs from 1993 and 1996; it is undisputedly absent from all later CBAs. The district court talked around this wrinkle by asserting that it was relying on the 1993 agreement alone, even as it inexplicably ruled that Subclass members who retired *after* that agreement expired *also* had lifetime benefits rights. At minimum, the district court's interpretation of the "continued for life" language cannot support summary judgment for any class members who did not retire under CBAs containing that language.

## ARGUMENT

Courts "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Tackett*, 574 U.S. at 435. This means "the parties' intentions control," and "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (internal quotations omitted). Here, application of black-letter labor law and ordinary contract-interpretation

principles shows that Alcoa did not violate any contractual obligation—much less any unambiguous obligation—when it eliminated company-paid and voluntary life insurance for existing retirees in 2019.

## I. Alcoa Did Not Breach the 2019 Massena/Warrick CBA by Terminating Company-Paid Life Insurance for the Main Class.

Usually, when an employer is alleged to have broken a promise to provide welfare benefits, the argument is that the CBAs that covered the former employees when they retired created vested rights surviving those CBAs' expiration.  *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003) (vesting of benefits grants the recipient "an unalterable right to [them]").  Such claims typically look backwards—to the CBA in effect at a former employee's retirement—due to the fundamental labor-law distinction detailed above: while "future retirement benefits of active workers" are a "mandatory subject[] of collective bargaining," *Pittsburgh Plate*, 404 U.S. at 159, 180, the "benefits of already retired employees" are only a permissive subject, *id.* at 164-65, 181 n.20; *supra* pp. 5-6.

For this reason, the "general rule" is that retiree-benefits promises in a CBA "cover[] only those who retire while it is still in effect"—i.e., only

individuals who were "employees" when the CBA was negotiated and became retirees while still covered by the agreement. *Stone*, 943 F.3d at 388. Hence the typical focus, in cases of this sort, is on the last CBAs that covered the plaintiffs as employees—i.e., the CBAs under which they retired.

Here, for the Main Class, Plaintiffs did not bring the usual, backward-looking claim.[9] Instead, they claimed that the 2019 Massena/Warrick CBA—which took effect *after* every Main Class member retired from a much broader range of facilities—nonetheless promised these existing retirees company-paid life-insurance benefits for its duration. The district court found that this unusual theory was not just right, but *unambiguously* right. For the reasons outlined below, that was error—either because the language of the 2019 CBA contains no such promise or because any such language was ambiguous.

## A. The 2019 CBA Unambiguously Did Not Promise Life-Insurance Benefits to Existing Retirees.

By its plain text, the 2019 CBA unambiguously did not promise life-

---

[9] For good reason. None of the CBAs in effect when the Main Class members retired contains any language hinting at vesting of company-paid retiree life insurance.

insurance benefits to existing retirees.  The CBA began by reciting (in the "Recognition" clause) that its "provisions … shall apply *solely* to those *employees* of [Alcoa] at its plants located at Warrick, Indiana; and Massena, New York, for whom the [USW]" was "the exclusive bargaining agency."   JA.087.   The main body of the CBA then exhaustively prescribed terms and conditions for those employees at those plants.  *See* JA.081-84.

Alcoa's life-insurance and other welfare-benefits promises were set forth in Article XXIII ("Group Insurance").  JA.090-93.  That provision reads, in relevant part:

> Medical Benefits, Prescription Drug Benefits, Dental Benefits, and Vision Benefits will be provided to eligible active employees and their eligible dependents.  The Company will provide Sickness and Accident, *Life Insurance*, and Accidental Death and Dismemberment benefits to eligible active employees.   The Company will also provide Medical and Prescription Drug Benefits to eligible retirees, surviving spouses, and their eligible dependents and *Life Insurance* to eligible retirees.

> Separate booklets describing these benefits are incorporated herein and made a part of this Agreement.  Effective January 1, 2020, the agreed upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets.

JA.090 (emphases added).

Again, "[a]s a general rule, an agreement like this one covers only those who retire while it is still in effect." *Stone*, 943 F.3d at 388. And nothing in the CBA suggests that Article XXIII did not adhere to that general rule. Indeed, under the CBA's self-defined scope, Article XXIII "appl[ied] solely to" USW "employees" at the Massena and Warrick plants. JA.087. As a matter of law, that description includes currently-active "employees" at those facilities who would retire during the 2019 CBA—and excludes already-retired former employees from those facilities or others. *Pittsburgh Plate*, 404 U.S. at 172; *Lid Elec.*, 362 F.3d at 943.

There is one relevant asterisk, but it does not help Plaintiffs. As one result of the parties' unique history of bargaining about healthcare, JA.452-58; JA.461; *supra* p. 6, a nine-page Retiree Health Care Letter was attached to the back of the 2019 CBA. JA.094-102. In that Letter, Alcoa *expressly* agreed that, for certain "post-May 31, 1993 retirees," it would "maintain its program of *medical and prescription drug benefits*" "through December 31, 2023." JA.094 (emphasis added). Alcoa further agreed to specific terms and limits regarding those benefits; expressly listed the facilities whose retirees were covered by its promise; and

stipulated that these existing-retiree benefits would be "mandatory subjects of bargaining" in the next negotiations.  JA.100.

The Retiree Health Care Letter demonstrates that these parties know very well how to depart from the general rule in order to secure existing-retiree welfare benefits for the term of a later CBA.  It also demonstrates that—when they have done so—they have done so expressly, in a purpose-built document (notably outside the main body of the CBA), defining clearly what existing-retiree benefits were guaranteed, to whom, for how long, and so on.  JA.094-102.  If these same parties had intended the 2019 CBA to similarly guarantee *life-insurance* benefits to existing retirees, they would have similarly said so.  But they did not.  There is no analogous life-insurance letter promising life-insurance benefits to existing retirees.  As numerous courts have held, that is conclusive evidence that the parties did not agree to bargain over those benefits.[10]

_____

[10] *See Gallo v. Moen Inc.*, 813 F.3d 265, 270 (6th Cir. 2016) (noting "difference in language demands a difference in meaning" where the "authors of the CBAs opted not to say that retiree healthcare benefits were" guaranteed but "explicitly" guaranteed "pension benefits for qualifying retirees"); *Schreiber v. Philips Display Components Co.*, 503 F. App'x 385, 388 (6th Cir. 2012) (inferring lack of intent to guarantee

The only hook for a contrary conclusion would be Article XXIII's provision of life-insurance benefits to "eligible retirees." But the Retiree Health Care Letter makes it even more obvious that Article XXIII does not speak to existing retirees. If it did, that Letter would be redundant; after all, Article XXIII already promises "Medical and Prescription Drug Benefits" to "eligible retirees" (the same term the district court used to infer a promise to provide life insurance to existing retirees). JA.090. This is additional confirmation (if any were needed) that Article XXIII follows the "general rule" that "an agreement like this one covers only those who retire while it is still in effect," i.e., future retirees covered by the CBA. *Stone*, 943 F.3d at 388. Article XXIII cannot reasonably be read so as to "'neutraliz[e]'" the parties' separate, explicit, detailed agreement regarding medical benefits for existing retirees. *Binks Mfg. Co. v. Nat'l Presto Indus.*, 709 F.2d 1109, 1116 (7th Cir. 1983).

In short, the 2019 Massena/Warrick CBA unambiguously did not

---

continued medical benefits for retirees due to "language demonstrat[ing] that the company and the union knew how to draft language guaranteeing continued benefits" but chose not to for medical benefits); *Taracorp, Inc. v. NL Indus.*, 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use … different language to address parallel issues … it is reasonable to infer that they intend this language to mean different things.").

guarantee retiree life-insurance benefits to the Main Class of existing retirees from a much broader range of Alcoa facilities. Consistent with black-letter labor law, Article XXIII exclusively addressed future retirees who were "employees" when the CBA was adopted. Separately, the appended Retiree Health Care Letter guaranteed *healthcare* benefits for existing retirees for the CBA's duration. Nothing in the 2019 CBA, however, did the same for life-insurance benefits, so Alcoa did not violate the CBA when it eliminated those benefits.

## B. The District Court's Contrary Interpretation Is Unreasonable.

### 1. The District Court Ignored Fundamental Labor-Law Principles.

Eschewing that straightforward interpretation, the district court—from the outset—leapt over basic labor-law principles to read Article XXIII as applying to *all* retirees, no matter when or from what facilities they retired. RSA.12-13. The court saw "no indication" of a narrower interpretation, RSA.13, only because it did not even pause to consider the CBA's self-defined scope; the "general rule" that a CBA "covers only those who retire" while it is in effect, *Stone*, 943 F.3d at 388; or the bedrock collective-bargaining principles from which that rule follows.

When the district court later discussed those vital contextual clues,

27

it only confirmed why its own interpretation was a nonstarter. Consider its elaborate, two-page effort to explain how Alcoa's reading of Article XXIII "would violate federal labor law" by "shunt[ing]" workers "outside the scope of the contract" the moment they retired. RSA.17-19. *Of course*, active workers who retire during a CBA remain covered by its benefits clauses for its duration: but that is *because* those workers were "employees" *when the CBA was negotiated*, and "future retirement benefits of active workers" are a mandatory subject. *Pittsburgh Plate*, 404 U.S. at 180. That contrasts with existing retirees—like the Main Class members—who were "not members of the bargaining unit" at all for any CBA negotiated after their retirement. *Id.* at 181 n.20. As explained, that settled law is precisely why the "general rule" is what it is, and why Alcoa's reading here is the natural one.

Similarly, when the district court acknowledged the Recognition clause as a "wrinkle" for its atextual interpretation, it concluded that the clause meant only that the 2019 CBA did not cover *non-union* employees. RSA.16. Again, that misses the point. Certainly, the CBA would not cover non-union employees, but for *precisely* the same reason it did not cover existing retirees: neither group was in the bargaining unit.

*Pittsburgh Plate*, 404 U.S. at 164-65, 181 n.20.

> ### 2. The District Court Misinterpreted the Retiree Health Care Letter.

The district court compounded these errors by drawing precisely the wrong inference from the Retiree Health Care Letter. Specifically, it reasoned that the existence of a *special* provision providing *particular* "benefits to [existing] retirees" necessarily "foreclose[d]" Alcoa's position that Article XXIII's *general* benefits promises "appl[ied] solely to employees" (including future retirees). RSA.16-17. As a matter of logic, that does not follow, and, as a matter of law, it is not a reasonable way to read a contract.

When a contract contains "specific and general … language on the same subject matter," "the specific language" controls that specific subject, but "[t]his does not mean that the general language is knocked out of the contract, never to be seen again." *Bank of Com. v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016). All it means is that "the specific provision" is "deemed to qualify the more general one, that is, to state an exception to it." *USW v. NLRB*, 544 F.3d 841, 859 n.10 (7th Cir. 2008) (internal quotation omitted). In other words, "[w]hen the first clause is general and the later clause more specific, … the later clause may be

given full effect and the earlier limited accordingly." 11 Williston on Contracts § 32:15 (4th ed.).

As applied to the 2019 CBA, this means that the Retiree Health Care Letter stated a departure from the general rule and qualified the Recognition clause only to the extent it promised to provide medical benefits to existing retirees. The Letter does not support the sweeping conclusion that Article XXIII promised *all* welfare benefits it mentioned to both future and existing retirees without distinction. To the contrary, the only appropriate inference from the Retiree Health Care Letter is that the absence of any comparable agreement regarding existing retirees' life-insurance benefits shows that the parties to the 2019 CBA did not bargain over those benefits. *See supra* pp. 24-27.

### 3. The 2013 Retiree Life Insurance SPD Is Irrelevant But Also Reflects the General Rule.

The district court went further astray by turning to a 2013 Life Insurance SPD addressed to then-existing retirees—a most unlikely guarantor of benefits—and equating the population previously described as "eligible" for benefits under that document with "eligible retirees" under the 2019 CBA. To whatever extent this 2013 SPD is relevant, however, its plain language supports Alcoa's reading of the CBA, not the

district court's.

To start, the district court again ignored important legal context. Under ERISA (completely independent of labor law), employers must periodically produce SPDs summarizing any benefits plans they provide (whether or not any CBA requires it), including the plans' "requirements respecting eligibility for participation and benefits."  29 U.S.C. § 1022(b); *id.* § 1024; 29 C.F.R. § 2520.104b-2.  Thus, in 2013, Alcoa prepared an SPD addressed to the then-existing retirees to whom it was providing benefits, and that SPD described the plan's then-existing eligibility requirements.  *See* JA.652.

However, the question here is not whether Main Class members were "eligible" to participate in 2013, under the plan as it was then structured.  *Contra* RSA.13-14.  Rather, this case asks whether *removing* their eligibility in December 2019 violated the recently signed Massena/Warrick CBA.  *See* JA.687; *Tackett*, 574 U.S. at 434-35 (employers "'generally free'" to revise welfare-benefits plans).  There is no reason to think that the 2013 SPD even speaks to that question.  Alcoa created the SPD in 2013 to satisfy its ERISA obligations as to then-eligible retirees—not to define the scope of its future obligations under a

CBA that it would enter six years later.

The district court nonetheless thought it "expressly clear" that the 2013 SPD was "incorporated" into the 2019 CBA, such that "all [its] terms" were therefore "contractual promises under the [CBA]." RSA.13 n.17. But this premise—foundational to the district court's analysis— proves on closer inspection to be a mirage, if not actively question-begging. The 2019 CBA never expressly incorporated the 2013 Retiree Life Insurance SPD. Instead, Article XXIII incorporated unnamed "booklets describing these benefits," i.e., the benefits described in that section. JA.090. If Article XXIII promised benefits to active workers and future retirees, but not existing retirees (which, again, is the general rule), there is no reason why its blanket cross-reference to "booklets describing these benefits" would have included an earlier SPD devoted to the benefits of already-existing retirees. Any such SPD would be immaterial to the active-worker and future-retiree benefits that Alcoa was promising in Article XXIII (i.e., "these benefits").

Thus, the notion that the 2019 CBA "incorporated" the 2013 Retiree Life Insurance SPD depends on (and thus cannot, without circularity, be used to support) the antecedent premise that Article XXIII of the 2019

32

CBA covered existing retirees. That is the key question at issue here (and, as discussed, the answer is no). At bottom, then, the 2013 Retiree Life Insurance SPD is irrelevant to this case, and the district court's extensive reliance on it was fundamentally misguided.

A closer examination of the SPD itself, and how it describes its own connection with Alcoa's CBAs, leads to the same conclusion by a different route. The SPD states that the plan has been "incorporated in and made a part of" numerous "collective bargaining agreements." JA.650; *see* JA.658 (noting "[t]he plan is maintained pursuant to one or more collective bargaining agreements"). In this way, it contrasts with other Alcoa SPDs, geared toward then-active employees, which identified themselves as "part of" a single specific CBA. *E.g.*, JA.112. The reason for this contrast is obvious in light of the general rule that each individual CBA covered active employees, including after their retirement, but did not cover those who retired before it took effect. Active workers at the same facility were always covered by the same CBA. But this SPD was addressed to plan participants who had already retired—at various times, from various facilities, and under various CBAs.

In that context, the SPD also makes clear that—for each *individual*

retiree—the relevant CBA is the one that last "covered" that individual "as an active employee" at retirement. *See* JA.652 ("You are eligible for company-provided life insurance if you *were* [1] an hourly employee who retired on or after June 1, 1993 … and are covered under the Alcoa Retirement Plan, Plan II, and [2] *covered by a collective bargaining agreement that contains this plan as part of the agreement.*" (emphasis added)); JA.657 ("You are eligible … if you are a retiree who, *as an active employee, was covered by a collective bargaining agreement* between Alcoa and [the participating] unions listed on the following page." (emphasis added)). That too perfectly tracks the general rule. Many CBAs had "contain[ed] th[e] plan as part of the agreement," and each CBA covered those who retired ("as … active employee[s]") while it was in effect—not those who retired under other CBAs. *See Stone*, 943 F.3d at 388.

In sum, "the 2013 Retiree Life SPD"—on its own terms—"is incorporated into whatever CBA covered each retiree when they retired," which for Main Class members is definitionally "***not*** the 2019 CBA" because they "all retired before [that] CBA went into effect." JA.899. Insofar as the district court believed otherwise (or that Alcoa "raise[d] no

34

dispute in the papers" about this issue), it was simply wrong.  *See* RSA.13-14 & n.7; JA.683-84, 899 (Alcoa explaining this below).  The 2013 SPD takes the general rule for granted and thus, even if it were "incorporated" into the 2019 CBA in some sense, lends no support to any interpretation of the CBA discarding that rule.[11]

### C. At Minimum, the 2019 CBA Is Ambiguous and Alcoa Was Entitled to Summary Judgment Based on Extrinsic Evidence.

Even if the Court concludes that the district court articulated a *reasonable* reading of the 2019 CBA—and Alcoa respectfully submits that it should not—then the Court should deem the contract ambiguous

---

[11] The district court also reasoned that the 2013 SPD (as supposedly incorporated in the 2019 CBA) "must provide retirement benefits" to existing retirees, because otherwise it would be "duplicative" of a separate SPD, issued in 2020, which described then-active employees' benefits and also discussed would happen to those benefits when they retired.  RSA.14-15; *see* JA.758-824 (2020 Active Employee SPD).  Naturally, recognizing that the 2019 CBA did not "incorporate" the 2013 Retiree Life Insurance SPD obviates any such concern.

That said, even putting aside the "incorporation" issue, there is no substance to this concern.  The two SPDs were written at different times, addressed different target audiences, and told each audience what they needed to know about their benefits.  To the extent of any overlap—which would only be for employees who retired during the term of the 2019 CBA—there is nothing superfluous, or otherwise troublesome, about one summary document describing retiree benefits from a pre-retirement perspective and another doing so from a post-retirement perspective.

because Alcoa's reading is also *at least* reasonable. *Reese*, 583 U.S. at 139 (a contract is ambiguous if "it remains reasonably susceptible to at least two reasonable but conflicting meanings" after applying established interpretive rules (cleaned up)). As shown, Alcoa's reading conforms to black-letter labor law; explains the different, non-overlapping roles of Article XXIII and the Retiree Health Care Letter; and is fully consistent with the 2013 Retiree Life Insurance SPD (to whatever extent that document matters). By contrast, the district court divined—from the mere inclusion of the word "retirees"—that the 2019 CBA made a dramatic departure from the default scope of collective bargaining over retiree benefits, rendering the Retiree Health Care Letter redundant and forcing an artificially cramped construction of the 2019 CBA's Recognition clause. There is no world in which the latter is a reasonable interpretation but the former is not.

At minimum, then, the district court erred by ruling that the 2019 CBA "*unambiguously* promises life insurance benefits" to the Main Class and granting summary judgment for Plaintiffs. RSA.19 (emphasis added). Because Alcoa's reading is at least reasonable, the district court should have denied Plaintiffs' motion for summary judgment and either:

(1) determined the meaning of the 2019 CBA based on extrinsic evidence; or (2) set the issue for trial if the extrinsic evidence was inconclusive. *See Reese*, 583 U.S. at 139 ("[W]hen a contract is ambiguous, courts can consult extrinsic evidence to determine the parties' intentions."); *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 956 (7th Cir. 2006) ("[I]f for any … reason the meaning of the contract remains uncertain even after the extrinsic evidence is presented, there must be a trial to determine the contract's meaning.").

Here, uncontradicted documentary and testimonial evidence abundantly proves that the parties did not bargain over existing retirees' life-insurance benefits in the 2019 CBA. While the district court did not consider this extrinsic evidence, the record is sufficiently clear that this Court may do so in the first instance, if it so chooses.

To start, extrinsic evidence from sources on both sides of this dispute overwhelmingly confirms the parties' shared understanding (until this case) that retirees' life-insurance benefits were governed by the CBAs under which they retired, in line with the general rule. In 2018, before this dispute began, a local union representative asked USW employee Cary Burnell whether the life insurance of a deceased retiree

(who retired in 2003) was governed by the current agreement or the agreement in place "when she retired." JA.827. Mr. Burnell has worked for the USW since 1988; was the lead bargainer for benefits in negotiations with Alcoa in 2010, 2014, and part of 2019; and was described by a fellow USW official as the union's "benefits expert." JA.690-97; JA.705. Burnell responded that "[r]etiree life insurance is determined by the agreement in effect at the time the employee retired." JA.827. Burnell testified to the same effect in his 2022 deposition: retirees' "benefits were determined by the collective bargaining agreement[] [and] summary plan description in effect at the time of retirement." JA.698.

Alcoa representatives attested to the same understanding. Scott Kovaloski, who worked for Alcoa as a benefits consultant from 2004 to 2016 and personally drafted the 2013 Retiree Life Insurance SPD, testified that existing retirees' life-insurance benefits were "never negotiated" in any of the parties' CBAs, JA.728-29, and that, when the 2013 SPD made reference to CBAs, it was pointing to "the various [CBAs] that the employees had when they were members of the Union," JA.725-26. Mike McAdoo, who worked in Alcoa's labor-relations department and

participated in decades of collective bargaining with the USW, similarly testified that Alcoa negotiated retiree life-insurance benefits for employees only, and that existing retirees' life-insurance benefits "would not be something that would be classically part of any of our negotiations." JA.746-57.

The extrinsic evidence also directly shows that, in negotiating the specific 2019 Massena/Warrick CBA at issue here, Alcoa and the USW did not bargain about the permissive subject of existing retirees' life-insurance benefits. Alcoa's lead negotiator in 2019, Nick Storm, testified that Alcoa "didn't negotiate on behalf of retirees … for life insurance" because "[i]t wasn't a mandatory subject of bargaining." JA.741-43. There is no contrary evidence. Indeed, while notes from the 2019 negotiations show that the parties actively negotiated retiree life-insurance benefits for *future* retirees, *see, e.g.*, JA.702-04; D.Ct. ECF Nos. 173-44, 173-45, 173-46, it is undisputed that they did not exchange any bargaining proposals about life-insurance benefits for *existing* retirees. *See* JA.678; JA.829. Mike Millsap, who took over as the lead benefits bargainer for the USW from Mr. Burnell in 2019, confirmed that Alcoa "didn't make any proposals during the 2019 negotiations with regard to

life insurance for existing retirees." JA.704. Perhaps even more telling, USW President Tom Conway, the union's lead negotiator in 2019, acknowledged that the USW was "negotiating on behalf of active employees" in 2019—but he admittedly could not "recall" any "negotiating on behalf of existing retirees other than" about the Retiree Health Care Letter (which, he also agreed, is "limited to health insurance"). JA.709-12.

In sum, the record is overwhelmingly clear that—consistent with the general labor-law rule—the bargaining parties here have long understood retiree life-insurance benefits to be covered by the CBAs that were in effect when employees retired, and that their collective-bargaining negotiations have never encompassed existing retirees' life-insurance benefits. Of particular relevance, when the parties negotiated the specific 2019 CBA at issue here, neither side broached existing retirees' life-insurance benefits as a possible topic of negotiation. Not even the union president and lead negotiator claims to recall that subject ever being discussed at the bargaining table. To put it bluntly, the idea that the 2019 CBA promised life-insurance benefits to existing retirees appears to have its origins with this litigation.

40

But it is not necessary to go that far to conclude that Alcoa was entitled to summary judgment on the extrinsic evidence. It is sufficient that, whatever the union may have believed or assumed about the status of existing retirees' life-insurance benefits, there is not a shred of evidence that *Alcoa* agreed to negotiate over those benefits in 2019. Because existing retirees' life-insurance benefits were only a permissive subject, any bargaining over that subject would have required Alcoa's agreement to include it within the scope of negotiations for the 2019 CBA. *See, e.g.*, *Rossetto I*, 128 F.3d at 540 ("a union may bargain for retirees if the employer agrees"); *Merk v. Jewel Cos.*, 848 F.2d 761, 766 (7th Cir. 1988) ("unions may bargain on behalf of retirees if the employer is willing").[12] No rational factfinder could conclude that Alcoa made any such agreement in 2019, because there is no evidence of that. That is dispositive.

---

[12] This would be no less true if (counterfactually) there were evidence that the USW had represented existing retirees with respect to life-insurance benefits in any negotiations prior to 2019. Parties are "not … obliged to negotiate in behalf of retirees again" after doing so in the past, *Pittsburgh Plate*, 404 U.S. at 181-82, and the parties here have never made existing retirees' life-insurance benefits a mandatory bargaining subject.

## II.  Alcoa Did Not Violate Any Vested Rights of Subclass Members by Terminating Voluntary Life Insurance.

For the Subclass and voluntary life insurance, Plaintiffs take a different tack, bringing a traditional vesting claim that the CBAs in effect when the Subclass members retired entitled them to voluntary-life-insurance benefits for life.  The district court agreed (after a fashion) by holding that language in one 1993 SPD, incorporated into one 1993 Alcoa-USW CBA, showed that Alcoa unambiguously "agreed to provide … voluntary life insurance benefits to the sub-class [members] for the rest of [their] lives."  RSA.21.

There are two fundamental problems with that ruling.  First, the cited 1993 SPD language did not vest lifetime rights to voluntary-life-insurance benefits, or at minimum did not do so unambiguously.  Second, in any event, that 1993 language cannot support summary judgment on a Subclass-wide basis, because it is *undisputedly absent* from all but one of the parties' later CBAs.  JA.466-67; *see* D.Ct. ECF Nos. 102-30, 102-31, 102-32, 102-33.

### A.  The District Court Misread the 1993 CBA.

#### 1.  The 1993 CBA Unambiguously Did Not Vest Lifetime Rights to Voluntary Life Insurance.

Beginning with the only contract the district court analyzed, the

1993 CBA unambiguously did not vest any lifetime rights to voluntary-life-insurance benefits.  Under "ordinary principles of contract law," CBA obligations presumptively "'cease … upon termination of the bargaining agreement.'"  *Tackett*, 574 U.S. at 435, 441-42.  As such, "'an employer's commitment to vest [welfare] benefits is not to be inferred lightly,'" *id.* at 441, and "a court should cast a cold eye on contentions that a contract with a fixed term actually created a perpetual obligation," *Bidlack*, 993 F.2d at 606; *see also Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir. 2005) ("[B]ecause employers are not legally required to vest benefits, the intention to vest must be found in 'clear and express language' in plan documents." (quoting *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632 (7th Cir. 2004))).

Here, the 1993 CBA contained a general durational clause, pursuant to which it terminated by 1996.  JA.678; JA.829; *see also* JA.452-54 (describing the 1993 and subsequent 1996 CBA negotiations).  Because a CBA's "general durational clause" presumptively "applie[s] to all benefits," the 1993 CBA promised voluntary retiree life insurance only for the limited duration of that CBA, "unless the agreement specified otherwise."  *Reese*, 583 U.S. at 140.

Of course, the district court purported to find language "specif[ying] otherwise" in an SPD incorporated into the 1993 CBA. The relevant text appears in a passage describing "how … coverage works" after "you're retired and age 65 or over." JA.141. It explains that, for those who enrolled in voluntary life insurance before September 1, 1965:

> Life insurance is reduced at age 65 by 10%, and reduced 10% each year thereafter until it reaches 50% of the amount in effect before age 65. The reduced amounts are continued for life;
> …
> Your payments are based on $.60 per thousand per month for the reduced amount of coverage in effect.

JA.141. A parallel provision addresses those who enrolled after September 1, 1965:

> Life insurance is reduced at age 65 by 75%. The reduced amounts are continued for life.
> …
> Your payments are based on $.60 per thousand per month for the reduced amount of insurance in effect.

JA.141. To the district court, this passage—specifically, the words "continued for life"—made the conclusion of lifetime vesting "inexorabl[e]." RSA.21.

In fact, on its face, this language is far too weak a basis to infer lifetime vesting. In context and as a whole, these provisions express no

44

intent to guarantee *the plan* for life or to restrain Alcoa from exercising its rights to modify or terminate the plan. *See Tackett*, 574 U.S. at 434-45. Instead, they merely describe terms of the plan itself—schedules by which, as retirees age, life-insurance amounts and corresponding premiums are reduced, until a point where the reductions level off and they "continue[] for life" at that level. That does not speak to whether the plan must continue to exist; it merely explains what will happen (i.e., "how … coverage" will "work[]") *assuming the plan remains in place. See Jones v. Am. Gen. Life & Accident Ins. Co.*, 370 F.3d 1065, 1070-71 (11th Cir. 2004) (language stating, "'[i]f you retire … you get to keep … your Group Insurance'" and "'[you] will continue to be covered after [you] reach age 65'" "merely describes the period of time during which [retirees] were eligible to receive the group life benefit, so long as the Plan continued to exist").

If the parties had intended "to create lifetime promises" in a time-limited CBA, this was not the way to do it. *Tackett*, 574 U.S. at 441. That intent would have been expressed "'in clear and express language,'" *id.*, not buried within provisions focused on age-related reductions to insurance amounts and premiums over time. Properly read and weighed,

45

the above language is not even "suggestive" of vesting. *Rossetto II*, 217 F.3d at 547.

At all events, that language certainly is not the unambiguous silver bullet the district court took it for. In the benefits context, "'lifetime'" and "'life'" are not "magic word[s]." *Sullivan*, 649 F.3d at 557. "What such … word[s] mean[] depends on context," *id.*, and they often "may be construed as 'good for life unless revoked or modified,'" *Vallone*, 375 F.3d at 633; *see United Mine Workers v. Brushy Creek Coal Co.*, 505 F.3d 764, 767 (7th Cir. 2007) ("Terminable benefits for life are benefits that go on regardless of the age of the worker or how long ago he retired, but that cease if the plan conferring those benefits ends."). Here, the above SPD passages are (at minimum) "'reasonably susceptible to'" such a construction. *Reese*, 583 U.S. at 139. Reading "[t]he reduced amounts are continued for life" to mean only that, after the age-based reductions described in the preceding sentences, the reduced amounts will "go on regardless of … age" so long as the plan continues, is perfectly sensible in context. *Brushy Creek*, 505 F.3d at 767. Thus, if "continued for life" even hints at vesting, the existence of another plausible reading renders it at most "merely suggestive," not dispositive. *Rossetto II*, 217 F.3d at

547.

Moreover, any such suggestion is "negated by the agreement read as a whole," *id.*, because other language in the 1993 SPD "reserve[s] rights that are inconsistent with vesting," *Stone*, 943 F.3d at 387. Specifically, the SPD states that, "if … the plan is discontinued," or "[t]he plan ends," "you may convert your … optional coverage[] to a personal policy." JA.144. If benefits were guaranteed for life, the SPD would not have told retirees that the plan might "end[]" or be "discontinued" and that they could then convert to a personal policy. *See Int'l Union of United Auto., Aerospace & Agric. Implement Workers v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703-04 (7th Cir. 2003) (holding that an agreement did not vest benefits despite a "lifetime benefits clause" because it was tempered by "plan termination and reservation of rights clauses"); *Grove v. Johnson Controls, Inc.*, 694 F. App'x 864, 870 (3d Cir. 2017) (holding that retiree booklets "includ[ing] provisions discussing what would happen 'when their group coverage terminates'" "indicat[ed] that [defendant] retained the right to terminate their plans," no different from booklets featuring "explicit reservation of rights clauses" (internal alterations omitted)). That scenario is incompatible with a vested,

47

lifetime, "unalterable right" to plan benefits. *Hackett*, 315 F.3d at 774; *see also Fulghum v. Embarq Corp.*, 785 F.3d 395, 407 (10th Cir. 2015) (similar "conversion language" "unambiguously contemplate[d] termination of the plans" and thus "demonstrate[d] Defendants had the power to terminate" benefits).

The district court, based on its already-settled conviction that the plan could not "end" as to voluntary life insurance, insisted that this conversion clause must apply exclusively to other "optional coverages" in the 1993 SPD. RSA.26. But the clause expressly applies to "*any* of the optional coverages"—which includes voluntary life insurance. JA.144 (emphasis added); *see* JA.132. When the plain text of one contract term creates problems for one interpretation of another, arguably ambiguous provision, that is a reason to interpret the latter term differently, not to ignore or rewrite the first provision.

The district court tried to buttress its cramped reading of the conversion clause by noting that "supplemental" life insurance—a second layer of optional coverage that could be purchased on top of voluntary insurance—automatically ended at certain ages (70 for active workers, 65 for retirees). *See* RSA.26; JA.143. But a plan participant aging out of

48

a given coverage, under conditions specified *in* the plan, is not the same as the plan *itself* "end[ing]" or being "discontinued." *See, e.g.*, JA.132; JA.144. The district court improperly conflated those two distinct concepts. *See* RSA.22-23.

If anything, the different durations of voluntary and supplemental coverage only bolster Alcoa's reading of "continued for life." The SPD used similar "continue" language when describing both coverages' durations. *Compare* JA.141 ("[Voluntary] [l]ife insurance is reduced," then "[t]he reduced amounts are continued for life."), *with* JA.143 ("If you are age 65 or under, your [supplemental] life insurance continues in full to age 65 then ends."). Supplemental coverage continued only up to a certain age; by contrast, after reaching the final reduced amount, voluntary coverage continued for life, i.e., would "go on regardless of the [insured's] age" "until they die[d]." *Brushy Creek*, 505 F.3d at 767. When the SPD described how long each coverage would normally continue, it was assuming—rather than promising—that the plan would remain "in effect"; of course, the benefits would "cease if the plan … ende[d]." *Id.* Especially given the SPD's parallel language across coverages, "continued for life" cannot be read to mean anything more.

49

**2.    At    Minimum,    the    1993    CBA    Did    Not Unambiguously Vest Lifetime Benefits.**

At the very least, the district court erred by ruling that "continued for life" singlehandedly rendered vesting *unambiguous*.  Again, words like "'life'" or "'lifetime'" are not "magic."  *Sullivan*, 649 F.3d at 557. Sometimes, as this Court's cases reflect, they can create *ambiguity* that requires a trial.  *See, e.g.*, *Bland*, 401 F.3d at 780 (reversing summary judgment, finding "lifetime" language ambiguous on vesting); *Bidlack*, 993 F.2d at 608 (finding "a promise to retired employees that they … will be covered for the rest of their lives" ambiguous on vesting); *see also Vallone*, 375 F.3d at 637 (explaining that language describing "'lifetime' benefits would have created an ambiguity allowing [the plaintiffs] a trial and allowing us to examine extrinsic evidence," except that "'t[he] suggest[ion] … of lifetime benefits … [was] negated by the agreement read as a whole'").  But no circuit has "suggested that promising to continue benefits until death, or some other future event, is absolute or always vesting language." *Xerox Corp. v. Local 14A, Rochester Reg'l Joint Bd., Xerographic Div. Workers United*, 128 F.4th 93, 105 (2d Cir. 2025). Thus, if the district court was right that "this case falls comfortably within the *Bland*-type," RSA.26, it should have found the 1993 CBA

50

ambiguous and denied summary judgment for the Subclass.  *See Bland*,
401 F.3d at 780.

The district court held otherwise only by turning the law upside
down.  As it reasoned, once "some language" (apparently any language)
"that suggests lifetime benefits" has been located, only an express
"reservation of rights clause" can stop the benefits from vesting *as a
matter of law*.  RSA.24-26; *see* JA.924.

This Court's cases do not support that magic-words rule.  *See, e.g.*,
*Rosetto II*, 217 F.3d at 547 (language "merely suggestive" of vesting, if
"the suggestion is not negated by the agreement read as a whole," raises
an issue for "trial," not summary judgment).  That is unsurprising,
because the rule makes no sense.  For one thing, a contract must always
be "read as a whole," *id.*, and "plan termination clauses" also conflict with
vesting, *Rockford Powertrain*, 350 F.3d at 703; *accord Grove*, 694 F. App'x
at 870.  More fundamentally, "lifetime benefits" constructions are
disfavored, even for facially "ambiguous writings."  *Tackett*, 574 U.S. at
441-42.  Demanding an express reservation-of-rights clause to stop a
mere "suggestion" of vesting from leading directly to *unambiguous*
vesting at summary judgment—in effect, a clear-statement rule favoring

vesting—is incompatible with the well-established principle that vesting of welfare benefits is the exception, not the rule. *See, e.g.*, *Tackett*, 574 U.S. at 441; *Bidlack*, 993 F.2d at 606; *cf. Jones v. Hendrix*, 599 U.S. 465, 491 (2023) (rejecting argument for a clear-statement rule in a statutory-interpretation case because "[i]nsisting on a heightened standard of clarity in this context would … mean adopting a presumption against finality as a substantive value," which the Court "decline[d] to do").

"Shorn of" the district court's erroneous rule, "this case is straightforward." *Reese*, 583 U.S. at 140. The phrase "continued for life"—as used in the insurance-reduction schedules on which the district court relied—was far from "'clear and express'" vesting language. *Tackett*, 574 U.S. at 441; *see Crown Cork & Seal Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 501 F.3d 912, 918 (8th Cir. 2007) (statement that "[y]our personal coverage continues until your death" was "not explicit vesting language"). If it arguably raised a "suggestion" of vesting, then the suggestion was "negated by the agreement read as a whole," *Rossetto II*, 217 F.3d at 547, because the language also easily could "be construed as 'good for life unless revoked or modified,'" *Vallone*, 375 F.3d at 633, and no other construction would "resolve the tension"

between vesting and the SPD's "plan termination" clauses, *Rockford Powertrain*, 350 F.3d at 703. Even if summary judgment does not go to Alcoa—though it should—summary judgment for the Subclass is untenable.

### B. At Minimum, the Absence of the "Continued for Life" Language From Post-1996 CBAs Precludes Summary Judgment for Subclass Members Who Retired Under Such CBAs.

Separately, there is an unbridged chasm between the district court's contractual analysis and the scope of its summary-judgment ruling. On one hand, the district court analyzed only the 1993 CBA—which it considered "all that is necessary to resolve the sub-class," RSA.23 n.13—and found that it provided for vesting solely based on its "continued for life" language. On the other hand, the district court extended its ruling to "any sub-class members [who] retired *after* the 1993 [CBA] expired," RSA.20 n.11 (emphasis added), even though, as noted, the "for life" language is present only in the 1993 CBA and its immediate 1996 successor—it is entirely absent from the parties' CBAs from 2001 onward. JA.466-67; *see* D.Ct. ECF Nos. 102-30, 102-31, 102-32, 102-33.

Plaintiffs' solution to this problem, which the district court later

echoed, was to insist that the "continued for life" provision "carried forward" from the 1993 and 1996 CBAs to become "an implied term" in all subsequent CBAs, ostensibly because "no change" was specifically "negotiated" in regard to that term.  JA.927; *see* JA.466-67.  But that "conflict[s] with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties." *Tackett*, 574 U.S. at 440.  As *Bidlack* explained in detail, a court cannot "interpolate" language vesting welfare benefits into "a contract that is plausibly complete without them," because doing so "would unjustifiably deprive the parties of the limitation of liabilities that is implicit in the negotiation of a written contract."  993 F.2d at 607-08.  And here, the post-1996 CBAs are complete on their face as to duration, because a "general durational clause" presumptively "appl[ies] to all benefits." *Reese*, 583 U.S. at 140.  Therefore, in construing the post-1996 CBAs, "courts would simply apply the general durational clause," *id.*, and that would be the end of the analysis.

Regardless, when granting summary judgment, the district court did not even rely on that theory.  The summary-judgment order did not reason that, in addition to the 1993 CBA "*explicitly*" providing for vesting,

54

later CBAs *implicitly* did the same. *See* RSA.19-28. Instead, over two footnotes, the summary-judgment order sketched a much more convoluted theory of how the 1993 CBA alone led to unambiguous "lifetime benefits" for all "sub-class members"—involving, inter alia, the fact that voluntary-life-insurance enrollment was "frozen since 1978," plus a purported "conce[ssion]" by Alcoa that it "never again bargained" to "remov[e]" "the vested benefits" purportedly "promised" in 1993. RSA.20 n.11; RSA.23 n.13.

That verbiage is deeply confused. First, as discussed, Alcoa never even promised lifetime benefits to Subclass members who retired during the 1993 CBA. Second, Alcoa did not concede that it "never again bargained over retiree life insurance"; it argued that it bargained over retiree life insurance for *future* retirees, but not *current* retirees, *see* RSA.23 n.13, consistent with black-letter labor law, *supra* pp. 5-6. Third, to the extent that any benefits "vested" under the 1993 CBA (for those who retired during its term), no later bargaining could have "remov[ed]" them. *See Bland*, 401 F.3d at 784 ("Upon vesting, benefits become forever unalterable[.]"). Conversely, for employees who did not "retire while [the 1993 CBA was] still in effect," *Stone*, 943 F.3d 388, it would not have

vested the benefits in the first place.

In the end, there is no coherent justification for extending the district court's reasoning to Subclass members who retired under the post-1996 CBAs in which the only language claimed to support vesting in *any* agreement is concededly absent. If nothing else, the district court's summary-judgment order should be vacated to the extent that it covers such Subclass members.

## CONCLUSION

For the reasons discussed above, this Court should reverse the judgment below and direct entry of judgment for Alcoa on all claims. At minimum, because the obligations Alcoa was found to have breached as a matter of law were anything but unambiguous, it should vacate the grant of summary judgment for Plaintiffs as to liability, vacate the resulting judgment and permanent injunction, and remand this case for appropriate proceedings.

Dated: December 19, 2025       Respectfully submitted,

/s/ *David T. Raimer*

David T. Raimer
   *Counsel of Record*
Bijan M. Aboutorabi
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939
dtraimer@jonesday.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with (1) the type-volume limitations of Circuit Rule 32(c) because, as calculated by the word-count feature of Microsoft Word for Microsoft 365, it contains 11,227 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f); and (2) the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook Std font.

Dated: December 19, 2025

Respectfully submitted,

*/s/ David T. Raimer*
David T. Raimer

*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

In accordance with Circuit Rule 25(a), I certify that on December 19, 2025, I electronically filed the foregoing Brief and Required Short Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. I further certify that all counsel of record are users of the appellate CM/ECF system and will be served by that system.

Dated: December 19, 2025                Respectfully submitted,

                                        */s/ David T. Raimer*
                                        David T. Raimer

                                        *Counsel for Defendants-Appellants*

# REQUIRED SHORT APPENDIX

## CIRCUIT RULE 30(d) CERTIFICATION

In accordance with Circuit Rule 30(d), I certify that all materials required by Circuit Rules 30(a) and (b) are included in the Required Short Appendix and the Joint Appendix.

Dated: December 19, 2025      Respectfully submitted,

*/s/ David T. Raimer*
David T. Raimer

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS

**Page**

Entry on Parties' Motions for Summary Judgment and
Decertifying Class, D.Ct. ECF No. 192 (Mar. 25, 2024) ...........RSA.01

Entry Granting Plaintiffs' Motion for Entry of Order of Final
Judgment, D.Ct. ECF No. 231 (Aug. 20, 2025) .........................RSA.36

Order Granting Permanent Injunction, D.Ct. ECF No. 232
(Aug. 20, 2025) .........................................................................RSA.44

Final Judgment, D.Ct. ECF No. 233 (Aug. 20, 2025) ...................RSA.47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| EDMOND M. BUTCH, on behalf of himself and all other persons similarly situated, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )     No. 3:19-cv-00258-RLY-CSW |
| | ) |
| ALCOA USA CORP., *et al.*, | ) ) |
| Defendants. | ) ) |

**ENTRY ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND
DECERTIFYING CLASS**

On December 31, 2019, Defendant Alcoa USA Corporation[1] unilaterally

terminated the life insurance benefits it provided to its retirees.  Plaintiffs are a group of

former Alcoa employees who are now retired and the Unions[2] who represented them in

collective bargaining with Alcoa.  The Plaintiff retirees retired from Alcoa plants after the

1993 CBA took effect.  They fall into two groups which have been certified as classes:

one of retirees who received life insurance paid for by Alcoa (the main class) and another

of those who participated in a voluntary life insurance program where Alcoa gave those

retirees the opportunity to purchase additional life insurance (the sub-class).  Both classes

of retirees contend that Alcoa's removal of life insurance benefits violated their

---

[1] Defendants also include two ERISA plans sponsored and administered by Alcoa for the retiree
plaintiffs—the Retirees Group benefit Plan for Certain Hourly Employees of Alcoa USA Corp.
and the Optional Life Insurance Plan.  For ease of reference, the court refers to the three
defendants as "Alcoa."
[2] Two national Unions that engaged in bargaining with Alcoa for the collective bargaining
agreements at issue in this case are also plaintiffs.

1

**RSA.01**

contractual rights established through collective bargaining in violation of Section 301 of

the Labor management Relations Act ("MLRA"), 29 U.S.C. § 185(a) (Counts I and III)

and Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1132(a) (Counts II and IV).

Plaintiffs moved for class certification.  The court granted that motion and

certified the following main class of retirees:

All retirees of Alcoa USA Corp., its predecessors, or affiliated companies,
(1) Who were represented by the United Steel, Paper and Forestry,
Rubber, Manufacturing, Energy, Allied Industrial and Service
Workers International Union, AFL-CIO/CLC ("USW") or its
predecessors while they were employees (or in the case of the
Wenatchee, Washington facility were represented by the
Aluminum Trades Council of Wenatchee, Washington AFL-CIO
("ATC") or its predecessors while they were employees) and who
retired from the following facilities on or after June 1, 1993:
- Alcoa, Tennessee (GPP Portion, including Tapoco, North
Carolina)
- Badin, North Carolina
- Baton Rogue, Louisiana
- Bauxite, Arkansas
- Frederick, Maryland (retirees on or after October 2, 2001)
- Gum Springs, Arkansas
- Hot Springs, Arkansas
- Lake Charles, Louisiana
- Louisville, Kentucky (Plant 1)
- Massena, New York (East Plant and West Plant, GPP
Portion)
- Mobile, Alabama
- Point Comfort, Texas
- Richmond, Virginia
- Rockdale, Texas
- Troutdale, Washington
- Warrick, Indiana
- Wenatchee, Washington
- Corpus Christi, Texas (Sherwin)
- Listerhill, Alabama (Reduction Plant)
- Longview, Washington

**RSA.02**

- Louisville, Kentucky (Plant 3)
- Torrance, California (Extrusions Plant)
- Fort Meade, Florida (retirees on or after April 20, 1994)
- Bellwood, Virginia (Extrusions Plant) (retirees on or after October 1, 1993)
- Richmond, Indiana (retirees on or after October 1, 1993)

(2) Who were eligible for company-paid life insurance upon their retirement; and,

(3) As to whom Alcoa USA Corp. has terminated company-paid retiree life insurance.

The court also certified the following subclass:

All retirees of Alcoa USA Corp., its predecessors, or affiliated companies,

(1) Who were represented by the USW or its predecessors while they were employees (or in the case of the Wenatchee, Washington facility were represented by the ATC or its predecessors while they were employees);

(2) Who upon their retirement were eligible for one or more forms of "Optional" life insurance, including voluntary, additional voluntary, and supplemental life insurance; and,

(3) As to whom Alcoa USA Corp. has terminated this retiree life insurance.

On July 14, 2023, Plaintiffs filed a motion for summary judgment on Counts I–IV of the Amended Class Action Complaint and on Alcoa's Thirteenth Affirmative Defense, which alleges the retirees waived their claim for life insurance benefits by accepting a cash payment from Alcoa. About a month later, Defendants filed a cross-motion for summary judgment on the same issues. The court heard oral argument on those motions on January 25, 2024. For the reasons that follow, the court now **GRANTS in part** and **DENIES in part** Plaintiffs' motion for summary judgment as to liability[3] and **DENIES** Defendants' cross-motion for summary judgment.

---

[3] Plaintiffs bring a claim for damages. (*See* Filing No. 44, Am. Compl. ¶ E). However, the parties do not discuss the appropriate amount of damages, nor is it obvious from the record

**RSA.03**

## I.       Background

Alcoa bargains with collective groups of employees who have formed unions.
(*See, e.g.*, Filing No. 173-31, 1993 Alcoa-USW CBA).  These negotiations have resulted
in collective bargaining agreements ("CBAs") since at least 1993, which is the earliest
relevant date for the purposes of this case.  (*Id.*).  Each of these agreements contain
promises by Alcoa to provide its employees with life insurance benefits during their
retirements.  (*Id.* at 61 ("The Company will also provide Life Coverage and Surviving
Spouse Coverage for such retired employees.")).[4]  The exact scope of these promises is
the issue in this case.

The collective bargaining agreements at issue incorporate as contractual terms a
plethora of summary plan descriptions (or "SPDs").  (*See id.* at 61 ("Separate Booklets
describing these benefits are incorporated herein and made a part of this Agreement.");
*see also* Filing No. 173-18, 2019 Warrick & Massena CBA at 61 (same)).  These SPDs
describe both the benefits and eligibility requirements of certain programs, including the
life insurance programs at issue in this case.  (Filing No. 173-41, 2013 Retiree Life
Insurance SPD at 6, 8 (describing "Who Is Eligible" and describing benefit payments that
pay out under "company-provided life insurance")).  So for example, the 2013 Retiree
Life Insurance SPD explained:

> You are eligible for company-provided life
> insurance if you were: an hourly employee who

---

presented.  Accordingly, the court construes the motion for summary judgment as a motion for
summary judgment as to liability.
[4] Throughout this Entry, the court cites to the PDF page number of plan documents and
collective bargaining agreements.

**RSA.04**

> retired on or after June 1, 1993 . . . except for a
> deferred vested retirement, and you are covered
> under the Alcoa Retirement Plan, Plan II; and
> covered by a collective bargaining agreement
> that contains this plan as part of the agreement.

(*Id.* at 5). It also provided a schedule of life insurance coverages for retirees who retired

between 1993 and 1996, 1996 and 2002, 2002 and 2006, 2006 and 2011, and after 2011.

(*Id.* at 8).

The 1993 Life Insurance SPD described a quadripartite division of life insurance.

(*See* Filing No. 90-5, 1993 Life Insurance SPD). The first plan was "Company-Provided

Life Insurance," which provided full-time employees with the full cost of life insurance

coverage. (*Id.* at 17). The remaining three programs were optional and allowed

employees to supplement their company-paid coverage.[5] (*Id.* at 23). The first of these

was contributory life insurance, which allowed employees to select an amount of life

insurance equal to one, two, three, or four times their annual compensation. (*Id.*). Next,

the voluntary life insurance program allowed employees who enrolled in the program

before March 1, 1978, to add life insurance beyond the company-paid amount at their

own expense. (*Id.* at 30). This program would allow coverage to continue "in full to age

65," after which the amount would be reduced, and "[t]he reduced amounts are continued

for life." (*Id.* at 32). Finally, the supplemental life insurance program allowed employees

to buy additional voluntary life insurance based on their annual compensation. (*Id.* at

33). Like the voluntary life insurance program, the supplemental program was frozen to

---

[5] Per the retirees' representations, the only optional life insurance program that is subscribed to by the sub-class is the voluntary life insurance program.

**RSA.05**

those employees who had enrolled in voluntary life insurance before March 1, 1978.

(*Id.*).  In contrast with voluntary life insurance though, if a retiree is at age 65 or over,

their supplemental "life insurance coverage ends."  (*Id.* at 34).  Other provisions provided

for contingencies when an employee's or retiree's life insurance ended.  (*Id.* at 35).

Similar SPDs were issued for both life insurance and health insurance for each

collective bargaining agreement.  (*See* Filing No. 173-1, 1993 USW Active Employee

SPD; *see also* Filing No. 102-32, 2010 Master SPD).  Following the signing of the 2010

CBA, Alcoa released the 2012 Active Employee SPD that described benefits for "active

full-time hourly employee[s] at an Alcoa location" that were covered by a CBA.  (2010

Master SPD at 7).  The next year, Alcoa released an additional life insurance SPD that

described benefits for employees "who retired on or after June 1, 1993."  (2013 Retiree

Life Insurance SPD at 6).  Both SPDs were "incorporated in and made part of the

collective bargaining agreements between Alcoa Inc. and the unions listed in the

'Participating Unions' section of this booklet."  (*Id.* at 4; *see also* 2010 Master SPD at 4).

Throughout the years, the Employee Life Insurance SPDs were reissued, with the

most recent being the 2020 Sickness and Accident, Long Term Disability and Life

Insurance Benefits SPD.  (Filing No. 173-29, 2020 Active Employee SPD).  Any changes

between the 2020 Active Employee SPD and 2012 Active Employee SPD are

unimportant for the purposes of this case.  (*Compare id.*, *with* 2010 Master SPD).  The

2013 Retiree Life Insurance SPD was not updated or supplanted by a newer one.

However, later CBAs agreed to carry forward all parts of the previous collective

bargaining agreements that were not changed.  (Filing No. 102-6, 2014 Settlement

**RSA.06**

Agreement at 2, (agreeing "that the current labor agreements and working rule . . . shall

remain unchanged except as modified below to provide new labor agreements"); Filing

No. 90-2, 2019 Settlement Agreement at 2 (same); Filing No. 169-25, 2023 Settlement

Agreement at 2 (same)).

With these agreements in the background, the retiree class members utilized two

life insurance programs—company-paid life insurance (main class) and the voluntary life

insurance program (sub-class)—stretching back to at least 1993.  (*See* Filing No. 173-17,

Ackerman Decl. ¶ 2).  During the 2019 collective bargaining negotiations, Alcoa

proposed terminating retirees' life insurance, which the Unions would not agree too.

(Filing No. 169-8, Storm Dep. at 94–95).  Alcoa dropped the issue, and no changes were

made to the contracts relating to life insurance.  (*Id.* at 95–96).  Collaterally—in Alcoa's

telling, at least—Alcoa decided to unilaterally eliminate life insurance benefits for the

retirees who had not been employees under the current CBA (*i.e.*, they retired before the

ratification of the 2019 CBA).  (Filing No. 173-2, Allen Decl. ¶ 2).  This terminated both

the company-paid and voluntary life insurance programs.  (*Id.*).

Alcoa announced its intent to terminate all the life insurance plans on December 4,

2019.  (*Id.*).  The next day, Alcoa mailed a letter to affected retirees explaining the

termination and enclosing a check to waive the retirees' claims to life insurance.  (*Id.* at

¶ 4).  Retirees had three months to cash the check, or it would be invalidated.  (Filing No.

173-4, Dec. 5 Letter).  The letter also stated the following in bold and underlined text:

> By endorsing and presenting this check for
> payment, you are agreeing to waive any claims
> for life insurance coverage from the Company

**RSA.07**

> after December 31, 2019.  If you do not agree to
> this waiver, you should not endorse, deposit, or
> cash the enclosed check.  You may wish to
> discuss this with your personal financial advisor
> or attorney, before endorsing, depositing, or
> cashing the enclosed check.

(*Id.*).  The check contained a shorter version of this waiver that made clear the retiree

would waive their claims to life insurance by cashing the check.  (Filing No. 173-5,

Check).  Alcoa also set up a telephone hotline to answer retirees' questions and instructed

the hotline workers to tell employees that Alcoa had the right to terminate benefits at its

leisure because the retirees were not covered by the current CBA.  (Filing No. 169-22,

Alcoa Expected Questions at 2).

When the Unions got wind of Alcoa's plan on December 10, 2019, they responded

by contacting Alcoa to explain that they did not agree that Alcoa had the authority to

unilaterally terminate life insurance benefits and explained they "would probably file a

suit." (Filing No. 169-23, Millsap Dep. at 30–32).  Alcoa expected a lawsuit because of

its actions.  (*Id.*).  Nine days later, Plaintiffs filed this lawsuit challenging the termination

of the life insurance programs for violating the CBAs.  (*See* Filing No. 1, Compl.).  In the

meantime, the Unions took a variety of actions to notify retirees not to sign the checks.

(*See* Filing No. 173-6, Burnell Dep. at 35–36; Filing No. 173-9, SOAR Email; Filing No.

97-7, Butch Dep. at 14, 18–20, 30–35).  Alcoa was served with the lawsuit on December

24, 2019, and mailed a second letter to retirees two days later who had not cashed their

checks.  (Allen Decl. ¶¶ 8–9).  After objection by Plaintiffs' counsel that the prior letters

were misleading, Alcoa sent a third letter explaining that a lawsuit had been filed

**RSA.08**

challenging Alcoa's ability to terminate the life insurance programs, while also explaining that employees could still waive their claims by cashing the checks. (Filing No. 16-12, 16-13 at 2–3). Ultimately, 5,360 retirees, or around 88% of the class, cashed the checks. (Filing No. 173-17, Ackerman Decl. ¶ 16).

## II.   Legal Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That requires reviewing the record in the "light most favorable to the nonmoving party and draw[ing] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). When reviewing cross-motions for summary judgment, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

The mere existence of an alleged factual dispute is not sufficient to defeat a motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). That is because "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## III.   Discussion

**RSA.09**

The main class and sub-class of Alcoa retirees bring the same cause of action with different supporting legal theories.  In Counts I (main class) and III (sub-class), they allege that the termination of the life insurance programs violated the CBAs Alcoa signed with the Unions, which supports a cause of action under Section 301 of the LMRA, 29 U.S.C. § 185.  They also allege in Counts II (main class) and IV (sub-class) that because the CBAs created obligations that provided benefits through an ERISA plan, the termination of the life insurance programs constituted a repudiation of negotiated plan terms, which is actionable under Section 502 of ERISA, 29 U.S.C. § 1132.  Both Section 301 of the LMRA and Section 502 of ERISA provide causes of action to plaintiffs when an employer takes actions that violate the terms of a CBA or an ERISA plan.  As a result, this case boils down to whether the removal of the life insurance programs violated the CBAs.

Alcoa does not dispute that it would have violated 29 U.S.C. § 185 and 29 U.S.C. § 1132 if the removal of the life insurance programs violated the CBAs.  It contends instead that the removal of the life insurance programs did not violate the CBAs.  Alcoa also asserts in its Thirteenth Affirmative Defense that checks cashed by 88% of the class to serve as a waiver to any claim for life insurance against Alcoa.

First, the court addresses whether the removal of the company-paid life insurance program violated the CBAs.  Next, the court turns to whether the removal of the voluntary life insurance program violates the CBAs.  Finally, the court addresses whether the waivers should be invalidated on a class-wide basis and whether summary judgment should be granted class-wide to Alcoa because 88% of the class waived their claims.

**RSA.10**

### A.    Main Class (Counts I & III)

The main class of Alcoa retirees contends Alcoa promised them life insurance

benefits in the 2019 and 2023 CBAs.[6]  In support, they point to "Article XXIII" of those

agreements which is the "Group Insurance" provision.  (*See* Filing No. 90-1, 2019 Master

CBA at 60).  That clause reads:

> Medical Benefits, Prescription Drug Benefits, Dental Benefits, and Vision Benefits will be provided to eligible active employees and their eligible dependents.  The Company will provide Sickness and Accident, Life Insurance, and Accidental Death and Dismemberment benefits to eligible active employees.  The Company will also provide medical and Prescription Drug Benefits to eligible retirees, surviving spouses, and their eligible dependents and Life Insurance to eligible retirees.

> Separate Booklets describing these benefits are incorporated herein and made a part of this Agreement.   Effective January 1, 2020, the agreed upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets.

(*Id.*).  The retirees contend the language promising "Life Insurance to eligible retirees"

gives them a contractual right to life insurance.  Alcoa contends the words "eligible

retirees" means only those employees who retire during the CBA.  This dispute presents a

straightforward issue of contractual interpretation.

---

[6] The 2023 collective bargaining is materially identical to the 2019 CBA for the purposes of this case.  (*See* Filing No. 169-25, 2023 Master Settlement Agreement (agreeing to carry forward 2019 CBA excepting certain provisions not relevant here)).

**RSA.11**

The court interprets CBAs "according to ordinary principles of contract law" so long as "those principles are not inconsistent with federal labor policy." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). "In this endeavor, as with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks omitted). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." 11 R. Lord, *Williston on Contracts* § 30:6 (4th ed. 2012). Only if a term is ambiguous may the court turn to extrinsic evidence for the term's meaning. *See CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018). And a term is only ambiguous if it is reasonably susceptible to two different meanings, *id.* (citing *Williston on Contracts* § 30:4), after considering all the contractual terms, as contract terms must be harmonized where possible, *Barnett v. Ameren Corp.*, 436 F.3d 830, 833 (7th Cir. 2006) ("Contractual provisions must be read in a manner that makes them consistent with each other.").

The dispute here turns on the words "eligible retirees." Consider that term; it consists of an adjective and a noun, with the adjective limiting the noun. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) (explaining adjectives "modify nouns" by "pick[ing] out a subset of a category that possesses a certain quality"). The ordinary meaning of the word "retiree" is "[a] person who has retired, esp[ecially] permanently from employment." *Retiree*, Oxford-English Dictionary (2d ed. 1989). To be retired means to have "le[ft] office, employment, or service permanently . . . esp[ecially] on reaching pensionable age; to stop working." *Retire*,

**RSA.12**

Oxford-English Dictionary (2d ed. 1989).  The SPDs similarly define being retired as

"[t]o be eligible for and elect retirement under a company retirement plan."  (2013 Life

Insurance SPD at 10).  There is no indication the parties meant something other than the

common meaning of retiree when agreeing to the 2019 CBA.  Thus, the broad category of

people who the CBA promises life insurance benefits to is any person who permanently

left employment from Alcoa after being eligible for and taking retirement per Alcoa's

regulations.  (*See, e.g.*, *id.*).

The 2013 Retiree Life Insurance SPD[7] also defines the term "eligible" as it relates

to life insurance.  An employee is "eligible for company-provided life insurance if" the

retiree was (1) "an hourly employee who retired on or after June 1, 1993," (2) was

"covered under the Alcoa Retirement Plan," and (3) was "covered by a collective

bargaining agreement that contains this plan as part of the agreement."  (2013 Life

Insurance SPD at 6).  Another piece of the SPD confirms this.  (*Id.* at 11 ("You are

eligible to participate in the Alcoa life insurance plan as described in this booklet if you

are a retiree who, as an active employee, was covered by a collective bargaining

agreement between Alcoa and one of the unions . . . .")).  There is no dispute that the

---

[7] The parties raise no dispute in the papers that the SPDs are terms of the respective CBAs when
they are incorporated by reference.  At oral argument however, Alcoa indicated that not all the
terms in a SPD are contractual promises under the collective bargaining agreement as a matter of
law under ERISA.  (Filing No. 188, Tr. of Or. Arg. at 68).  This is technically correct but beside
the point here: the SPDs and CBAs make expressly clear that the SPDs are part of the CBA
between the Unions and Alcoa.  (2019 CBA at 60 ("Separate booklets describing these benefits
are incorporated and made a part of this Agreement."); 2013 Life Insurance SPD at 4 ("This
booklet is the plan document and summary plan description (SPD) of life insurance benefits,
which are incorporated in and made part of the collective bargaining agreements between Alcoa
Inc. and the unions . . . ."); *cf.* Alcoa's Br. at 26 (arguing the 2020 Active Employee SPD was
"expressly incorporated" with identical language)).

**RSA.13**

2013 Retiree Life Insurance SPD is incorporated into the 2019 CBA.  Consequently, the

word "eligible" restricts the word "retirees" in the CBA to those retirees who retired after

June 1, 1993, and were covered by a CBA.  This is essentially duplicative of the plaintiff

class here, meaning that the plaintiff class of post-1993 retirees is guaranteed life

insurance benefits by the 2019 CBA.

This conclusion is confirmed by the structure of the SPDs.  There are three SPDs

incorporated into the 2019 CBA: the 2020 Employee Benefits SPD, the 2013 Retiree

Health Insurance SPD, and the 2013 Retiree Life Insurance SPD.  (*See* 2020 Employee

Benefits SPD at 4 ("This booklet is . . . incorporated in and made part of the collective

bargaining agreement[] . . . ."); 2013 Retiree Life Insurance SPD at 4 (same); 2013

Retiree Health SPD at 4 (same)).  Predictably, the 2020 Employee SPD deals with life

insurance benefits for employees.  (2020 Employee Benefits SPD at 35–38).  Crucially, it

also addresses how those benefits function when that employee retires, and what those

benefits look like for the term of the 2019 CBA.  (*Id.* at 38 ("If you retire . . . at age 62 or

older, the amount of your Company-provided life insurance is reduced to $7,500.")).  The

2013 Retiree Life Insurance SPD provides life insurance benefits to retirees too.  (2013

Retiree Life Insurance SPD at 6–8 (explaining benefits and that "[y]our company-

provided life insurance coverage begins on the day you retire" with different levels of

benefits depending on when the employee retired, which stretches as far back as 1993)).

Alcoa's theory—that the 2013 Retiree Life Insurance SPD applies only to

employees who will retire during the term of the 2019 CBA instead of post-1993

retirees—renders the 2013 Retiree Life Insurance SPD superfluous because the 2020

**RSA.14**

Employee Benefits SPD already provides retirement life insurance benefits for retirees. *But see, e.g.*, *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1116 (7th Cir. 1986) ("[A] written contract should be given a construction that harmonizes all the various parts of the contract so that no provision is conflicting with, or repugnant to, or neutralizing of any other.") (internal quotation marks omitted).  If, as Alcoa affirmatively contends, the 2020 Employee Benefits SPD provides for retirement benefits for employees who will retire during the 2019 CBA, then the 2013 Retiree Life Insurance SPD must provide retirement benefits for a different group, else it would be duplicative of the 2020 Employee Benefits SPD.  And the only possible group that could be is the group expressly described by the 2013 Retiree Life Insurance SPD: those who retired after June 1, 1993, from the variety of plants listed in the agreement.  (2013 Retiree Life Insurance SPD at 12 (listing a variety of plants for retirees "who retired on or after June 1, 1993")).

An astute observer might recognize the term 'eligible' does not have a set meaning within the context of the 2019 CBA because it modifies different groups like "active employees," "dependents," and "retirees."  (2019 Master CBA at 61).  There is nothing unusual or unworkable about this because each of the SPDs clarifies what eligible means for each group.  For example, the 2020 Employee Benefits SPD describes the eligibility for active employees, (2020 Employee Benefits SPD at 7), while the 2013 Retiree Life Insurance SPD provides differing eligibility requirements for retirees and spouses, (2013 Retiree Life Insurance SPD at 6).  The overarching promise in the 2019 CBA, however, is to promise life insurance whenever a retiree is eligible, and there is nothing about the

**RSA.15**

usage of the term 'eligible' in relation to active employees that undermines the class of

eligible retirees as defined by the 2013 Retiree Life Insurance SPD.

There is one wrinkle: the 2019 CBA states in a "recognition provision" that the

contract's "provisions" will:

> apply solely to those employees of the Company
> at its plants located at Warrick, Indiana; and
> Massena, New York, for whom the Union has
> been certified as the exclusive bargaining agency
> by the National Labor Relations Board, or for
> whom the company has recognized the Union as
> the exclusive bargaining agency.

(2019 Master CBA at 9).  Alcoa seeks to emphasize that the agreement applies "solely to

. . . employees" but not retirees.  (*Id.*).  This misreads the focus of this provision, which

should be placed on the part of the sentence explaining the terms apply only to those who

have had "the Union" as their exclusive bargaining agency.  (*Id.*).

There are a few contextual clues that foreclose Alcoa's argument.  First, the 2019

CBA is between the Union and Alcoa but contemplates that there may be employees of

Alcoa who are *not* members of the Union.  (2019 Master CBA at 14–15 (discussing

procedures for new employees that are not required to become members of the unions in

certain states)).  The recognition provision then differentiates between the different types

of Alcoa workers who might consider themselves "employees," and carves out a subset of

employees that get benefits under the contract.  This makes sense because the provision

does not limit the term "employee" in any way other than that the Union represents them

and that they be from a particular plant.  Keeping in mind that a retiree *cannot* be an

employee, the provision is seeking to exclude non-union and non-Warrick and Messana

**RSA.16**

employees, rather than addressing retirees at all.  Put another way, the language "solely

. . . to those employees" contrasts 'those employees' (union) against 'other employees'

(non-union), rather than contrasting employees against retirees.

Another important clue buoying that conclusion is that the 2019 CBA quite clearly

does not apply solely to employees as it expressly provides benefits to retirees.  (*See* 2019

Master CBA at 60 (explaining "eligible retirees" shall have life insurance benefits)).

Indeed, the 2019 CBA has a provision expressly referring to a group of post-1993 retirees

who could not possibly be employees for the ratification of the agreement.  (*Id.* at 135

("[T]he Company will maintain its program of medical and prescription drug benefits . . .

for post May 31, 1993, retirees.)).[8]  As a definitional matter, retirees are excluded from

the category of employee through the ordinary meaning of those two terms.  *Compare*

*Retiree*, Oxford-English Dictionary (2d ed. 1989) (defining retiree as one who has

"permanently" left "employment"), *with Employee*, Oxford-English Dictionary (2d ed.

1989) ("A person who works for an employer.").  The same is true as a matter of federal

labor law.  *Allied Chem. & Alkali Workers of Am, Loc. Union No. 1 v. Pittsburgh Plate*

*Glass Co., Chem. Div.*, 404 U.S. 157, 168 ("The ordinary meaning of 'employee' does not

include retired workers; retired employees have ceased to work for another for hire.").

As a result, the only way to harmonize the recognition provision with the provisions

expressly providing benefits to retirees is to understand the recognition provision as

---

[8] Alcoa contends that this is not termed as an article of the collective bargaining agreement and
so is not covered by the recognition provision.  However, the recognition provision applies to
"provisions," not articles.  (2019 CBA at 10).  And there is no dispute the Retiree Healthcare
Letter is a provision of the current collective bargaining agreement.

**RSA.17**

dealing with different types of employees instead of differences between employees and retirees.

The parties agree that the 2019 CBA provides benefits to retirees, not just employees.  (*See* Filing No. 172, Defs.' Br. in Supp. of Cross-Motion at 26 (explaining the term 'eligible retirees' guarantees benefits to "future retirees").  The difference is that Alcoa contends the recognition provision requires reading the term "eligible retirees" to mean "eligible future retirees," while the retirees contend the term "retirees" is only limited by the word "eligible."[9]  Recall the discussion above about how adjectives limit nouns to only include a category of that noun with a certain quality.  *Weyerhaeuser*, 139 S. Ct. at 368.  Alcoa's proposed reading inserts an additional, atextual adjective.  And contrary to Alcoa's contentions, this hidden limitation is not suggested by the recognition provision because both Alcoa's and the retirees' constructions require reading the recognition provision as applying to more than just employees.  In other words, if the recognition provision truly means provisions apply solely to employees but not retirees, then any person who retires no longer receives any benefits and Alcoa and the retirees are incorrect.

Consider the hypothetical of an employee who is a future retiree, meaning they were employed by Alcoa when the 2019 CBA went into effect but will retire soon after.

---

[9] It is also demonstrably not the case that the number of employees is frozen at the time the contract was put in force.  The collective bargaining agreement has express terms governing new employees who would be governed by the agreement, (2019 CBA at 15 ¶¶ I–J), and governing retirees, (*id.* at 61, 135).  That means the contract contemplates that the number of employees will grow and shrink as new employees are added and old employees are lost to retirement.

**RSA.18**

At the ratification of the 2019 CBA, there is no issue.  As soon as that employee retires however, they cease to be an employee and they immediately become a retiree as a matter of federal labor law, which shunts them outside the scope of the contract.  Not only does this leave the language promising benefits to retirees as a dead letter, which violates the rule against superfluity, *Barnett*, 436 F.3d at 833 ("Contractual provisions must be read in a manner that makes them consistent with each other."), but it would also violate federal labor law because retiree benefits for current employees is a mandatory subject of bargaining, *Allied Chem.*, 404 U.S. at 176–82.  The consequence of this is that the recognition provision does not favor any construction of the term 'eligible retiree' over another because that provision says nothing about retirees in the first place.

To conclude, the CBA unambiguously promises life insurance benefits to eligible retirees.  The term "eligible retirees" unambiguously includes employees who retired after June 1, 1993, pursuant to an Alcoa retirement plan and were covered by a CBA between Alcoa and the Unions.  Because Alcoa terminated the company-paid life insurance plan despite its contractual promise to the contrary, it was in breach of the 2019 CBA and remains in breach of the 2023 CBA.  Summary judgment in favor of the main class of retirees on Counts I and II of the Amended Class Action Complaint is appropriate.

### B.    Sub-Class

The sub-class of retirees is a little different; the sub-class claims a vested interest in the benefits provided by a voluntary life insurance program that has not allowed new

**RSA.19**

enrollment since 1978.[10]  The sub-class prevails on the plain language of the 1993 CBA,

which plainly and unambiguously guarantees them a right to the voluntary life insurance

program.[11]

As stated previously, courts "interpret collective-bargaining agreements, including

those establishing ERISA plans, according to ordinary principles of contract law, at least

when those principles are not inconsistent with federal labor policy." *Tackett*, 574 U.S. at

435.  "In this endeavor, as with any other contract, the parties' intentions control."

*AnimalFeeds Int'l*, 559 U.S. at 682 (internal quotation marks omitted).  "Where the words

of a contract in writing are clear and unambiguous, its meaning is to be ascertained in

accordance with its plainly expressed intent." *Williston on Contracts* § 30:6.

The default rule is "contractual obligations will cease, in the ordinary course, upon

termination of the bargaining agreement," where that bargaining agreement contains an

express provision terminating the contract.  *Litton Fin. Printing Div., Litton Bus. Sys.,*

*Inc. v. NLRB*, 501 U.S. 190, 207 (1991).  However, the parties are free to agree to provide

benefits following the expiration of a CBA.  *Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d

434, 439 (7th Cir. 1998) (explaining benefits surviving a CBA "depend[s] entirely on the

---

[10] The court's order approving this sub-class included "[a]ll retirees of Alcoa . . . [w]ho upon
their retirement were eligible for one or more forms of 'Optional' life insurance, including
voluntary, additional voluntary, and supplemental life insurance."  (Filing No. 117, Class
Certification Order at 23).  The retirees indicate and Alcoa does not contest that all of the
members of the sub-class are participants of the voluntary life insurance program rather than the
supplemental or contributory programs.
[11] To the extent any sub-class members retired after the 1993 collective bargaining agreement
expired, Alcoa promised them lifetime benefits and concedes it never again bargained over those
benefits, meaning it agrees it did not bargain for the removal of the vested benefits.  The court
notes that the parties have not submitted any evidence that any members of the sub-class retired
after the expiration of the 1993 CBA.

**RSA.20**

contract between the company and employees").  Such an agreement, however, cannot be
inferred from silence.  *Tackett*, 574 U.S. at 442.  Rather, an agreement to vest benefits
must be stated in "explicit terms" or through any "implied terms of the expired
agreement."  *Id.* at 443 (Ginsburg, J., concurring) (quoting *Litton Fin. Printing*, 501 U.S.
at 203); *see also CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018) (reversing the Sixth
Circuit's determination that healthcare benefits had vested because "[t]he Sixth Circuit
did not point to any explicit terms, implied terms, or industry practice suggesting"
benefits vested for life" (citing *Tackett*, 574 U.S. at 443–44 (Ginsburg, J., concurring)));
*Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 385 (7th Cir. 2019) (Hamilton, J.) ("The
contract may also provide for vesting through implied terms.").

Application of these rules leads inexorably to the conclusion that the Unions and
Alcoa agreed to provide the voluntary life insurance benefits to the sub-class for the rest
of the retirees' lives.  To start, the 1993 CBA contains a general durational clause.  (1993
CBA at 8).  As a result, the default rule is that unless the CBA provides a different term
for the voluntary life insurance program, Alcoa's obligation to provide benefits
terminated with the agreements.  *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir.
2006).  The 1993 CBA does, however, create a different term for the voluntary life
insurance program when the 1993 Life Insurance SPD states that life insurance under the
voluntary life insurance program would be "continued for life."  (1993 Life Insurance
SPD at 33).  This language clearly and expressly indicates the parties agreed the
voluntary life insurance program would continue for the life of the retiree.  Consider

*Bidlack v. Wheelabrator Corporation*, 993 F.2d 603, 608 (7th Cir. 1993),[12] where the
Seventh Circuit explained a clause providing that benefits "shall be continued for the
spouse after the death of the retiree" was vague but could reasonably "be thought a
promise to retired employees that they and their spouses will be covered for the rest of
their lives" because "the provision does not say 'when they die or the collective
bargaining agreement expires, whichever occurs first,' but simply when they die."  The
provision here is similar but more definite.  Instead of saying benefits shall be continued
in an indeterminate sense, the contract states exactly how long benefits will run: for life.
As a result, retirees' dependents have a vested interest in the voluntary life insurance
program through the express and unambiguous terms of the 1993 CBA.

Another key indicator is that other benefits programs specify when they end,
unlike the voluntary life insurance program.  For example, the supplemental life
insurance program explains "[i]f you are age 70 . . . life insurance . . . [will] end."  (1993
Life Insurance SPD at 34).  Similarly, the voluntary life insurance program states
accidental dismemberment and death coverage under the voluntary program "ends at
retirement" immediately after explaining "[l]ife insurance . . . amounts are continued for
life."  (*Id.* at 32).  Alternatively, the contributory life insurance program is silent as to
how long it lasts, indicating it does not survive the expiration of the 1993 CBA.  (*Id.* at

---

[12] Alcoa questions the continuing vitality of *Bidlack* following the Supreme Court's decisions in
*Tackett* and *Reese*.  The Seventh Circuit has continued to apply *Bidlack*, as well as the rest of its
precedent, because "*Tackett* and *Reese* are consistent with the approach we have taken for
decades."  *Stone*, 943 F.3d at 385 (citing *Cherry*, 441 F.3d at 481 (in turn citing *Bidlack*, 993
F.2d at 606–07)).  Alcoa's attempt to distinguish *Stone*'s language is unpersuasive.

**RSA.22**

26–29).  When the parties wanted a particular benefit to expire at a particular time, they said so.  Conversely, when the parties wanted coverage to continue for life, they said so.  Here, they said so for the voluntary benefits program that Alcoa unilaterally terminated, which constitutes a violation of the 1993 CBA.

Alcoa's counterarguments are unavailing.[13]  First, Alcoa points to a line of Seventh Circuit caselaw that has explained that a term promising "lifetime" benefits does not necessarily create an obligation to provide lifetime benefits.  *See, e.g.*, *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632–33 (7th Cir. 2004) (holding a promise to provide "lifetime benefits" meant "good for life unless revoked or modified").  These cases are inapposite because the driving factor behind these decisions are that the contracts simultaneously promised lifetime benefits and reserved the company's right to modify or eliminate benefits in separate contractual terms.  *Id.* at 633 (explaining its holding was "particularly plausible" because "the contract documents include a reservation of rights clause"); *see also UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 704 (7th Cir. 2003) ("We must resolve the tension between the lifetime benefits clause, and the plan termination and

---

[13] Alcoa appears to contend that the 1993 collective bargaining agreement only promises benefits to employees employed during the term of that contract, and it continuously argues it never bargained over benefits for retirees who had already retired at the time the agreement was ratified.  The evidence cannot be read to support these contentions.  Alcoa and the Unions agreed to incorporate into the 1993 collective bargaining agreement provisions that *explicitly* promised benefits to a group whose membership had been frozen since 1978, which included people who had already retired.  Importantly, because that group was frozen, the 1993 agreement is all that is necessary to resolve the sub-class—which consists only of retirees in the frozen pre-1978 voluntary life insurance program—claims.  To the extent later agreements are necessary, Alcoa concedes it never again bargained over retiree life insurance, and so did not bargain for the removal of these benefits.  (Tr. of Or. Arg. at 33 ("Alcoa has never ever, not once, negotiated for existing retirees as part of a CBA with the exception of the health care letter . . . .")).

**RSA.23**

reservation of rights clauses, by giving meaning to all of them.").  "The reason" for these holdings "is that benefits described as 'lifetime' are not really vested when the same contract also reserves the right to revoke them, because the only proper construction of the two seemingly conflicting provisions is that the 'lifetime' benefits are 'good for life unless revoked or modified.'"  *Barnett*, 436 F.3d at 833 (quoting *Vallone*, 375 F.3d at 633).

Cases going the other way underscore this.  Consider *Bland v. Fiatallis North America, Incorporated*, 401 F.3d 779 (7th Cir. 2005).  There, the Seventh Circuit explained that "lifetime language" could create vested benefits because "the plan documents" did not "contain . . . such limiting language" that "allow[ed] an employer to modify or terminate retiree welfare benefits."  *Id.* at 780.  It even stated the rule explicitly: "[U]nder *Vallone* and its antecedents, the presence of 'lifetime' language . . . defeats summary judgment" so long as that language is "uncontradicted by the agreement read in its entirety."  *Id.* at 786–87.  The Seventh Circuit made the same point after *Tackett* and *Reese*, when it distinguished *Vallone*, *Barnett*, and *Rockford Powertrain* as being cases "that addressed contracts that included both 'lifetime' language and reservation-of-rights clauses expressly allowing alteration or termination of benefits." *Stone*, 943 F.3d at 387.  Other circuits also follow this rule.  *See Bland*, 401 at 787 ("This holding is consonant with the decisions of other circuits." (citing *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 98 (2d Cir. 2001))).

Any argument that the Supreme Court's decision in *Reese* abrogated the rule that reservation of rights clauses are required to prevent the vesting of lifetime benefits is

incorrect.  While the Supreme Court in *Reese* did not take notice of any reservation of rights language, that was because that case concerned a contract that contained *no* language vesting benefits.  *Reese*, 583 U.S. at 140 ("No provision specified that the healthcare benefits were subject to a different durational clause.").  Thus, the Supreme Court held that the contract was silent as to vesting and proceeded no further in the analysis than to look at the general durational clause.  *Id.* at 140 (emphasizing that "[w]hen a collective-bargaining agreement is merely silent on the question of vesting," benefits do not vest).  The reservation of rights analysis comes *after* a court finds some language that suggests lifetime benefits.  *See Bidlack*, 993 F.2d at 608 (noting "the agreements are not silent on the issue" of vesting because the terms of the agreements suggested "a promise to retired employees that they and their spouses will be covered for the rest of their lives"); *cf. Vallone*, 375 F.3d at 634 (distinguishing *Bidlack* because "*Bidlack* did not involve the situation here where 'lifetime' benefits were granted by the employer while the right to terminate or modify them was reserved").

The ultimate rule is this.  If the CBA contains no language that suggests benefits vest, then benefits do not vest.  *See Reese*, 583 U.S. at 135–36; *Tackett*, 574 U.S. at 441–42; *see also Stone*, 943 F.3d at 385 (reading this as the holding of *Reese* and *Tackett*).  If there is language that could be read to provide lifetime benefits, that language must be read as not vesting benefits if there is other language suggesting the company has reserved its right to terminate benefits.  *See Vallone*, 375 F.3d at 633; *Rockford Powertrain*, 350 F.3d at 704.  But where the CBA contains language suggesting benefits vest and contains no language reserving the company's right to terminate benefits,

**RSA.25**

benefits will vest. *Bland*, 401 F.3d at 785–86 (contrasting cases with "lifetime" language and no reservation of rights clause to cases without any lifetime language and cases with reservation of rights clause); *Stone*, 943 F.3d at 385 (same).

Alcoa has not pointed to any reservation of rights clause here and has failed to contest Plaintiffs' assertion that the 1993 CBA does not contain any reservation of rights language. (*See, e.g.*, Tr. of Or. Arg. at 57). The court has already described how the CBA specifically provided for voluntary life insurance benefits that survive the termination of the contract. As a result, this case falls comfortably with the *Bland*-type of cases.

Alcoa next points to language in the 1993 Life Insurance SPD that discusses contingencies if a retiree's "plan ends." (1993 Life Insurance SPD at 36). It contends this language evinces the intent of the parties to end the voluntary life insurance program. Not so. Of the three types of plans, two can end; the supplemental life insurance plan states this expressly and the contributory life insurance plan must be read as ending at the end of the contract under *Tackett*. It is hornbook law that "[a] contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms." *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995). Reading the provision in the 1993 Life Insurance SPD allowing retirees to purchase a personal plan in the event their plan ends as Alcoa suggests would nullify the "for-life" language applicable only to the voluntary life insurance program. By contrast, reading this language as providing contingencies only for the plans that can end harmonizes each provision of the contract.

Alcoa also argues the provision granting life insurance benefits for life is actually a term for calculating a retirees' premium payments, not a grant of benefits. This misreads the relevant language, which provides that "[i]f you're retired and age 65 or over, here's how *your coverage* works:" a retirees' "[l]ife insurance is reduced at age 65 by 75%. The reduced amounts are continued for life . . . . Your payments are based on $.60 per thousand per month for the reduced amount of insurance in effect." (1993 Life Insurance SPD at 33 (emphasis added)). The 1993 Life Insurance SPD makes clear that it is the amount of life insurance (i.e., the payout) that is continued for life when it is describing a retiree's *coverage*, not their premium. While the 1993 Life Insurance SPD does discuss what a retiree will pay for that amount of life insurance, that is a separate from the clause promising life insurance coverage for life. This argument is not a reasonable reading of the 1993 Life Insurance SPD.

This leads Alcoa to its final redoubt. Alcoa argues that the clause providing coverage for life means for the life of the CBA. The Seventh Circuit has explained the contract need not use magic words to vest contractual rights. *Bidlack*, 993 F.2 at 607 ("We reject the extreme position[] . . . that the contract must either use the word 'vest' or must state unequivocally that it is creating rights that will not expire when the contract expires."). And the ordinary meaning of the term "for life" means "for the life of the retiree." Only where there is a reservation of rights clause does a promise for life reasonably mean something else. *See, e.g.*, *Barnett*, 436 F.3d at 833–34. By specifying a length of benefits other than the one laid out in the general durational clause, the contract specifies that the parties intended a duration *other* than the one provided in the general

**RSA.27**

durational clause, mainly as defined by the life of the retiree. *Reese*, 583 U.S. at 140

(noting courts "would simply apply the general duration clause" only if "an agreement

does not specify a duration for healthcare benefits in particular"). In short, the plain

language of the parties' contracts gives the sub-class voluntary life insurance benefits for

the rest of their lives.

Finally, the parties do not spend any time discussing who is a member of the sub-

class and when and from where they retired. Considering the 1993 CBA and 1993 Life

Insurance SPD discussed by the parties applies only to six facilities,[14] the court's holding

extends solely to retirees from those six facilities. The court takes no position on a

hypothetical participant in the voluntary life insurance program that retired from a facility

that is not one of the six covered by the 1993 Life Insurance SPD because the parties do

not spend any significant time discussing that possibility or offering evidence that such a

hypothetical class member exists. With this understanding, summary judgment for the

sub-class of retirees is appropriate on Counts III and IV of the Amended Class Action

Complaint because Alcoa unilaterally terminated the vested benefits under the voluntary

life insurance program.

### C.    Waiver (Alcoa's Thirteenth Affirmative Defense)

Having said all this, retirees from both classes have a problem: many signed and

cashed checks agreeing to waive any claim for life insurance. (*See* Sample Check ("By

endorsing, you are agreeing to waive any claims for life insurance coverage from the

---

[14] These six facilities are: Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile, Alabama; Point Comfort, Texas; and Rockdale, Texas. (1993 Life Insurance SPD at 3).

**RSA.28**

Company after December 31, 2019.  If you do not agree to this waiver, you should not

endorse, deposit or cash this check.")).  Alcoa contends in its Thirteenth Affirmative

Defense that by signing the checks and accepting a cash payment, the retirees have

waived any entitlement to life insurance benefits.  The retirees tender three class-wide

theories for why the waiver should be invalidated.  First, the waivers cannot be valid

under the LMRA as the retirees argue that statute prohibits the waiver of claims under

CBAs.  Second, the waivers should be invalidated under ERISA because Alcoa breached

its fiduciary duties as a plan administrator in its communications seeking waiver.  And

third, the waiver should be invalidated for being improper communications under Federal

Rule of Civil Procedure 23.  The first two arguments are amenable to class-wide

resolution, but the retirees are incorrect that either argument provides a basis for

invalidating the waivers.  The last however presents individualized factual issues in the

current posture and consequently cannot be resolved on a class-wide basis.  The court

takes each argument in turn.

First, the LMRA does not prohibit an individual represented by a union from

waiving their contractual right to benefits.[15]  By default, "[a] party may waive any

provision, either of a contract or of a statute, intended for his benefit."  *Shutte v.

Thompson*, 82 U.S. 151, 159 (1873); *see also United States v. Mezzanatto*, 513 U.S. 196,

200–01 (1995) (affirming the continuing validity of *Shutte*).  The retirees have not cited a

---

[15] Throughout their argument, the retirees frame the waiver as Alcoa "unilaterally" lessening the
effect of their breach.  This is not correct.  A waiver of claims definitionally needs two parties
acting bilaterally, through an offer by Alcoa and the knowing and voluntary acceptance of the
retiree.

**RSA.29**

case where a court has held this presumption is not applicable in the LMRA context or

that the LMRA prohibits waiving claims.  The cases the retirees cite for this proposition

are cases wherein a prearranged private contract conflicts with part of the CBA, rather

than dealing with situations where a party has waived its rights under a CBA.  *See, e.g.*,

*J.I. Case Co. v. NLRB*, 321 U.S. 332, 338 (1944) (explaining an individual employment

contract signed before the CBA between employer and employee could not be a waiver of

the terms of the CBA); *cf. Baker v. Amsted Indus., Inc.*, 656 F.2d 1245, 1248–49 (7th Cir.

1981) (explaining an employer and "individual employee" cannot agree to terms that "bar

collective bargaining" or "waive benefits" for the bargaining group because "terms and

conditions of employment can be arranged only by the majority representative").  Taken

to its logical conclusion, the retirees' argument would prevent any employee from settling

their claims once filed, as they would necessarily be giving *something* up that they

contend is guaranteed by the contract.  That would create immense strain on judicial

resources and uncertainty for plaintiffs and defendants.  As no authority supports the idea

that the LMRA should be used to invalidate the waiver of claims on a class-wide basis,

this argument fails.

The argument that ERISA requires vacating the waivers faces an identical

problem.  Like others who have made this argument, "Plaintiffs offer no authority for"

their contention that a waiver of statutory rights is never enforceable when "the defendant

breached its fiduciary duty by even seeking [waiver]."  *Schuman v. Microchip Tech. Inc.*,

No. 16-cv-5544, 2023 WL 5498065, at *8 (N.D. Cal. Aug. 23, 2023).  Such a rule would

also impede the strong public policy of allowing parties to settle suits.  These two reasons

**RSA.30**

are sufficient to determine that class-wide invalidation of the waivers is not appropriate
under ERISA.  This is not to say that the allegedly misleading communications that
allegedly breached ERISA are not relevant—they might be relevant to any individual's
decision to sign the check—they just do not provide a class-wide basis for invalidating
the waivers.

Third, the argument that Rule 23 is sufficient to invalidate the waivers on a class-
wide basis also fails.  "To the extent that the district court is empowered . . . to restrict
certain communications in order to prevent frustration of the policies of Rule 23, it may
not exercise [that] power without a specific record showing by the moving party of the
particular abuses" that would violate Rule 23.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102
(1981) (quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977)).  In other words, the
court may restrict communications with the class or putative class where the defendant
has engaged in (or threatens to engage in) "coercive, misleading, or other abusive
communications."  *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 926 (N.D. Ill. 2013).
But even where such communications are committed, the court must give "explicit
consideration to the narrowest possible relief which would protect the respective parties."
*Gulf Oil Co.*, 452 U.S. at 102.  This means the class faces an incredibly high bar to show
the waivers should be invalidated on a class-wide basis under Rule 23.

The default rule is that defendants "may normally enter into settlements with
individual potential class members prior to class certification."  Newberg on Class
Actions § 9:7 (5th ed. 2013) (collecting cases).  In most circumstances, it is not
appropriate to invalidate individual settlement agreements.  *See Tolmasoff v. Gen. Motors,*

*LLC*, No. 16-11747, 2016 WL 3548219, at \*15 (E.D. Mich. June 30, 2016) (discussing

cases).  That is particularly so given the "general policy . . . in favor of [the] settlement of

litigation by compromise and settlement procedures."  *Du Puy v. U.S. Dep't of Lab.*, 519

F.2d 536, 541(7th Cir. 1975).  Only when the defendant engages in communications that

significantly mislead the recipient does it become appropriate to consider a class-wide

vacatur of any waivers.  *See, e.g.*, *Brodsky v. HumanaDental Ins.*, No. 1:10-cv-3233,

2016 WL 5476233, at \*12 (N.D. Ill. Sept. 29, 2016) (invalidating waivers where the

waiver failed to notify putative class members of the class action over six years after the

class action was filed).

    The record does not support that level of misconduct on the part of Alcoa

regarding the class.  As an initial matter, only Alcoa's second communication raises any

specter of misconduct because Alcoa's first communication occurred prior to the filing of

the lawsuit and the third communication disclosed the suit.  Moreover, nothing in the

record establishes the whole class did not have notice of the lawsuit, which undermines

the retirees' theory that the second communication misled the retirees into believing the

lawsuit did not exist.  To be sure, Alcoa's second communication did not mention the

lawsuit filed seven days earlier.  But that is not a substitute for evidence demonstrating

the class was unaware of the putative class action; the Unions undertook a series of steps

to raise awareness of the suit, so many could have been aware.[16]  (*See* Burnell Dep. at

35–36; SOAR Email; Butch Dep. at 14, 18–20, 30–35).  Additionally, the retirees have

---

[16] Given that this is a reason to deny Plaintiffs' motion for summary judgment, this factual
inference is properly drawn against the Plaintiffs.

**RSA.32**

not shown why invalidating the waivers is the narrowest possible relief.  On this record, a singular communication that may not have mislead class members is not a basis to invalidate the waivers on a class-wide basis.

This cuts the other way too.  Alcoa cannot establish that every class member who cashed the checks did so knowingly and voluntarily, particularly given that no evidence establishes every member of the class knew of the impending lawsuit.  *See Howell v. Motorola, Inc.*, 633 F.3d 552, 559 (7th Cir. 2011) (explaining "for a release to be valid, the party must sign it knowingly and voluntarily").  Contrary to Alcoa's suggestion, it is not enough to have evidence that some retirees knew of the pending lawsuit and had sufficient knowledge to waive their rights.  Such a holding would deprive unnamed retirees of due process as it would bind non-parties without a "full and fair opportunity to litigate" their claims.  *See Montana v. United States*, 440 U.S. 147, 153–54 (1979) (explaining how applying preclusion when a party has a sufficient opportunity to litigate fosters "reliance on judicial action").  Such an application of *res judicata* "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)).  To the extent Alcoa did not provide these retirees with the key context necessary to make a knowing and voluntary waiver, the waiver would not be valid.  But this inquiry turns on the unique circumstances, knowledge, and decisions of each of the 4,970 retirees that cashed the checks and is not workable in the context of the class.

**RSA.33**

In sum, summary judgment is not appropriate for either party on a class-wide basis on the issue of waiver set forth in Alcoa's Thirteenth Affirmative Defense.[17]  Keeping the class together following this order would create "a massive series of individualized analyses."  *Groussman v. Motorola, Inc.*, No. 10 C 911, 2011 WL 5554030, at *4 (N.D. Ill. Nov. 15, 2011) (denying class certification).  Any retiree who signed and cashed the check waiving their right to life insurance—whether members of the main or sub-class— will be decertified from this class action.

## IV.    Conclusion

For the foregoing reasons, the court **EXCLUDES** from the classes any member of the main class or sub-class who signed and cashed a check purporting to waive their claim to life insurance.  This includes named plaintiff Ellison, but none of the other named plaintiffs.  Plaintiff Ellison shall remain in the case in an individual capacity.

The court also finds that the protection of these excluded class members' due process rights requires that a separate notice of this order be issued to each of them.  The notice should explain the basis for the court's ruling and the fact that Defendants intend to raise waiver as an affirmative defense to the excluded individuals' claims for benefits. The notice should explicitly encourage each excluded class member to seek legal advice concerning the issues presented by this case.  The parties are **ORDERED** to meet and

---

[17] Only one named plaintiff, Martin L. Ellison, signed and cashed the check.  (*See* Filing No. 97-9, Ellison Dep. at 23).  However, the parties spend no time discussing whether he knowingly and voluntarily waived his rights.  Consequently, the court does not address whether he validly waived his claims.  The parties' motions shall be denied without prejudice as to Plaintiff Ellison.

confer on the text of this additional notice and submit a draft for the court's approval by

**April 29, 2024.**

Additionally, the court **GRANTS in part** and **DENIES in part** Plaintiffs' Motion

for Summary Judgment as to liability (Filing No. 168) for the Main Class and Sub-class

of retirees.  The Motion is **GRANTED** on Counts I–IV of the Amended Class Action

Complaint, and it is **DENIED** with respect to Alcoa's Thirteenth Affirmative Defense.

The court **DENIES** Defendants' Cross-Motion for Summary Judgment (Filing No. 171)

with respect to the Main Class and Sub-class of retirees on Count I–IV.  It is **DENIED as**

**moot** on the Thirteenth Affirmative Defense.  Finally, Plaintiffs' and Defendants' Motions

for Summary Judgment are **DENIED without prejudice** with respect to Plaintiff Ellison.

**IT IS SO ORDERED** this 25th day of March 2024.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsels of Record.

**RSA.35**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| EDMOND M. BUTCH, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:19-cv-00258-RLY-CSW |
| ) | |
| ALCOA USA CORP., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ENTRY GRANTING PLAINTIFFS' MOTION FOR
ENTRY OF ORDER OF FINAL JUDGMENT**

Plaintiffs, retired Alcoa employees and their unions, sued Defendants, Alcoa USA

Corporation and two ERISA plans sponsored and administered by Alcoa, asserting that

Alcoa's termination of their life insurance benefits violated the Labor Management

Relations Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA").

The court previously granted in part Plaintiffs' Motion for Summary Judgment as to

liability and denied Defendants' Cross-Motion for Summary Judgment.  Plaintiffs now

move for entry of an order of final judgment.  For the reasons set forth below, the court

**GRANTS** Plaintiffs' motion.

**I.    Background**

In September 2022, the court certified the main class in this action, consisting of

retirees represented by the USW Union or its predecessors who retired on or after June 1,

1993, from twenty-six identified facilities and who had company-paid life insurance

benefits terminated by Alcoa.  (*See* Filing No. 117, Entry Granting Pls.' Mot. for Class

**RSA.36**

Certification at 21–22).  The court also certified a subclass consisting of Alcoa retirees

represented by the USW Union or its predecessors[1] who had optional life insurance

benefits terminated.  (*Id.* at 23).

   In July and August 2023, the parties cross-moved for summary judgment.  (Filing

Nos. 168, 171).  On March 25, 2024, the court denied Defendants' motion for summary

judgment, and it granted in part and denied in part Plaintiffs' motion for summary

judgment as to liability.  (Filing No. 192 at 35).  First, the court held that the main class

was entitled to company-paid life insurance and granted summary judgment for the main

class on its claims.  (*Id.* at 19).  Second, the court concluded that the subclass was entitled

to lifetime voluntary life insurance benefits and granted summary judgment for the

subclass on its claims, extending its holding solely to retirees from the following six

facilities: Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile,

Alabama; Point Comfort, Texas; and Rockdale, Texas.  (*Id.* at 20–21, 28 & n.14).  Lastly,

the court concluded that Alcoa's affirmative defense—that class members waived any

entitlement to life insurance benefits by cashing checks from Alcoa that purported to

waive any claim for life insurance—was not an appropriate ground for summary

judgment for either party on a class-wide basis and decertified any retiree who cashed a

check from the class action.  (*Id.* at 28–29, 34).  Because named plaintiff Martin L.

Ellison cashed a check, he remained in the case in an individual capacity.  (*Id.* at 34).

---

[1] Both the main class and the subclass also include retirees from the Wenatchee, Washington,
facility who were represented by the ATC Union or its predecessors.  (Entry Granting Pls.' Mot.
for Class Certification at 23).

**RSA.37**

Therefore, the court denied the parties' cross-motions for summary judgment without

prejudice with respect to Plaintiff Ellison.  (*Id.* at 35).

On April 22, 2024, Plaintiffs moved to amend the court's summary judgment order

to state that the subclass entitled to summary judgment included retirees from Tapoco,

North Carolina; Massena, New York; Warrick, Indiana; Wenatchee, Washington; and

Richmond, Indiana.  (Filing No. 193).  On March 21, 2025, the court granted in part and

denied in part Plaintiffs' motion.  (Filing No. 217 at 9).  Specifically, the court granted the

motion to the extent it extended its holding on the subclass's claims to retirees from the

facilities in Massena, New York; Warrick, Indiana; and Wenatchee, Washington.  (*Id.* at

7, 9).  It denied the motion with respect to the Tapoco, North Carolina, and Richmond,

Indiana, facilities.  (*Id.* at 9).

On May 3, 2024, Plaintiffs moved for an entry of final judgment.  (Filing No.

200).  Because Plaintiff Ellison and his claims remained in the case, the court construed

Plaintiffs' motion as a Federal Rule of Civil Procedure 54(b) motion for partial final

judgment.  (*See* Filing No. 218 at 3–4).  On March 21, 2025, the court denied Plaintiffs'

motion because their motion was untimely and they did not demonstrate extreme

hardship justifying their delay.  (*Id.* at 4–6).

On May 6, 2025, the parties stipulated to the dismissal without prejudice of

Ellison and his claims from the action.  (Filing No. 224).  The court acknowledged the

dismissal on May 7, 2025.  (Filing No. 225).

Also on May 6, 2025, Plaintiffs filed a Consent Motion to Amend Subclass

Definition.  (Filing No. 223).  The parties agreed that the claims of the individuals who

**RSA.38**

retired from the Tapoco and Richmond facilities were no longer suitable for class resolution because their claims could not be decided on the basis of the contractual agreements that applied to the rest of the subclass. (*Id.* ¶¶ 7–8). On May 12, 2025, the court granted Plaintiffs' motion and amended the subclass definition to limit the subclass to those who retired from the facilities in Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile, Alabama; Point Comfort, Texas; Rockdale, Texas; Massena, New York; Warrick, Indiana; or Wenatchee, Washington. (Filing No. 226).

On May 15, 2025, Plaintiffs filed the instant Motion for Entry of Order of Final Judgment. (Filing No. 227, Pls.' Mot. for Entry of Order of Final J.).

## II.    Discussion

Plaintiffs move pursuant to Federal Rule of Civil Procedure 58 for an entry of judgment. *See* Fed. R. Civ. P. 58(a), (d). They ask for an injunction requiring Alcoa to (1) reinstate company-paid life insurance coverage and voluntary life insurance coverage and (2) "ensure that the beneficiaries of any Class Member or Subclass Member who died since Alcoa terminated those coverages receive the life insurance benefit they would have received but for Alcoa's unlawful termination of that coverage." (Pls.' Mot. for Entry of Order of Final J. ¶ 7). Additionally, for those class or subclass members who died or will die between termination and reinstatement of coverage, Plaintiffs argue that their beneficiaries are entitled to prejudgment interest, calculated at the average prime rate of interest, compounded monthly. (*Id.* ¶¶ 8–10).

Defendants take issue with two aspects of Plaintiffs' requested injunctive relief. First, Defendants argue that a requirement that Alcoa "ensure" beneficiaries "receive"

4

**RSA.39**

their life insurance benefits is confusing and would make Alcoa responsible for events outside its control. (Filing No. 228, Defs.' Resp. at 1). Second, Defendants contend prejudgment interest should be compounded annually.

**A.    Language of the Injunction**

Plaintiffs disagree that their proposed language that Alcoa ensure beneficiaries receive the life insurance benefits owed is confusing or otherwise inappropriate. That said, Plaintiffs acknowledge that they "simply want the beneficiaries of deceased Class/Subclass Members to get the life insurance benefit payments" owed and that an injunction requiring Alcoa to "pay the beneficiaries the life insurance benefit they would have received but for Alcoa's unlawful termination of that coverage, plus prejudgment interest," as proposed by Defendants, will suffice. (Filing No. 229, Pls.' Reply at 3). Accordingly, the court accepts the language agreed to by the parties.

Defendants do not raise any other argument with respect to the requirements of Plaintiffs' proposed injunction or the language contained therein.

**B.    Prejudgment Interest**

Plaintiffs request that life insurance benefits owed prior to reinstatement of coverage be paid with prejudgment interest. Defendants do not dispute that prejudgment interest should be awarded. The court agrees that an award of prejudgment interest is appropriate here to make Plaintiffs whole. *See Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) ("Courts award prejudgment interest because compensation deferred is compensation reduced by the time value of money, and only prejudgment interest can make the plaintiff whole." (internal quotation marks omitted)); *Fritcher v. Health Care*

5

**RSA.40**

*Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002) (explaining that "prejudgment interest should be presumptively available to victims of federal law violations," including in ERISA cases, because "[w]ithout it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay").

Plaintiffs submit that the appropriate prejudgment interest rate is the simple average prime interest rate from the initiation of this lawsuit to the date of judgment, which is the approach the court used in another ERISA case involving Alcoa. *See* Entry Granting Pls.' Mot. for Entry of Order of J. at 19–21, *Kaiser v. Alcoa USA Corp.*, 3:20-cv-278-RLY-CSW (S.D. Ind. Mar. 28, 2025), Dkt. No. 180. Defendants do not argue otherwise. The court concludes that the simple average prime interest rate from the initiation of this case to the date of judgment is appropriate. *See Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) ("[T]he best starting point is to award interest" by using the "average of the prime rate for the years in question." (emphasis omitted)); *see J.K.J. v. Polk County*, Nos. 15-cv-428, 15-cv-433, 2018 WL 2271166, at *2 (W.D. Wis. May 17, 2018) (explaining that the simple average prime rate, as opposed to the weighted average prime rate, "not only seems more practical, it appears to be more widely accepted by the Seventh Circuit"). The court calculates that figure to be 6.26%.[2]

That leaves the issue of compounding interest. "Compound interest generally more fully compensates a plaintiff . . . ." *Am. Nat'l Fire Ins. ex rel. Tabacalera*

---

[2] *See Historical Prime Rate*, JPMorganChase, https://www.jpmorganchase.com/legal/historical-prime-rate (last visited Aug. 14, 2025).

**RSA.41**

*Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 938 (7th Cir. 2003).  The

parties disagree about whether interest should be compounded monthly or annually.

Courts in the Seventh Circuit typically compound interest either annually or monthly.

*Allen v. Int'l Truck & Engine Corp.*, No. 1:02-cv-00902-RLY-MJD, 2017 WL 1382610,

at *10 (S.D. Ind. Apr. 18, 2017).  The court, in its discretion, concludes that interest

should be compounded monthly.  *See Frey*, 903 F.3d at 682.  As one court put it:

> Because monthly compounding of interest is standard on everything from
> mortgages to credit cards to car loans, such compounding is appropriate here.
> By compounding the interest at a lesser frequency, Defendants would be
> profiting from their wrong and Plaintiff would not be compensated fully for
> the lost value of her money in the marketplace.

*Cabernoch v. Union Lab. Life Ins.*, No. 06 C 1515, 2009 WL 2497669, at *4 (N.D. Ill.

Aug. 14, 2009).  Monthly compounding is appropriate because it will better compensate

class members and ensure Alcoa "does not benefit from what amounts to an interest-free

loan obtained as a result of illegal activity."  *Allen*, 2017 WL 1382610, at *10.

    In sum, the court concludes that class members are entitled to prejudgment

interest, at the average prime rate of 6.26%, compounded monthly, on life insurance

benefits owed prior to Alcoa's reinstatement of coverage.

**RSA.42**

### III.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Entry of Order of Final Judgment (Filing No. 227) is **GRANTED**, except to the extent the court modifies the language of the proposed injunction to require Alcoa to "pay" beneficiaries life insurance benefits owed before reinstatement.  Plaintiffs shall have **45 days** from the date of this Entry to file a motion for attorney's fees, costs, and expenses.  The injunction shall be set forth in a separate order.  Additionally, final judgment shall follow by separate order.

**IT IS SO ORDERED** this 20th day of August 2025.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.

**RSA.43**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| EDMOND M. BUTCH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:19-cv-00258-RLY-CSW |
| | ) | |
| ALCOA USA CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING PERMANENT INJUNCTION**

Consistent with the court's summary judgment entry concluding that the main

class was entitled to company-paid life insurance and the subclass was entitled to lifetime

voluntary life insurance benefits, the court **DECLARES** as follows:

1. The company-paid life insurance that had been provided to class members[1]

   immediately prior to Alcoa's termination of such coverage effective December

   31, 2019, is guaranteed by the 2019–2023 CBA and the 2023–2026 CBA

   between Alcoa and the USW.  Class members are entitled to company-paid

   retiree life insurance under the 2023–2026 CBA.

---

[1] Class members who cashed checks from Alcoa have been decertified from this action.  (*See*
Filing No. 192, Summ. J. Entry at 34).  In this Order, references to class members refer to those
individuals who are part of the class certified by the court on September 28, 2022, (Filing No.
117, Entry Granting Class Certification), and who did not cash checks from Alcoa.

1

**RSA.44**

2. The voluntary retiree life insurance that had been provided to subclass members[2] immediately prior to Alcoa's termination of such coverage effective December 31, 2019, is guaranteed for the lifetime of subclass members. Subclass members are entitled to lifetime voluntary retiree life insurance.

The court now issues the following permanent injunction:

3. Consistent with this declaration of rights, Alcoa must promptly reinstate and maintain said coverages and notify class members and subclass members that such coverages have been reinstated pursuant to this Order.

4. For all class or subclass members who died or will die between the time Alcoa terminated life insurance coverage and the time Alcoa reinstates that coverage, Alcoa shall pay the beneficiaries the life insurance benefit they would have received but for Alcoa's unlawful termination of that coverage, plus prejudgment interest at a rate of 6.26%, compounded monthly from the date of death, along with a notification that such benefits have been required by this Order.

5. No later than sixty days after entry of this Order, Alcoa must file with the court a detailed explanation of its actions pursuant to paragraphs 3 and 4. In addition, Alcoa must meet and confer with Plaintiffs to the extent Plaintiffs have any questions about the particular life insurance benefits reinstated to

---

[2] Subclass members who cashed checks from Alcoa have been decertified from this action. (*See* Summ. J. Entry at 34). In this Order, references to subclass members refer to those individuals who are part of the subclass as defined by the court on May 12, 2025, (Filing No. 226, Order Amending Subclass Definition), and who did not cash checks from Alcoa.

**RSA.45**

individual class members or subclass members or the amounts paid to the

beneficiaries of any class members or subclass members who have died.

**IT IS SO ORDERED** this 20th day of August 2025.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.

**RSA.46**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

EDMOND M. BUTCH, *et al.*,          )
                                    )
                Plaintiffs,         )
                                    )
        v.                          )        No. 3:19-cv-00258-RLY-CSW
                                    )
ALCOA USA CORP., *et al.*,          )
                                    )
                Defendants.         )

## FINAL JUDGMENT

The court has granted summary judgment for Plaintiffs and issued a permanent

injunction.  Accordingly, the court now enters final judgment in favor of the Plaintiffs and

against the Defendants.

**IT IS SO ORDERED** this 20th day of August 2025.


_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Kristine L. Seufert, Clerk


BY:  _____
     Deputy Clerk, U.S. District Court



Distributed Electronically to Registered Counsel of Record.


1

**RSA.47**