No. 25-2635

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

Edmond M. Butch, Charles R. Wyatt, Daniel A. Henry, and Robert H. Crow, *on behalf of themselves and all persons similarly situated*; United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC; and Aluminum Trades Council of Wenatchee, Washington AFL-CIO, **Plaintiffs-Appellees,**

v.

Alcoa USA Corp.; Retirees Group Benefits Plan for Certain Hourly Employees of Alcoa USA Corp.; and Optional Life Insurance Plan, **Defendants-Appellants.**

Appeal from the U.S. District Court for the Southern District of Indiana (Hon. Richard L. Young), Case No. 3:19-cv-258-RLY-CSW

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

Joel R. Hurt
*Counsel of Record*
Ruairi McDonnell
**FEINSTEIN DOYLE PAYNE**
**& KRAVEC, LLC**
Law & Finance Building, Suite 1300
429 Fourth Avenue
Pittsburgh, PA  15219
Telephone:  412-281-8400

*Counsel for Plaintiffs-Appellees*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2635

Short Caption: Butch, et al. v. Alcoa USA Corp., et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Edmond Butch, Charles R. Wyatt, Dan Henry, Robert Crow, United Steel, Paper & Forestry, Rubber, Manuf., Energy;

Allied Indus. & Service Workers Int'l Union, AFL-CIO/CLC; Alum.Trades Council of Wenatchee, Washington AFL-CIO

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Feinstein Doyle Payne & Kravec LLC

Macey Swanson LLP

(3)    If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: _____      Date: September 22, 2025

Attorney's Printed Name: Joel R. Hurt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      Yes ✔      No ☐

Address: Feinstein Doyle Payne & Kravec, LLC

429 Fourth Avenue, Suite 1300, Pittsburgh, PA 15219

Phone Number: 412-281-8400      Fax Number: 412-281-1007

E-Mail Address: jhurt@fdpklaw.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2635

Short Caption: Butch, et al. v. Alcoa USA Corp., et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Edmond Butch, Charles R. Wyatt, Dan Henry, Robert Crow, United Steel, Paper & Forestry, Rubber, Manuf., Energy;

Allied Indus. & Service Workers Int'l Union, AFL-CIO/CLC; Alum.Trades Council of Wenatchee, Washington AFL-CIO

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Feinstein Doyle Payne & Kravec LLC

Macey Swanson LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:




Attorney's Signature: _____    Date: September 22, 2025

Attorney's Printed Name: Ruairi McDonnell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☐

Address: Feinstein Doyle Payne & Kravec, LLC

    429 Fourth Avenue, Suite 1300, Pittsburgh, PA 15219

Phone Number: 412-281-8400    Fax Number: 412-281-1007

E-Mail Address: rmcdonnell@fdpklaw.com

rev. 12/19 AK

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................iii

I.    INTRODUCTION.................................................................... 1

II.   JURISDICTIONAL  STATEMENT ........................................ 3

III.  STATEMENT OF THE ISSUES...................................... 3

IV.   STATEMENT OF THE CASE ........................................... 4

    A.  General background ...................................................... 4

    B.  Company paid life insurance...................................... 6

        1.  The parties' Cap agreement creates a distinction between Alcoa's pre- and post-1993 retirees. ................. 6

        2.  During the term of the 2010 CBAs, the parties agree to new 2013 Retiree SPDs.................................... 8

        3.  The parties carried forward the terms of the 2013 Retiree Life Insurance SPD in subsequent negotiations. .............. 12

    C.  Voluntary life insurance.............................................. 13

    D.  Alcoa terminated life insurance in 2019 ................................. 15

V.    STANDARD OF REVIEW .............................................. 17

VI.   SUMMARY OF THE ARGUMENT ............................... 18

    A.  Company-paid life insurance .................................... 18

    B.  Voluntary life insurance............................................ 21

VII.  ARGUMENT ..................................................................... 23

    A.  Company-paid life insurance. ................................... 23

1. The 2019 CBA and incorporated 2013 Retiree Life Insurance SPD provide life insurance to the Main Class....................................23

2. *Stone's* "general rule" does not help Alcoa .......................27

3. Alcoa cannot escape the obligations imposed by the 2013 Retiree Life Insurance SPD........................................29

   a. Alcoa conceded that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD before the District Court..................................................30

   b. The record evidence demonstrates that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD. .................................................33

   c. The 2013 Retiree Life Insurance SPD cannot reasonably be read as being incorporated into expired, defunct CBAs. ..............................................37

4. The "Recognition" provision does not preclude the 2019 CBA from granting life insurance benefits to class members. ...............................................44

5. The Retiree Health Care Letter does not imply an intention to exclude retiree life insurance from the 2019 CBA.…………………………………………………47

6. The extrinsic evidence favors Plaintiffs. ...........................51

B. Voluntary life insurance............................................58

1. The 1993 and 1996 Active Employee SPDs unambiguously grant lifetime benefits. ...........................58

2. The "continued for life" agreement remained as an implied term in post-1996 CBAs. ...................................66

VIII. CONCLUSION ...............................................................70

CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND TYPEFACE REQUIREMENTS...............................................71

CERTIFICATE OF SERVICE................................................................72

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Aeroground, Inc. v. CenterPoint Props. Tr.,*
    738 F.3d 810 (7th Cir. 2013) ...................................................... 47, 63

*AFC Franchising, LLC v. Purugganan,*
    43 F.4th 1285 (11th Cir. 2022) ....................................................... 26

*Alabama v. North Carolina,*
    560 U.S. 330 (2010) ...................................................................... 58

*Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate
Glass Co.*
    404 U.S. 157 (1971) ................................................................. 28, 45

*Aurora Loan Servs. v. Craddieth,*
    442 F.3d 1018 (7th Cir. 2006) ......................................................... 28

*Beanstalk Grp. v. Am Gen. Corp.,*
    283 F.3d 856 (7th Cir. 2002) ........................................................... 38

*Bidlack v. Wheelabrator Corp.*
    993 F.2d 603 (7th Cir. 1993) ..................................................... 64, 67

*Bland v. Fiatallis N. Am., Inc.,*
    401 F.3d 779 (7th Cir. 2005) ........................................................... 65

*Cheli v. Taylorville Cmty. Sch. Dist.,*
    986 F.3d 1035 (7th Cir. 2021) ......................................................... 60

*Diehl v. Twin Disc,*
    102 F.3d 301 (7th Cir. 1996) ................................................... *passim*

*Dispatch Automation, Inc. v. Richards,*
    280 F.3d 1116 (7th Cir. 2002) ......................................................... 38

*Domka v. Portage Cty.,*
    523 F.3d 776 (7th Cir. 2008) ..................................................... 30, 31

*Fednav Int'l Ltd. v. Cont'l Ins. Co.,*
    624 F.3d 834 (7th Cir. 2010) ..................................................... 19, 31

*Hughes v. Sw. Airlines Co.*,
   961 F.3d 986 (7th Cir. 2020) ............................................................ 41

*Ill. Conference of Teamsters & Emp'rs Welfare Fund v. Mrowicki*,
   44 F.3d 451 (7th Cir. 1994) .............................................................. 66

*Kenseth v. Dean Health Plan, Inc.*,
   722 F.3d 869 (7th Cir. 2013) ............................................................ 69

*Kunkel v. Commissioner*,
   821 F.3d 908 (7th Cir. 2016) ............................................................ 54

*Large v. Mobile Tool Int'l, Inc.*,
   724 F.3d 766 (7th Cir. 2013) ............................................................ 36

*M&G Polymers USA, LLC v. Tackett*,
   574 U.S. 427 (2015) ........................................................................ 29

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013) ....................................................... 25-26

*Mastrobuono v. Shearson, Lehman, Hutton, Inc.*,
   514 U.S. 52 (1995) .......................................................................... 26

*Old Colony Tr. Co. v. Omaha*,
   230 U.S. 100 (1913) .................................................................. 58, 69

*Premcor USA, Inc. v. Am. Home Assurance Co.*,
   400 F.3d 523 (7th Cir. 2005) ............................................................ 26

*Rossetto v. Pabst Brewing Co.*,
   128 F.3d 538 (7th Cir. 1997) ............................................................ 45

*Skycom Corp. v. Telstar Corp.*,
   813 F.2d 810 (7th Cir. 1987) ............................................................ 54

*Stone v. Signode Indus. Grp. LLC*,
   943 F.3d 381 (7th Cir. 2020) ................................................... *passim*

*Sullivan v. CUNA Mut. Ins. Soc'y*,
   649 F.3d 553 (7th Cir. 2011) ............................................................ 63

*Taracorp v. NL Indus.*,
   73 F.3d 738 (7th Cir. 1996) ..................................................... *passim*

iv

*UAW v. Rockford Powertrain, Inc.*,
    350 F.3d 698 (7th Cir. 2003) .................................................. 36-37, 63

*UMW v. Brushy Creek Coal Co.*,
    505 F.3d 764 (7th Cir. 2007) .......................................................... 63

*United States v. Crawley*,
    837 F.2d 291 (7th Cir. 1988) .......................................................... 65

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. &
Serv. Workers Int'l Union v. NLRB*,
    544 F.3d 841 (7th Cir. 2008) .......................................................... 47

*United Steelworkers of Am. v. Am. Mfg. Co.*,
    363 U.S. 564 (1960) ........................................................................ 49

*Vallone v. CNA Fin. Corp.*,
    375 F.3d 623 (7th Cir. 2004) .......................................................... 63

*Young v. Verizon's Bell Atl. Cash Balance Plan*,
    615 F.3d 808 (7th Cir. 2010) .......................................................... 61

*Zielinski v. Pabst Brewing Co.*,
    463 F.3d 615 (7th Cir. 2006) ..................................................... 59-60

## I.    INTRODUCTION

Below, the District Court held that Alcoa breached its unambiguous collective bargaining agreements ("CBAs") when it terminated two types of retiree life insurance it had long provided to union retirees at the end of 2019. Rightly so.

The first type of insurance is known as "Company-paid" life insurance. On that front, the CBA in effect when Alcoa terminated benefits provided that "eligible retirees" will be provided life insurance benefits. In addition, an incorporated summary plan description known as "the 2013 Retiree Life Insurance SPD" required the Company-paid life insurance to be provided to class members "for the term of the collective bargaining agreement[.]" On its face, this language clearly grants Company-paid benefits during the CBA's term to the class members in this case.

However, that's not all. The language in the 2013 Retiree Life Insurance SPD mirrored the language in Alcoa's "2013 Retiree *Health Insurance* SPD" which described the health benefits that were, undisputedly, contractually guaranteed to class members for the term of the CBA. And in turn, the language in both Retiree SPDs mirrored the

language in the incorporated SPDs applicable to Alcoa's *active employees* ("Active Employee SPDs") which described benefits that are axiomatically guaranteed for the term of the CBA. Thus, the textual identity between the 2013 Retiree Life Insurance SPD on one hand and the 2013 Retiree Health Insurance SPD and Active Employee SPDs on the other cements the conclusion that Company-paid retiree benefits were guaranteed for the CBA's term. *See, e.g., Taracorp v. NL Indus.*, 73 F.3d 738, 744 (7th Cir. 1996) (in contractual interpretation, as in statutory interpretation, "we assume that the same words have the same meaning").

The second type of insurance is known as "Voluntary" life insurance. On that score, the parties' Active Employee SPDs incorporated into their CBAs from 1993 and 1996 stated that upon retirement, such benefits would be "*continued for life*[,]" much like the language this Court in *Diehl v. Twin Disc*, 102 F.3d 301, 306-308 (7th Cir. 1996) held to unambiguously grant lifetime benefits to retirees. The parties' subsequent agreements did not contain the same language. However, since in each round of bargaining after 1996 the parties carried forward their agreement that retiring employees would receive

Voluntary life insurance that "continued for life[,]" the post-1996 CBAs "provide for vesting through implied terms." *See Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 385 (7th Cir. 2020).

In its appeal brief ("Brief"), Alcoa asks this Court to find these agreements unambiguous in its favor. But Alcoa's arguments only highlight the lack of merit to its claim that the class member retirees' rights to life insurance ended with the expiration of the CBAs that were in effect when they retired. As explained below, that is because it is simply impossible to accept Alcoa's interpretation of the parties' written agreements without violating several well-established rules of contractual interpretation along the way.

## II.  JURISDICTIONAL STATEMENT

Alcoa's jurisdictional statement is complete and correct.

## III.  STATEMENT OF THE ISSUES

1.    Did the District Court err when it held that Alcoa, by terminating Company-paid life insurance, breached the 2019 CBA and incorporated 2013 Retiree Life Insurance SPD?

**Suggested Answer: No.**

2.    Did the District Court err when it held that Alcoa, by terminating Voluntary life insurance, breached the CBAs in effect when Subclass members retired?

**Suggested Answer: No.**

## IV.  STATEMENT OF THE CASE

### A.    General background

For years, Alcoa and the Plaintiff unions, including the United Steelworkers, have negotiated "Master CBAs." JA.450-451 (¶1).[1] Those Master CBAs, which covered most Alcoa facilities, provided health and life insurance benefits for bargaining unit employees, including upon retirement. JA.451 (¶2).

The Master CBAs were usually effective for several years, so Alcoa and the unions would periodically negotiate new ones. *Id.* (¶3). Those negotiations did not begin from scratch; instead, the parties negotiated changes to the current CBA, and would conclude by agreeing upon a "Memorandum of Understanding" or "Settlement Agreement" that identified the terms amended in, added to, or deleted from, the new CBA.

---

[1] Consistent with Alcoa's approach, references to "Alcoa" and the "unions" generally include predecessors.

*Id.* Those documents typically stated that "the current labor agreements" would "remain unchanged except as modified" during the negotiations. JA.103; JA.197; JA.404; JA.412; JA.418; JA.668. *See also* JA.475-76; JA.498-99.

The Master CBAs contain an Article titled "Group Insurance," which provide that health and life insurance benefits would be provided to "active employees" and, separately, "retired employees" or "retirees." JA.451 (¶4). This provision further states that "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement." *Id.* The "separate booklets" are summary plan descriptions ("SPDs") required by ERISA which contain the details of the negotiated benefits. JA.452 (¶5); JA.482-484; JA.504-505. As Alcoa's negotiator Mike McAdoo testified, new SPDs would be produced if the negotiated changes were "substantial enough[,]" but not if there were only "small changes." JA.484.

Scott Kovaloski was Alcoa's liaison to union representative Cary Burnell regarding the drafting and editing of those SPDs. JA.506. Because of what Mr. Kovaloski described as the "back and forth" "tennis match" between the company and union over the wording in the SPDs,

Alcoa would typically publish the SPDs after the CBAs into which they were incorporated had been negotiated. JA.506-507; JA.452 (¶5); JA.535.[2]

## B.   Company-paid life insurance

### 1.   The parties' Cap agreement creates a distinction between Alcoa's pre- and post-1993 retirees.

In 1993, Alcoa and the union agreed that employees retiring in the future would be subject to a "Cap" on Alcoa's spending on their retiree health care. JA.452 (¶6). This agreement was memorialized in a "Cap letter" which explained that the Cap could not be engaged until after the 1993 CBAs' expiration. *Id.* (¶¶6-7). When the parties deferred the Cap's engagement in the next two rounds of bargaining, the Cap letter in the 1996 and 2001 CBAs stated that "the Company shall maintain its program of medical benefits for post May 31, 1993 retirees" subject to the Cap being implemented at a later time. JA.453-454 (¶¶11, 14).

In 2006, Alcoa and the unions agreed to engage the Cap, and that agreement was recorded in a new letter in the 2006 CBAs titled "Retiree Health Care" which stated that "the Company will maintain its program

---

[2] As will be discussed, it is those SPDs that primarily support both claims here.

of medical and prescription drug benefits ('Program') for post May 31, 1993 retirees" subject to the Cap. JA.456 (¶20); JA.210-214; JA.222-230. The Retiree Health Care Letter applied to post-1993 retirees from 20 operational facilities identified as "USW Locations" and 15 closed or sold facilities identified as "Other USW Locations." JA.456-457 (¶20); JA.210; JA.214; JA.222; JA.229.

During this period, the Capped post-1993 retirees were also entitled to Company-paid life insurance benefits upon retirement, as described in incorporated SPDs detailing active employees' sickness & accident and life insurance benefits (hereinafter, the "Active Employee SPDs").[3] *E.g.*, JA.452 (¶20); JA.457 (¶22). Under the 1993 CBAs, retiring employees were entitled to $35,000 in Company-paid insurance until age 62, when the benefit reduced to $4,500. JA.452-453 (¶¶8-9). In 1996, the parties increased the post-62 benefit to $5,000. JA.454 (¶12). In 2001, the pre-62 benefit was increased to $40,000 and the post-62 benefit to $7,500. JA.455 (¶¶15-17). And in 2006, the parties increased the pre-62 benefit

---

[3] Plaintiffs use the capitalized term "Active Employee SPDs" to refer to the sickness & accident and life insurance SPDs, consistent with Alcoa's terminology, but the parties had active employee SPDs for other benefits too, including health insurance. *E.g.,* JA.337; JA.513.

to $44,000. JA.457 (¶¶21-23). Each negotiated increase applied prospectively, to employees retiring in the future. JA.452-455, JA.457 (¶¶8-9, 12, 14-16, 21-23).

### 2. During the term of the 2010 CBAs, the parties agree to new 2013 Retiree SPDs.

In the next round of negotiations in 2010, the parties increased the pre-62 benefit to $48,000; that increase was reflected in the 2012 Active Employee SPD. JA.458 (¶¶25-27); JA.346; JA.364. They also agreed upon a revised Retiree Health Care Letter in the 2010 CBAs which identified premiums that would apply to the post-1993 retirees during 2011, 2012, 2013, and 2014. JA.254; JA.260-261; JA.269; JA.275-276; JA.285; JA.291-292. In addition, the parties decided that employees hired on or after July 1, 2010 would not get retiree health care. JA.254; JA.269; JA.285.

In December, 2012, Mr. Kovaloski emailed Mr. Burnell, copying the chief negotiators for Alcoa and the union, and providing drafts of a "Retiree Health Care SPD that will apply to the retirees covered by the Retiree Health Care Agreement (dates of retirement on/after June 1, 1993)" and a "Retiree Life Insurance SPD[.]" JA.558-559; JA.512-513. These were Alcoa's first retiree-specific SPDs. JA.558-559; JA.513;

JA.515. Mr. Kovaloski explained, "a separate SPD for life insurance is necessary since new hires are still eligible for Retiree Life, whereas they are not eligible for Retiree Health Care." JA.559. He said that he had used the active employee SPDs as models for the new Retiree SPDs and asked Mr. Burnell to "provide comments" on both SPDs. JA.558-559; JA.514. Later, Mr. Kovaloski sent Mr. Burnell another set of drafts and again requested his comments. JA.561; JA.518.

In October of 2013, Alcoa finalized and sent the new 2013 Retiree Health Insurance SPD and 2013 Retiree Life Insurance SPD to the post-1993 retirees, along with a cover letter identifying both as "Agreement[s]." JA.459 (¶29); JA.565-567; JA.519-524. Alcoa also emailed copies to local union leaders, advising them to "use these electronic copies as your resource should anyone come to you with questions." JA.565; JA.519-520.

With the exception of the fact that those hired on or after June 1, 2010 were not eligible for retiree health care, the SPDs applied to the same group, as both stated under a "Participating Unions" section that "You are eligible to participate in the Alcoa [] plan as described in this booklet if you are a retiree who, as an active employee [] was covered by

a collective bargaining agreement between Alcoa and one of the unions listed [below/on the following page]." JA.627; JA.657-658. Following this was a table which identified, for those "who retire/retired on or after June 1, 1993," the "USW Locations" and "Other USW Locations" from the Retiree Health Care Letter. JA.627; JA.658.

The SPDs also described the benefits then being provided to post-1993 retirees. The 2013 Retiree Life Insurance SPD included a table titled "Benefit Payment" which reflected five different Company-paid benefit amounts for those who retired during the 1993, 1996, 2001, 2006, and 2010 CBAs, respectively. JA.654.[4] The 2013 Retiree Health Insurance SPD described the 2011-2014 premium schedule in the 2010 CBA's Retiree Health Care Letter, explaining that "Alcoa capped the amount in pays for retiree health care coverage." *Compare* JA.578 *with* JA.261, JA.276, JA.292. It also listed Medicare Part B reimbursement amounts for post-1993 retirees based on retirement date, consistent with 2010 CBAs' "Group Insurance" provision and Retiree Health Care Letter.

---

[4] The 2013 Retiree Life Insurance SPD did not address Voluntary life insurance. JA.652.

*Compare* JA.579 *with* JA.250, JA.266, JA.281-282, *and with* JA.262, JA.277, JA.293.

In large part, the language in each Retiree SPD was the same as the other, and in turn, the same as that in the active employee SPDs. For example, both Retiree SPDs had "Master Agreement Plan" on the cover, as did the 2012 Active Employee SPD. *Compare* JA.648 *and* JA.571 *with* JA.346. Both Retiree SPDs also stated that they were "the plan document and summary plan description" of the benefits described therein and "incorporated in and made part of the collective bargaining agreements between Alcoa Inc. and the unions listed under the 'Participating Unions'" section of the SPDs, just like the 2012 Active Employee SPD. *Compare* JA.650 *and* JA.573 *with* JA.348. Finally, like the 2012 Active Employee SPD, the 2013 Retiree Life Insurance SPD contained a "Future of the Plan" provision stating:

> The plan described in this booklet is provided for the term of the collective bargaining agreement between the union and Alcoa, Inc. The company reserves the right to make administrative changes to the plan from time to time. However, these changes cannot diminish the benefits negotiated under the terms of the agreement.

*Compare* JA.664 *with* JA.394. Except for two minor differences, the "Future of the Plan" provision in the 2013 Retiree Health Insurance SPD was identical. JA.638.

### 3. The parties carried forward the terms of the 2013 Retiree Life Insurance SPD in subsequent negotiations.

In the following round of bargaining in 2014, the parties agreed to carry forward the Retiree Health Care Letter, subject to new premiums. JA.460 (¶30). The parties did not negotiate any changes with respect to life insurance, and their 2014 Settlement Agreement provided that the then-existing 2010 CBAs "shall remain unchanged except as modified[.]"*Id.* (¶¶31-32); JA.197.[5]

By the next round of negotiations in 2019, the only operating Alcoa Master Agreement locations were Warrick, Indiana and Massena, New York. JA.080. The parties agreed to a revised Retiree Health Care Letter,

---

[5] In 2016, the then-existing Alcoa Inc. split into two new companies (Arconic and Alcoa, the defendant here) and divvied up responsibility for employees and retirees by location. Pursuant to a Letter of Understanding between the company and union whereby the new companies would create "mirror" plans of those existing at that time, Mr. Kovaloski revised the 2013 Retiree Life Insurance SPD to reflect the new corporate names and the locations that had become the responsibility of each new company. JA.066-71; JA.854-857; JA.862-882. Alcoa, however, never finalized its version. JA.078 (¶41); JA.835-836.

but negotiated no changes with respect to life insurance. JA.461-462 (¶¶37-38); JA.094. The 2019 Settlement Agreement provided that the 2014 CBAs "shall remain unchanged except as modified[.]"JA.103.

In bargaining in 2023 (at which point this litigation was pending, without a merits ruling), the parties agreed that employees retiring after the end of the 2023 CBA would no longer be eligible for retiree life insurance. JA.465 (¶51); JA.674. The parties did not negotiate any other changes with respect to life insurance, but did agree that the "2013 Retiree Life Insurance Agreement (as updated by subsequent Labor and Settlement Agreements) will be amended and restated effective January 1, 2024[.]" JA.465 (¶51); JA.673. The 2023 Settlement Agreement provided that "the current labor agreements . . . shall remain unchanged except as modified" therein. JA.465 (¶51); JA.668.

## C.    Voluntary life insurance

Voluntary life insurance was addressed in the Active Employee SPDs. Specifically, the Active Employee SPDs incorporated into the 1993 CBAs devoted 12 pages to optional, supplemental life insurance for which employees paid premiums, including "Voluntary Life Insurance" which was "frozen and applied exclusively to employees enrolled . . . before

March 1, 1978." JA.132-143; JA.316-327. Under the SPDs' "Voluntary Life Insurance" section, a sub-section labeled "When You Are Retired And Age 65 and Older" stated that "Life insurance will be maintained in full to age 65" and that at age 65, the amount would be reduced and "[t]he reduced amounts are continued for life[.]" JA.139, JA.141; JA.323, JA.325. That language remained in the 1996 Active Employee SPDs. JA.187; *see also* JA.337-338; JA.340-341; JA.343-344; JA.454 (¶12).

In 2001, while the parties agreed in their Memoranda of Understanding to increase the Company-paid benefit as one of their "substantive changes to the Summary Plan Descriptions . . . for active hourly employees[,]" they negotiated no other changes with respect to life insurance. JA.454-456 (¶¶14-16); JA.400; JA.403; D.Ct. ECF No. 102-35 at 39-42; ECF No. 102-34 at 15-17. Nevertheless, when Alcoa issued the 2003 Active Employee SPD, the once-robust section on optional life insurance coverages had been reduced to three pages, D.Ct. ECF No. 102-30 at 22-24, and the only thing it said about retirement was that employees could "contact MetLife directly for information, including . . . reductions in coverage when you reach age 65 or retire." *Id.* at 24.

In bargaining in 2006, 2010, and 2014, the parties did not negotiate any changes with respect to active employees' Voluntary life insurance (including upon retirement), and agreed that unless modified, their then-current agreements would continue "unchanged." JA.404; JA.412; JA.418; JA.197; JA.457-458, 460 (¶¶21, 25, 31-32). Like the 2003 version, the 2008, 2012, and 2017 Active Employee SPDs incorporated into the 2006, 2010, and 2014 CBAs continued to say nothing about retirement and simply referred employees to MetLife for more information. D.Ct. ECF No. 102-31 at 2, 38; JA.346, JA.382; D.Ct. ECF No. 102-33 at 2, 39; JA.759, JA.810; JA.457-458, 460 (¶¶22-23, 26-27, 35).

## D. Alcoa terminated life insurance in 2019

Effective December 31, 2019, Alcoa eliminated life insurance for employees who had retired on and after June 1, 1993 and prior to the effective date of the 2019 CBA. JA.687.[6] This was the first time Alcoa had ever terminated retiree life insurance. JA.464 (¶48).

---

[6] Quoting JA.687, Alcoa misleadingly claims it "exercised its 'right to amend or terminate'" life insurance benefits " 'in whole or in part at any time'[.]" Brief at p. 9. That so-called "right" is written *nowhere* other than the same non-negotiated December 31, 2019 Plan Amendment document in which Alcoa resolved to terminate benefits. JA.687.

Plaintiffs sued, JA.039-64, and after some discovery, the District Court certified, with respect to Company-paid insurance, a "Main Class" of post-1993 retirees from 26 of the "USW Locations" and "Other USW Locations" identified in the 2013 Retiree Life Insurance SPD. RSA.02-03.[7] It also certified a smaller "Subclass" who had been paying for the supplemental Voluntary insurance. RSA.03.

Later, the parties cross-moved for summary judgment. *Id.* With respect to the Main Class, Plaintiffs contended that Alcoa breached the 2019 CBA and incorporated 2013 Retiree Life Insurance SPD (and remained in breach of the 2023 CBA), which required Company-paid life insurance to be maintained during the term of those agreements. RSA.11-13; JA.449; JA.465. As for Voluntary life insurance, Plaintiffs alleged that Alcoa breached the CBAs in effect when Subclass members retired, thus breaching the "continued for life" obligation set forth explicitly in the 1993 and 1996 agreements and implicitly in those from 2001, 2006, and 2014. JA.465-467.

---

[7] The other locations had been allocated to Arconic in the 2016 corporate split. JA.873.

Alcoa's position regarding both types of insurance was that class members were only entitled to benefits for the term of the CBA in effect when they retired. D.Ct. ECF No. 172 at 8. And since the CBAs in effect when class members retired were expired at the time Alcoa terminated those benefits, nothing was breached. *Id.* at 23.

The District Court ruled for Plaintiffs. RSA.01-35. It found that the 2019 and 2023 CBAs unambiguously granted Company-paid benefits to the Main Class. RSA.11-19. It also found that the 1993 agreements unambiguously granted lifetime benefits to the Subclass, and that Alcoa never subsequently bargained to change that lifetime entitlement. RSA.19-28. The District Court later issued an injunction requiring Alcoa to reinstate coverage and pay benefits to the beneficiaries of the retirees who had died. RSA.36-47.

## V.    STANDARD OF REVIEW

Alcoa is correct when it says that the standard of review is de novo.

## VI.    SUMMARY OF THE ARGUMENT

### A.    Company-paid life insurance

The District Court correctly held that the 2019 CBA and incorporated 2013 Retiree Life Insurance SPD unambiguously granted Company-paid life insurance to the Main Class.

The overarching theme of Alcoa's appeal is that Plaintiffs' winning contractual interpretation runs afoul of the pronouncement in *Stone*, 943 F.3d at 388, that, as a "general rule," a CBA "covers only those who retire while it is still in effect." However, the point in *Stone* was not that CBAs generally do not cover those who retire before the CBA's effective date, as Alcoa suggests, but rather than CBAs generally do not cover those retiring after the CBA expires. That hardly matters though. Even if CBAs do not cover existing retirees as a "general rule," such rules naturally have exceptions. And when ordinary contract principles are applied, it is clear that this case presents one.

Alcoa also argues that the 2019 CBA did not incorporate the 2013 Retiree Life Insurance SPD at all. However, since Alcoa told the District Court that "the 2013 Retiree Life Insurance SPD *is* incorporated into the 2019 CBA" "for employees who retire during the term of the 2019 CBA[,]"

D.Ct. ECF No. 239 at 16-17 (emphasis added), it is barred from denying now what it previously conceded. *See Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010) ("a party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court").

That said, even if Alcoa were permitted to reverse course now, the record evidence makes clear that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD. And Alcoa's competing theory—whereby the SPD is incorporated into the now-expired CBAs in effect when class members retired—is frivolous. Common-sense dictates that there would be no need to retroactively incorporate an SPD into a series of long expired CBAs if, as Alcoa says, those CBAs granted retirees no rights beyond their terms. Moreover, Alcoa's interpretation is simply incompatible with the plain language in the SPD.

Alcoa also says that current retirees are excluded from the 2019 CBA by a "Recognition" provision stating that the agreement "shall apply *solely* to those *employees*" at Warrick and Massena "for whom the Union has been certified as the exclusive bargaining agency by the National Labor Relations Board, or for whom the Company has recognized the

Union as the exclusive bargaining agency." But the first problem with this reading is once an employee retires, even *during* the term of the CBA, he is no longer in "the Union[.]" Thus, if the "Recognition" provision excludes retirees, it excludes not just existing retirees, but also future retirees that both sides agree *are* covered by the CBA.

The second problem is that even under Alcoa's interpretation, the "Recognition" provision *must* be read to permit exceptions because it is undisputed that the 2019 CBA provides *health* benefits to existing retirees. In turn, this means the 2019 CBA may similarly provide Company-paid life insurance to existing retirees. By incorporating the 2013 Retiree Life Insurance SPD, the 2019 CBA did exactly that.

Alcoa's last text-based argument is that the existence of the Retiree Health Care Letter expresses, by negative implication, an intention to *not* provide existing retirees with life insurance. But this ignores the unique origins of that letter. More importantly, it ignores that the parties used the *same* contractual language the 2013 Retiree Life Insurance SPD describing Company-paid life insurance for the Main Class as it did in the 2013 Retiree Health Insurance SPD describing their benefits under the Retiree Health Care Letter. And these similarities show that the

post-1993 retirees were entitled under the 2019 CBA to both health care *and* Company-paid life insurance.

Alcoa's last-ditch effort to persuade the Court that its interpretation is supported by extrinsic evidence fails too. That evidence—not least of which is Alcoa's course of performance over two decades—fully supports Plaintiffs.

### B.    Voluntary life insurance

Alcoa's objections to the District Court's Voluntary life insurance ruling are equally meritless.

To start, Alcoa says that the "continued for life" language in the 1993 and 1996 Active Employee SPDs cannot sustain a finding of vested benefits. To the contrary however, this Court held in *Diehl*, 102 F.3d 301, that similar language granting benefits "for the lifetime" of retirees unambiguously granted benefits that survived the agreement's expiration.

In addition, the "for life" language in the SPDs' Voluntary life insurance provision regarding retiring employees can be readily contrasted with the contractual *silence* in the neighboring provision

regarding active employees. This linguistic difference further bolsters the conclusion that "for life" means just what it says.

Furthermore, contrary to the Alcoa's claims, the "for life" obligation is not cabined by the SPD provision titled "Converting to a Personal Policy" which tells employees about their conversion rights "[i]f your life insurance ends or the plan is discontinued[.]" That is because even if the underlying life insurance "plan" was discontinued, the right to continued "coverage" for life would survive. (Indeed, that is exactly what happened in 2016 when Alcoa's predecessor split into two new entities.) And even if there were any tension between the conversion provision and the provision describing Voluntary life insurance that would "continue[] for life" in retirement, the latter, more specific provision trumps. Indeed, at bottom, Alcoa's repeated harping on the "Converting to a Personal Policy" provision only highlights how the provision is utterly *unlike* the explicit reservation of rights provisions found in other cases to prevent vesting.

Alcoa's objection that there was no written "for life" agreement in connection with the 2001, 2006, 2010, and 2014 CBAs also goes nowhere. Because those agreements contain textual gaps that must be filled, and because the parties never negotiated to remove their "for life" agreement,

the post-1996 agreements "provide for vesting through implied terms."

*Stone*, 943 F.3d at 385

## VII. ARGUMENT

### A. Company-paid life insurance

#### 1. The 2019 CBA and incorporated 2013 Retiree Life Insurance SPD provide life insurance to the Main Class.

The 2019 CBA and incorporated 2013 Retiree Life Insurance SPD unambiguously guarantee Company-paid life insurance benefits to the Main Class for the CBA's term. The 2019 CBA's "Group Insurance" provision provides that "eligible active employees" *and* "eligible retirees" will receive life insurance benefits, JA.090, and as the District Court noted, the dictionary defines "retiree" as "a person who has retired[.]" RSA.12. In addition, the 2013 Retiree Life Insurance SPD, which Alcoa conceded was the SPD applicable to the Main Class at the time it terminated benefits, JA.078 (¶41), clearly defines those retirees "eligible" for Company-paid life insurance as the post-1993 retirees from the plants listed in the SPD, including those in the Main Class. RSA.13-15 (citing JA.648-667). That SPD also clearly states that "[t]he plan described in

this booklet is provided for the term of the collective bargaining agreement[.]" JA.664.

In addition, the District Court aptly noted that Alcoa's competing reading creates a contractual redundancy. RSA.14-15. Alcoa had argued that "the 2013 Retiree Life Insurance SPD is incorporated into the 2019 CBA *only for employees who retired during the term of the 2019 CBA*." D.Ct. ECF No. 239 at 16-17 (emphasis in original; citing D.Ct. ECF No. 172). But for those employees, the 2019 CBA already incorporates the 2020 Active Employee SPD, which states "[i]f you retire: at age 62 or older, the amount of your Company-provided life insurance is reduced to $7,500" while "before age 62, your Company-provided life insurance is maintained in full until you reach age 62; then it is reduced to $7,500." JA.792. Thus, the District Court rightly reasoned that lest it be rendered duplicative, the 2013 Retiree Life Insurance SPD must provide benefits to a "different group," *i.e.*, the existing post-1993 retirees identified in the SPD. RSA.14-15.

Moreover, the SPD language the parties used when addressing the post-1993 retirees' Company-paid life insurance benefits is the same as the SPD language they used when addressing that group's retiree *health*

benefits, which are undisputedly contractually guaranteed pursuant to the Retiree Health Care Letter. As explained, the 2013 Retiree Life Insurance SPD and 2013 Retiree Health Insurance SPD both (1) are titled "Master Agreement Plan," (2) state that the SPD "is the plan document and [] SPD" of the benefits described therein, which are "incorporated" into the CBAs, (3) contain a "Participating Unions" section which identifies the "eligible" post-1993 retirees, and (4) contain a "Future of the Plan" provision which says that the benefits described therein "[are/is] provided for the term of the collective bargaining agreement between the union and Alcoa Inc." *Compare* JA.648, 650, 652, 654, 657-658, 664 *with* JA.571, 573, 575, 579, 627, 638. In turn, this language was originally imported from the active employee SPDs which described benefits that are, like the post-1993 retirees' health benefits, also undisputedly contractually guaranteed for the term of the current CBA. JA.346, 348, 394; JA.558-559. Thus, the only reasonably conclusion to draw is that the Company-paid life insurance benefits of post-1993 retirees are contractually guaranteed under the then-current CBA too. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 811 (7th Cir. 2013) ("one would expect terms appearing in both the general and special

conditions, which together make up the unified local policy, to have the same meaning"); *Taracorp*, 73 F.3d at 744 ("we assume that the same words have the same meaning"); *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1292 (11th Cir. 2022) ("Words 'used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.'") (quoting 11 Williston on Contracts § 32:6 (4th ed., May 2022 Update)).

In the same vein, note that under Plaintiffs' reading, the term "retirees" in the "Group Insurance" provision includes existing post-1993 retirees, JA.090, consistent with that same term in the Retiree Health Care Letter. JA.094. *See Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 527 (7th Cir. 2005) ("A cardinal rule of contract interpretation is that a document 'should be read to give effect to all its provisions and to render them consistent with each other.'") (quoting *Mastrobuono v. Shearson, Lehman, Hutton, Inc.*, 514 U.S. 52, 63 (1995)). On the other hand, in Alcoa's world, the word "retirees" refers to one group in the "Group Insurance" provision—active employees upon their future retirement—and a different group of post-1993 retirees in the Retiree Health Care Letter. *See, e.g.,* Brief at p.16.

Alcoa's objections to the District Court's ruling are examined below.

### 2. *Stone's* "general rule" does not help Alcoa.

We begin with Alcoa's mantra-like invocation of the statement in *Stone*, 943 F.3d at 388, that, as a "general rule," a CBA "covers only those who retire while it is still in effect." *See* Brief at pp. 1, 15-17, 21-22, 24-28, 30, 32-35, 37. Armed with this quote and the fact that current retirees' benefits are a permissive subject of bargaining, Alcoa argues that Plaintiffs' reading of the 2019 CBA "flies in the face" of the "general rule" and that the District Court should have started with the "assumption" that the 2019 CBA does *not* cover the Main Class. *Id.* at pp. 15, 1.

However, *Stone's* "general rule" is not the panacea the company hopes for. As an initial matter, the Court's quote must be read in context. In *Stone*, this Court pointed out that CBAs "generally terminate at some point, giving the parties the opportunity to renegotiate" and "change the scope of benefits for *future* retirees." 943 F.3d at 388 (emphasis in original). It went on to observe that the employer defendant there "might have decided to scale back retirement benefits promised in the [CBA] and exercised its termination right to force the negotiation of a new [CBA] *for future retirees*[,]" prefacing this by recognizing "[a]s a general rule, an

agreement like this one covers only those who retire while it is still in effect." *Id.* (emphasis added). In other words, *Stone* was making the point that CBAs generally do not cover employees retiring *after* the CBA expires, not that that CBAs generally do not cover those who retired *before* the CBA takes effect. Thus, Alcoa improperly attempts to take *Stone* "out of context." *See Aurora Loan Servs. v. Craddieth*, 442 F.3d 1018, 1026 (7th Cir. 2006).

Further, even if *Stone* had announced a "general rule" that CBAs do not cover current retirees, the very nature of a "*general* rule" is that it permits exceptions. As Alcoa notes, existing retirees' benefits are a permissive subject, which means that CBAs *may* grant benefits to them. *See* Brief at pp. 5-6 (citing *Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 176-182 and n.20 (1971)). And here, particularly since Alcoa concedes that the 2019 CBA "depart[ed] from the general rule" with respect to the post-1993 retirees' health benefits, Brief at p. 16, there is no reason that the same could not be true of the post-1993 retirees' Company-paid life insurance benefits.

Additionally, nothing in *Stone* says that courts ought to start with an "*assumption*" that a CBA does not cover current retirees, as Alcoa

urges. *See id.* at p.1 (emphasis added). In fact, such an assumption would be directly *contrary* to ordinary principles of contract law. *See M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 439 (2015) (courts should rely upon "record evidence" rather than "suppositions about the intentions of employees, unions, and employers negotiating retiree benefits").

In sum, Alcoa's repeated citation to *Stone*'s "general rule" does not further its cause. Unfortunately for the company, it needs actual contract language to support its position. As discussed below, it has none.

### 3. Alcoa cannot escape the obligations imposed by the 2013 Retiree Life Insurance SPD.

We now move on to Alcoa's text-specific arguments, starting with the boldest: the company's claim that District Court erred by holding that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD. *See* Brief at pp. 17, 30-35. As Alcoa describes it, the 2013 Retiree Life Insurance SPD is incorporated, for each individual retiree to whom it applies, into the CBA in effect when he or she retired. *See id.* at pp. 33-34. However, says Alcoa, the SPD was *not* incorporated into the 2019 CBA, and the District Court's conclusion that it did rested on nothing more than a logically fallacious, "question begging" assumption. *See id.*

at p. 32. Alcoa also says that the District Court "was simply wrong" when it held that "there was no dispute in the [parties' summary judgment] papers" that the SPD was incorporated into the 2019 CBA. *Id.*at pp. 34-35.

As explained below, this argument fails. Try as it might, Alcoa simply cannot escape the unambiguous obligations imposed by the 2013 Retiree Life Insurance SPD.

### a. Alcoa conceded that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD before the District Court.

As an initial matter, Alcoa waived (or forfeited) the argument that the 2019 CBA does not incorporate the 2013 Retiree Life Insurance SPD.

"It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered" and "[i]f it does not do so, and loses the motion, it cannot raise such reasons on appeal." *Domka v. Portage Cty.*, 523 F.3d 776, 783 (7th Cir. 2008) (citation omitted). This rule is strictly applied. "[A] party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue

may have been before the district court in more general terms." *Fednav Int'l Ltd*, 624 F.3d at 841 (citing *Domka*, 523 F.3d at 783).

This rule applies here. When this matter was before the District Court, Alcoa never contended that the 2013 Retiree Life Insurance SPD was not incorporated into the 2019 CBA. In fact, it agreed that it was.

The crux of Plaintiffs' case has always been that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD. *See* D.Ct. ECF No. 1 at 7-11 (¶¶33-55); D.Ct. ECF No. 44 at 8-12 (¶¶36-58); D.Ct. ECF No. 89 at 8-9; D.Ct. ECF No. 169 at 7, 27. And until now, Alcoa never denied that the 2019 CBA incorporates the SPD. *See generally*, D.Ct. ECF No. 172; D.Ct. ECF No. 178. Instead, on summary judgment Alcoa attempted to argue around the issue slantwise, asserting that the 2013 Retiree Life Insurance SPD was, for each post-1993 retiree it covered, incorporated *only* into the CBA that was in effect at the time he or she retired. *See* JA.683; JA.684; JA.898; JA.901. Thus, because the Main Class retired *before* the 2019 CBA went into effect, neither the 2019 CBA nor the SPD granted *them* any benefits at the time benefits were terminated. *See id*.

The District Court took this as Alcoa's acknowledgment that the 2013 Retiree Life Insurance SPD *was* incorporated into the 2019 CBA,

albeit "only [with respect] to employees who will retire during the term of the 2019 CBA[.]" RSA.14. (So did Plaintiffs. *See* D.Ct. ECF No. 176 at 13-14.) And for good reason. Alcoa *explicitly* confirmed its September 17, 2025 brief in support of its motion to stay the injunction that "as Defendants argued at summary judgment, the 2013 Retiree Life Insurance SPD *is incorporated into the 2019 CBA* only for employees who retire during the term of the 2019 CBA." D.Ct. ECF No. 239 at 16-17 (emphasis in original removed; emphasis added).

Considering this, Alcoa's contention that the District Court messed up is not well taken. Recall that when the District Court reasoned that the 2013 Retiree Life Insurance was duplicative of the 2020 Active Employee SPD under Alcoa's interpretation, it did so assuming that Alcoa believed that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD "only [with respect] to employees who will retire during the term of the 2019 CBA[,]" RSA.14-15, exactly as Alcoa stated in its motion to stay brief. D.Ct. ECF No. 239 at 16-17. Yet now, Alcoa blithely dismisses the District Court's reasoning, stating "[n]aturally, recognizing that the 2019 CBA did not 'incorporate' the 2013 Retiree Life Insurance

SPD obviates any such concern" that the two SPDs could be duplicative. Brief at p. 35, n.11.

Talk about moving the goalposts. Unless it is okay for Alcoa to manufacture reversible errors after the fact, the company's contention that the 2019 CBA did not incorporate the 2013 Retiree Life Insurance SPD must be rejected.

> **b.** **The record evidence demonstrates that the 2019 CBA incorporated the 2013 Retiree Life Insurance SPD.**

Even if Alcoa did not waive the argument, the record evidence makes clear that the 2019 CBA *does* incorporate the 2013 Retiree Life Insurance SPD.

As explained, the "separate booklets" referenced in the "Group Insurance" provision were the SPDs Alcoa typically published after the CBAs had been negotiated, following the "back and forth" "tennis match" between the company and union. JA.452 (¶5); JA.482-484; JA.504-507; JA.535. As also shown, Mr. Kovaloski sought Mr. Burnell's comments on the two new 2013 Retiree SPDs drafts. JA.558-559; JA.512-514; JA.518; JA.561. And once those SPDs were final, Alcoa sent them to post-1993 retirees and local union leaders with a cover letter identifying them as

"Agreement[s]." JA.459 (¶29); JA.565-667; JA.514; JA.519-524. In other words, Alcoa clearly treated the Retiree SPDs as being among the 2010 CBAs' "separate booklets" when the SPDs were issued.

The language in the 2013 Retiree SPDs also confirms that they were incorporated into the then-current CBAs. When it created the Retiree SPDs, Alcoa used pre-existing language from the active employee SPDs, including the "Master Agreement Plan" title, the "incorporation" language in the introductory section, and the "Future of the Plan" provision. *Compare* JA.648, JA.650, JA.664 *with* JA.571, JA.573, JA.638 *and with* JA.346, JA.348, JA.394. This naturally shows that just as the active employee SPDs were incorporated into the then-current 2010 CBA, the Retiree SPDs were too. *See, e.g., Taracorp*, 73 F.3d at 744. By way of illustration, Alcoa conceded below that "the Future of the Plan provision in the 2012 Active Employee SPD fixes benefits for the term of the then-current CBA" and "is referring to the current CBA then in effect[.]" JA.684. Why would the parties have used this exact language in the Retiree SPDs if it meant something different? They wouldn't.

These same textual similarities between one Retiree SPD and the other further illustrate the point and dispense with Alcoa's assertion that

the Court should read the same language to have different meanings based on nothing more than Alcoa's self-serving claim that the 2013 Retiree Life Insurance SPD must be read in a different "context." *See* Brief at p. 31. The 2013 Retiree Health Insurance SPD described the premiums for the years 2011-2014 for post-1993 retirees under the terms of the Retiree Health Care Letter in the then-current 2010 CBAs. *Compare* JA.578 *with* JA.261, JA.276, JA.292. Thus, the 2013 Retiree Health Insurance SPD was clearly incorporated into the 2010 CBAs as the "[s]eparate booklet" that described the post-1993 retirees' health benefits. JA.250; JA.265; JA.281. It therefore follows that the 2013 Retiree Life Insurance SPD, worded the same as the 2013 Retiree Health Insurance SPD, was incorporated into the 2010 CBAs too.

As for what happened when the 2010 CBAs expired, the parties' subsequent agreements provided that their then-current agreements would "remain unchanged" except as modified. JA.460-462 (¶¶31-32, 37-38); JA.197; JA.103. And since there were no negotiated changes with respect to Company-paid life insurance for current retirees or the 2013 Retiree Life SPD, this meant that the terms of the 2013 Retiree Life Insurance SPD remained an incorporated part of the 2014 and 2019

CBAs. *See Large v. Mobile Tool Int'l, Inc.*, 724 F.3d 766, 772 (7th Cir. 2013) (where parties agree to "modify" a contract, "the original contract will remain in force, except to the extent modified by any new agreement.").[8] And of course, in 2023, the parties explicitly agreed that the "2013 Retiree Life Insurance Agreement (as updated by subsequent Labor and Settlement Agreements) will be amended and restated effective January 1, 2024[.]" JA.465 (¶51); JA.673. This not only carried the SPD forward into the 2023 CBA, but it plainly shows that the SPD was understood to be in effect under the prior agreements too.

All of this evidence explains why Alcoa until now conceded that "the 2013 Retiree Life Insurance SPD *is* incorporated into the 2019 CBA" but only for active employees. *See* D.Ct. ECF No. 239 at 16-17. Likely because it realized that "the incorporation of the insurance plan into the CBA requires the incorporation of *all* clauses contained in the plan description[,]" *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 704 (7th

---

[8] Alcoa points out that the "Group Insurance" provision "never expressly" incorporated the 2013 Retiree Life Insurance SPD and instead "incorporated unnamed 'booklets describing these benefits.'" Brief at p. 32. But this does not help Alcoa because the "Group Insurance" provision in the 2019 CBA doesn't expressly incorporate *any* specific SPD by name. JA.090.

Cir. 2003) (emphasis added), Alcoa chose to argue that the SPD's incorporated clauses should not be *interpreted* as granting benefits to the Main Class.

### c. The 2013 Retiree Life Insurance SPD cannot reasonably be read as being incorporated into expired, defunct CBAs.

Turning to that very point now, the notion that the 2013 Retiree Life Insurance SPD was only retroactively incorporated into the pre-2019 CBAs in effect when class members retired must be rejected too. But first, some background.

In its appellate brief, Alcoa, unsurprisingly, never mentions the 2013 Retiree Health Insurance SPD. But before the District Court, faced with Plaintiffs' argument that the similarities between the two Retiree SPDs reflected an intention to grant both health and Company-paid life insurance to post-1993 retirees under the current CBA, Alcoa argued that *both* Retiree SPDs were incorporated into the expired CBAs in effect when retirees retired. JA.693; JA.683-684. Thus, in Alcoa's view, for someone who retired in 1994, both the 2013 Retiree Health Insurance SPD and 2013 Retiree Life Insurance SPD were incorporated only into the 1993 CBA, and so on. *See id.*

This interpretation faces three fundamental problems. *First and foremost*, it makes no sense. According to Alcoa, when the 2013 Retiree Life Insurance SPD was issued, the 1993, 1996, 2001, and 2006 CBAs were expired and provided employees who retired under them with no further right to Company-paid life insurance. Why then would there be any need for those CBAs to incorporate the SPD at all? Likewise, when the 2013 Retiree Health Insurance SPD was issued, the post-1993 retirees were receiving benefits under the Retiree Health Care Letter in the current 2010 CBAs, not the expired ones, so it would make no sense to incorporate that SPD into expired CBAs either. The inherent absurdity of Alcoa's reading, as much as anything else, means that it cannot stand. *See Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons") (citation omitted); *cf. Beanstalk Grp. v. Am Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) ("a contract will not be interpreted literally if doing so would produce absurd results").

*Second*, Alcoa's interpretation only works if the parties agreed that language like the "Future of the Plan" provision from the pre-existing active employee SPDs—where, as Alcoa put it, that provision "fixes

benefits for the term of the then-current CBA," JA.684—would carry an entirely different meaning in the Retiree SPDs. Accepting this premise without *any* evidence that this was what the parties intended would be contrary to law. *See, e.g., Taracorp*, 73 F.3d at 744.

*Third*, even without understanding that background, Alcoa's interpretation is irreconcilable with the Retiree SPDs' plain language. The SPD's "Future of the Plan" provisions state "[t]he [benefits/plan] described in this booklet [are/is] provided for the term of the collective bargaining agreement between the union and Alcoa Inc[.]" JA.664; JA.638. The use of the present tense "[are/is] provided" makes clear that the benefits described in both Retiree SPDs were provided for the term of the *current* CBA, not expired ones.  Indeed, tying the "*Future* of the Plan" to the "term of the collective bargaining agreement" makes clear that the "agreement" cannot be one that is already long expired.

By way of further illustration, consider the "Benefit Payment" table in the 2013 Retiree Life Insurance SPD which identifies different benefit amounts for retirements on or after June 1, 1993, June 1, 1996, April 1, 2002, June 1, 2006, and January 1, 2011. JA.654. A "plan" that provides benefits for people retiring *after* January 1, 2011 (for example) obviously

cannot be incorporated into and "provided for the term" of CBAs that were expired *before* that date. JA.664.

The same problem is evident when reading the 2013 Retiree Health Insurance SPD's description of the premiums for 2011-2014 after Alcoa capped its spending. *Compare* JA.578 *with* JA.261, JA.276, JA.292. Plainly, a capped plan with premiums for 2011 through 2014 cannot be incorporated into the 2006 CBAs which did not address premiums beyond 2010, *compare* JA.578 *with* JA.214 and JA.230, much less the 2001, 1996, and 1993 CBAs which stated that the Cap could not take effect during their terms. *Compare* JA.578 *with*, *e.g.,* D.Ct. ECF No. 102-11 at 100, D.Ct. ECF No. 102-14 at 84-85, JA.400.

Another example of the inherent mismatch between the Alcoa's interpretation and the SPD language is the fact that at the time many of the post-1993 retirees retired, the CBA in effect was not between their "union and *Alcoa, Inc.*[,]" but instead between their union and *Reynolds Metal Company*, a predecessor company Alcoa did not acquire until 2000. JA.832-834.

All that to say, Alcoa's theory of retroactive incorporation effectively and impermissibly would require one to rewrite the plain language of the

Retiree SPDs. *See, e.g., Hughes v. Sw. Airlines Co.*, 961 F.3d 986, 990 (7th Cir. 2020) ("It is not our place to rewrite contracts.").

Alcoa offers up a couple of text-based arguments in favor of its interpretation, but they collapse under scrutiny. Alcoa points out that the introductory section of the 2013 Retiree Life Insurance SPD says that the plan "has been 'incorporated in and made a part of' numerous 'collective bargaining agreements.'" Brief at p. 33 (quoting JA.650). The company also points to the "Participating Unions" section which says "[t]he plan is maintained pursuant to one or more collective bargaining agreements." *Id.* (quoting JA.658). Per Alcoa, these references to multiple "agreements" support its reading because they "contrast[] with other Alcoa SPDs, geared toward then-active employees, which identified themselves as 'part of' a single specific CBA." *Id.* (citing JA.112).

Not so fast. Alcoa cites the 1993 Active Employee SPD, which applied to the employees under the 1993 CBA between Alcoa and the United Steelworkers. JA.111-112. However, the appropriate comparator is the *2012* Active Employee SPD Alcoa had recently issued when the Retiree SPDs were created. JA.346. And that SPD has the exact same references to multiple "agreements" that Alcoa quotes from the 2013

Retiree Life Insurance SPD. JA.348; JA.387. Thus, Alcoa's effort to manufacture a "contrast" between the active employee SPDs and the 2013 Retiree Life Insurance SPD fails.

More to the point, the fact that there is a reference to multiple CBAs does not mean that the SPD is incorporated into *expired* CBAs. At the time the 2012 Active Employee SPD and the 2013 Retiree SPDs were issued, there *was* more than one 2010 Master Agreement CBA. *See* JA.247; JA.263; JA.278; JA.412; JA.418. And anyway, even if Alcoa's reading did seem plausible, it simply would make no sense to read the SPD that way, particularly since the 2013 Retiree Health Insurance SPD has the same references to multiple "agreements[,]" JA.573; JA.628, and we know that that booklet was not incorporated into expired CBAs.

Grasping for another textual handhold, Alcoa points to the 2013 Retiree Life Insurance SPD's "Who is Eligible" section which says "You are eligible for company-provided life insurance if you were [a post-1993 retiree] and covered by a collective bargaining agreement that contains this plan as part of the agreement." Brief at p. 34 (citing JA.652). The company also points out that the "Participating Unions" section states "You are eligible to participate in the Alcoa life insurance plan as

described in this booklet if you are a retiree who, as an active employee, was covered by a [CBA] between Alcoa and one of the unions listed on the following page." *Id.* (citing JA.657).

However, neither of these provisions aid Alcoa either. Alcoa evidently interprets the "and covered by a collective bargaining agreement that contains this plan as part of the agreement" clause in the "Who is Eligible" section to mean that the plan described in the 2013 Retiree Life Insurance SPD is incorporated only into the CBA in effect when a retiree retired. But nothing in provision states what Alcoa infers; for example, nothing in the provision prevents a CBA from "cover[ing]" someone who retired before it took effect or states that a retiree is *only* "covered" by the CBA in effect at retirement. The better reading of the clause—and indeed, the only one that makes sense—is that it simply means that to be eligible, one had to retire after June 1, 1993 under a CBA that provided for Company-paid life insurance in retirement.

Likewise, the "Participating Unions" section says that to be "eligible" one must be a post-1993 retiree that "*was* covered" by a CBA at one of the designated "USW" and "Other USW" locations. But this does not support Alcoa's interpretation either, because nothing stated therein

precludes the then-current CBA from granting benefits to those retirees. JA.657. And even if it did appear to do so, we are again left with the fact that the very same language is in the 2013 Retiree Health Insurance SPD too, JA.627, where the benefits described therein were provided under the Retiree Health Care Letter in the then-*current* 2010 CBAs, not expired ones.

In short, both sentences say that to be *eligible*, one must have retired under a post-1993 CBA, but neither supports Alcoa's theory of *incorporation*.

Ultimately, Alcoa's interpretative gymnastics only highlight the *lack* of textual support for its absurd interpretation of the Retiree SPDs.

### 4. The "Recognition" provision does not preclude the 2019 CBA from granting life insurance benefits to class members.

Alcoa also argues that the 2019 CBA unambiguously excludes current retirees through the "Recognition" provision which states "[t]he provisions of this Agreement shall apply *solely* to those *employees*" at Warrick and Massena "for whom the Union has been certified as the exclusive bargaining agency by the National Labor Relations Board, or for whom the Company has recognized the Union as the exclusive

bargaining agency." Brief at pp. 22-24 (citing JA.087; emphasis added). However, Alcoa overreads the provision, which simply cannot be reasonably read to preclude a grant of life insurance to existing retirees.

*First*, the "Recognition" provision cannot *reasonably* be read to target retirees for exclusion from the CBA's scope at all. That is because upon an employee's retirement, the union is *immediately* no longer his or her "bargaining agency[,]" even *during* the term of the CBA. *See Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 539-40 (7th Cir. 1997) ("A union's power to negotiate with management derives from the fact that the union is the exclusive bargaining representative of a group of people. Labor jurisprudence is clear that retirees cannot be part of this group or 'bargaining unit.'") (citing and quoting *Allied Chem. & Alkali Workers*, 404 U.S. at 172). Thus, if the "Recognition" provision's reference to "employees . . . for whom the Union [is] the exclusive bargaining agency" were meant to exclude retirees by negative implication, it was meant to exclude both current *and* future retirees. As the District Court rightly reasoned, the better reading is that the provision was intended not to exclude retirees of any stripe, but instead non-union and non-Warrick/Massena *employees*. RSA.16-19. *See Stone*, 943 F.3d at 388

(rejecting reading of a CBA which "would lead to [an] impractical conclusion").

Alcoa flippantly dismisses this reasoning, contending "*[o]f course*, active workers who retire during a CBA remain covered by its benefits clauses for its duration: but that is because those workers were 'employees' when the CBA was negotiated, and 'future retirement benefits of active workers' are a mandatory subject." Brief at p. 28. But this is not responsive. If all it took to be an "employee[] . . . for whom the Union [is] the exclusive bargaining agency" was that one had to fit that definition when the CBA went into effect, then the "Recognition" clause would fail to exclude any such employees who would leave the union or Warrick and Massena during the CBA's term. Obviously, that could not be what was intended. And the concept that future retiree benefits are a mandatory subject is irrelevant to the fact that if the provision were intended to exclude retirees, even a future retiree who fit the "Recognition" provision's definition when the CBA went into effect would lose that definitional status upon retirement during the term of the CBA. Thus, Alcoa cannot salvage its interpretation of the "Recognition" provision.

*Second*, even if Alcoa's reading is correct, Alcoa admits that the 2019 CBA provides health benefits to current retirees notwithstanding the "Recognition" provision, and thus there is no reason that the same cannot be true of Company-paid life insurance if the agreement so provides. As discussed in Section VII.A.3 above, because the 2019 CBA incorporates the 2013 Retiree Life Insurance SPD, the "Recognition" provision must be read as being qualified by the more specific language in the incorporated SPD. *See Aeroground, Inc. v. CenterPoint Props. Tr.*, 738 F.3d 810, 816 (7th Cir. 2013) ("the more specific provision of a contract governs where it arguably conflicts with a more general provision" and "where one provision is general enough to include the specific situation to which the other is confined, 'the specific provision will be deemed to qualify the more general one, that is, to state an exception to it'") (quoting *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. NLRB*, 544 F.3d 841, 859 n.10 (7th Cir. 2008); other citations omitted). Were it otherwise, the parties could *never* address the rights of current retirees in their CBA.

> **5.  The Retiree Health Care Letter does not imply an intention to exclude retiree life insurance from the 2019 CBA.**

Alcoa also argues that the Retiree Health Care Letter, along with the absence of an analogous life insurance letter, establishes that there was no agreement to provide the latter benefit to existing retirees. Brief at pp. 16-17; 24-25; 29-30. As Alcoa puts it, "[i]f these same parties had intended the 2019 CBA to similarly guarantee life-insurance benefits to existing retirees, they would have similarly said so." *Id.* at p. 25. Alcoa also argues that if the "Group Insurance" provision's promise of "Medical and Prescription Drug Benefits" to "retirees" referred to current retirees, the Retiree Health Care Letter "would be redundant." *Id.* at p. 26.

While there may be some superficial appeal to this *expressio unius est exclusio alterius*-style argument—*i.e.*, "the expression of one thing is the exclusion of the other," *see Diehl*, 102 F.3d at 308, it ultimately fails. As *Diehl* put it, "*expressio unius est exclusio alterius* . . . is at best an aid in interpretation, not a hard-and-fast rule." *Id*. Likewise, *Stone* said that "[t]he principle that contracts should be interpreted to avoid rendering language superfluous or redundant is not absolute" and instead "a preference to be employed to the extent possible given the range of reasonable meanings that can be ascribed to the contractual language." 943 F.3d at 387-388. And the fact remains that Alcoa's interpretation is

simply not reasonable in this case.

Recall that the Retiree Health Care Letter originated with the 1993 Cap agreement. At that point, its purpose was not to affirmatively grant health benefits to current retirees, but rather to ensure that *future* retirees' benefits would *not* be capped. Of course, in subsequent CBAs, some of the post-1993 Capped retirees covered by the letter *were* current retirees. However, given the letter's genesis, the absence of a comparable letter for life insurance should be chalked up to the simple fact that the parties never agreed to a life insurance Cap, rather than an affirmative intention to *not* provide current retirees with life insurance. *See United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 570 (1960) ("[w]ords in a [CBA] are to be understood only by reference to the background which gave rise to their inclusion") (Brennan, J. concurring).

In addition, because of the overwhelming *similarities* between the 2013 Retiree Health Insurance SPD and the 2013 Retiree Life Insurance SPD, that is the *only* reasonable inference that can be drawn. Put simply, contrary to Alcoa's claim, the parties *did* "similarly say" that current post-1993 retirees have Company-paid life insurance benefits for the term of the current CBA, just as they have health care benefits, and they

did so unambiguously in the two 2013 Retiree SPDs.[9]

It also bears noting that in making this argument, Alcoa runs headlong into the record evidence. Alcoa asserts that the Retiree Health Care Letter makes "obvious" that the "Group Insurance" provision "does not speak to existing retirees" when it uses the term "retirees[,]" Brief at p. 26; it also states that the "Group Insurance" provision and the Retiree Health Care Letter have "different, non-overlapping roles[.]" *Id.* at p. 36. But in the 2006 and 2010 CBAs, both the Retiree Health Care Letter *and* the "Group Insurance" provision listed the same Medicare Part B premium reimbursement amounts for post-1993 retirees who retired *before* the effective date of those CBAs. *E.g., compare* JA.218 *with* JA.230 *and compare* JA.281-282 *with* JA.293. Beginning with the 2014 CBAs, the "Group Insurance" provision underwent a formatting revision that made it shorter, and the reimbursements were no longer listed. *E.g., compare* JA.280-284 *with* D.Ct. ECF No. 102-25 at 99-101. But the point

---

[9] In its reply in support of its motion to stay the injunction in this Court, Alcoa responded to this point by claiming "there is no reason to equate the Retiree Health Care Letter with any Retiree Health SPD language." ECF No. 17 at p. 12. This statement is frivolous. *See, e.g.,* JA.558 (in which Mr. Kovaloski attached "the Retiree Health Care SPD that will apply to the retirees covered by the Retiree Health Care Agreement (dates of retirement on/after June 1, 1993).").

is, the parties clearly viewed the "Group Insurance" provision and Retiree Health Care Letter as co-extensive, not "non-overlapping."

### 6. The extrinsic evidence favors Plaintiffs.

Finally, while consideration of extrinsic evidence is not necessary, that evidence conclusively supports Plaintiffs' interpretation of the 2019 CBA.

To show that the union understood that Company-paid life insurance for current retirees was not granted by the current CBA, Alcoa starts by pointing to two statements by Mr. Burnell. *Id.* at pp. 37-38. The first is a 2018 email in which a local union representative named Mark asked whether a retiree who retired "15 years ago . . . get[s] [$]7500.00 as per the SPD that we currently have or does she fall under the SPD from when she retired[?]" and Mr. Burnell responded "[r]etiree life insurance is determined by the agreement in effect at the time the employee retired[.]" JA.826-827. The second is Mr. Burnell's deposition statement where he agreed "benefits were determined by the collective bargaining agreement, summary plan description in effect at the time of retirement[.]" JA.698.

Neither advances Alcoa's cause. As Mr. Burnell stated, Company-paid retiree life insurance *is* determined by the CBA in effect when that person retired and the associated Active Employee SPD. But it does not follow from this that Mr. Burnell rejected the notion that current retirees have rights to Company-paid life insurance under the then-current CBA too. Indeed, he testified as the United Steelworker's Fed. R. Civ. P. 30(b)(6) representative that the post-1993 retirees' Company-paid life insurance benefits were guaranteed by the 2013 Retiree Life Insurance SPD which remained in effect from CBA to CBA. JA.884-887. And while Alcoa suggests that because benefits are granted to retiring employees under the Active Employee SPDs, those benefits cannot be granted to current retirees under the 2013 Retiree Life Insurance SPD, that is a false dichotomy. Post-1993 retirees were entitled to benefits under *both* types of booklets: the Active Employee SPD applied until the CBA in effect when they retired had expired, and then they were covered by the 2013 Retiree Life Insurance SPD. Indeed, that is precisely why the 2013 Retiree Life Insurance SPD has the "Benefit Payment" table listing the Company-paid insurance amounts by retirement date, and as provided

under the Active Employee SPDs. JA.654. So, Alcoa's effort to manufacture a "gotcha" moment fails.

Alcoa also points out that, as indicated by union representatives Mike Millsap and Tom Conway, the 2019 negotiations included no proposals that specifically addressed Company-paid benefits for existing retirees. Brief at pp. 39-40 (citing JA.702-704; JA.709-712). But this evidence doesn't help Alcoa either, because such proposals were simply not *necessary* to provide the post-1993 retirees with Company-paid benefits under the 2019 CBA. As explained, by not agreeing to any changes with respect to those benefits in 2014 and 2019, the prior agreement set forth in the 2013 Retiree Life Insurance SPD remained "unchanged" and carried forward. As discussed *supra* at footnote 5, this was illustrated by Mr. Kovaloski drafting a new Retiree Life Insurance SPD after the corporate split in 2016, even though there had been no discussion of the matter in 2014, as well as the parties' agreement to republish the SPD "(as updated by subsequent Labor and Settlement Agreements)" in 2023. JA.673.

Finally, Alcoa argues that its employees—Mr. Kovaloski, negotiator Mike McAdoo, and Nick Storm, the company's in-house attorney and

chief negotiator in 2019—testified that retiring employees had Company-paid life insurance only pursuant to the CBA in effect when they retired and the parties never bargained otherwise in 2019. *See* Brief at pp. 38-39. The response to this is twofold.

*First*, federal contract law is "objective," which "means that the parties' intents matter only to the extent that they are expressed to each other" and "[w]hen considering parol evidence a court looks to documents, and sometimes to oral exchanges, but never considers either side's private thoughts and hopes." *Kunkel v. Commissioner*, 821 F.3d 908, 910 (7th Cir. 2016). Under this standard, the views of Mr. Kovaloski, Mr. McAdoo, and Mr. Storm with respect to the meaning of the parties' agreements that were never communicated to the union—at least insofar as those views unsurprisingly dovetail with Alcoa's litigation position—are evidentiarily weightless. Were it otherwise, Alcoa would be permitted to take the Court on a "tour through [its] cranium, with [Alcoa] as the guide." *See Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987).

*Second*, plenty of what these three Alcoa employees testified to *contradicts* the position(s) Alcoa has taken throughout this litigation. For

example, as stated above, Alcoa appears to claim now that the 2013 Retiree Life Insurance SPD was incorporated not into the then-current CBA, but instead the expired CBAs in effect when class members retired. Well, someone should have told Mike McAdoo, because he understood both 2013 Retiree SPDs to be among the "separate booklets" incorporated into the 2010 CBA, and he stated that the "Future of the Plan" provision in those SPDs meant that "those benefits would be continued during the term of that collective bargaining agreement. *That collective bargaining agreement was the 2010 agreement.*" JA.890-895 (emphasis added).

Likewise, while Alcoa argued below that both 2013 Retiree SPDs were incorporated into the CBA in effect when the post-1993 retirees retired, Mr. Storm said that the two booklets were incorporated differently. He agreed with Alcoa that the 2013 Retiree Life Insurance SPD was one of the "separate booklets" incorporated into the 2010 CBA "[a]s to the 2010 CBA actives" but "[n]ot as to the prior retirees[,]" JA.838-839, and that the SPD's "Future of the Plan" provision's reference to "the term of the collective bargaining agreement" meant the CBA in effect when the retiree retired. JA.839-840. But Mr. Storm split ways with Alcoa's current legal team when he conceded that the 2013 Retiree

Health Insurance SPD *was* incorporated as one of "separate booklets" in the 2010 CBA, JA.837-838, and that "the term of the collective bargaining agreement" in the "Future of the Plan" provision in that booklet referred to the "current agreement . . . since it incorporates the retiree health care cap letter that applies to those retirees." JA.841. In fact, by his deposition's end, Mr. Storm had lost the plot entirely, admitting that at the time of the corporate split in 2016, the 2014 CBA provided life insurance benefits to "current retirees." JA.843-844.

As for Mr. Kovaloski, he struggled mightily to explain what the Retiree SPDs he drafted meant. When asked by Plaintiffs' counsel what the "collective bargaining agreement" in the "Future of the Plan" provision referred to in the 2013 Retiree Health Insurance SPD, he first said "the CBA that existed whenever the retiree left the company . . . when they were an employee." JA.848-849. Upon further probing, he said that it was "the current collective bargaining agreement[,]" *i.e.*, the 2010 CBA. JA.849-850. And when asked for clarification, Mr. Kovaloski changed his final answer to "I don't know . . . I really don't know how to answer that question." JA.850-853. Wonder why.

Since Alcoa's interpretation doesn't even make sense to its own

partisans, that is a good reason for this Court to reject it.

All that said, if this Court were to consider extrinsic evidence, it ought to consider the *objective* evidence that fully supports the District Court's conclusion.

That evidence includes the company's response to an information request from the USW in the 2006 bargaining—before the Retiree SPDs were issued—which refutes Alcoa's claim that life insurance benefits for current retirees were never covered by the current CBA. In the 2006 negotiations, the union asked Alcoa for "a breakdown of all requested retiree health care data by applicable retiree plan, for example: a. pre May 31, 1993; b. June 1, 1993 to May 31, 1993; c. June 1, 1996 to May 31, 2001; and d. post-June 1, 2001." JA.556. Alcoa responded by stating that it "does not consider the pre May 31, 1993 retirees as being covered by the CBA" and provided a detailed breakdown of the different Company-paid life insurance amounts for post-May 31, 1993 who retired under the 1993, 1996, and 2001 CBAs. *Id.*; *see also* JA.552-553. The clear implication: unlike the pre-1993 retirees, Alcoa considered the post-1993 Capped retirees to "be covered" by the current CBA, and with respect to both their health care *and* Company-paid life insurance.

Most importantly, if Company-paid benefits *were* limited to the CBA in effect when a retiree expired, one would expect Alcoa to routinely terminate those benefits at each CBA's end. Yet there is no dispute that for many years, Alcoa *never* terminated life insurance benefits for current retirees. JA.464 (¶48). Indeed, Alcoa maintained benefits for a retiree who retired under the 1993 CBA for over 23 years longer than it now claims it was obligated to do so. This "course of performance . . . is highly significant[,]" *Alabama v. North Carolina*, 560 U.S. 330, 346 (2010), "if not controlling[.]" *Old Colony Tr. Co. v. Omaha*, 230 U.S. 100, 118 (1913).[10]

## B.  Voluntary life insurance

### 1.  The 1993 and 1996 Active Employee SPDs unambiguously grant lifetime benefits.

As explained, under the 1993/1996 Active Employee SPDs' "Voluntary Life Insurance" section, a sub-section titled "When You Are Retired And Age 65 and Older" states that at age 65, "[t]he reduced amounts [of Voluntary life insurance] are continued for life[.]" JA.139,

---

[10] This same course of performance also applies to the Voluntary life insurance. And relatedly, Arconic, which shares Alcoa's corporate ancestry, continues to provide life insurance to its post-1993 retirees under the same contractual language. JA.464 (¶48).

JA.141; JA.323, JA.325. According to Alcoa, however, "continued for life" simply means that benefits will continue for life "*assuming the plan remains in place*," but there is no such guarantee that the plan will remain in place. Brief at pp. 44-45 (emphasis in original). This is made clear, Alcoa says, because the "Converting to a Personal Policy" provision which contemplates that the unnamed "plan" could "end" or be "discontinued" is "inconsistent" with a lifetime right to benefits. *Id.* at p. 47 (citing JA.144).

This argument fails. *First*, the District Court's interpretation of the "continued for life" language was fully consistent with *Diehl*, where this Court considered comparable language. That case concerned a time-limited "Shutdown Agreement" which stated "that the retired employees 'shall, notwithstanding any provision of the Insurance Agreement . . . , be entitled for the lifetime of the pensioner . . . to [health care coverage]." *Diehl*, 102 F.3d at 306. As this Court held, "the language just quoted must mean what it says: the retired employees shall be entitled to welfare benefits for their lifetime." *Id.* And therefore, the retirees' rights unambiguously survived the termination of the time-limited Shutdown Agreement. *See id.* at 308. *See also Zielinski v. Pabst Brewing*

- 59 -

*Co.*, 463 F.3d 615, 617-18 (7th Cir. 2006) (noting that in *Diehl*, the presumption that short term CBAs do not create "vested" rights "could not overcome the shutdown agreement's explicit provision of benefits 'for the lifetime of the pensioner'").

*Second*, here the "continued for life" language in the "When You Are Retired And Age 65 and Older" sub-section of the SPDs is conspicuously absent from the neighboring "When You Are an *Active Employee* and Reach Age 65" sub-section, which is *silent* as to duration. *Compare* JA.141 *and* JA.325 *with* JA.140 *and* JA.324 (emphasis added). This difference is presumed to mean something. *Taracorp*, 73 F.3d at 744 ("we assume . . . that the choice of substantially different words to address analogous issues signifies a different approach"); *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1044 (7th Cir. 2021) ("When parties to the same contract use different language to address parallel issues it is reasonable to infer that they intend this language to mean different things.") (cleaned up; citation omitted). And what it naturally means here is it that under the SPD, an active employee's entitlement to benefits after 65 will last for "the term of the collective bargaining agreement" as stated in the "Future of the Plan" provision, which

generally speaks to the duration of the "plans described in this booklet[.]" *See* JA.145: JA.329. On the other hand, a retired employee's benefits will last "for life" after age 65, consistent with the well-settled rule that "if both a general and a specific provision apply to the subject at hand, the specific provision controls[.]" *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010).

*Third*, the "Converting to a Personal Policy" provision Alcoa hangs its hat on does not prevent vesting. For one thing, the provision is simply not inconsistent with a lifetime right to Voluntary life insurance in retirement. The "Converting" provision says that "[i]f your life insurance ends or the plan is discontinued, you may convert your company-paid insurance or any of the optional coverages to a personal policy without a medical examination." JA.144; JA.328. Alcoa says that "the SPD would not have told retirees that the plan might 'end' or be 'discontinued'" if benefits were guaranteed for life. Brief at p. 47. But Alcoa is conflating two separate concepts: on the one hand, "plans," and on the other, "coverage," or "benefits." The "Administrative Information" sections of the SPDs make clear that when the SPDs speak of "plans," they are referring to legal entities used as the vehicle for providing the various

different benefit coverages listed in the booklet. *See* JA.145; JA.329 ("The Life Insurance and Sickness and Accident Benefits are provided through welfare benefit plans."). Conversely, the "When You Are Retired And Age 65 and Older" sub-section provides for lifetime "coverage," *not* any particular "plan." JA.141; JA.325 ("If you're retired and age 65 or over, here's how your coverage works . . . [after 65, the reduced amounts of life insurance] are continued for life"). Thus, as long as retirees receive their lifetime "coverage," it does not matter what "plan" Alcoa uses to provide it. And as a perfect real-world example of this, the "plans" referenced in the 1993 SPDs *were* ended and replaced by new ones as a result of the 2016 corporate split discussed above. *See* JA.068 (providing that "[e]ligible participants will participate in . . . Retiree Health Care and Life Insurance plans within . . . either Alcoa Corporation or Arconic"). Nevertheless, Alcoa continued to provide Voluntary life insurance coverage thereafter to Subclass members even after the "plans" were discontinued. JA.464 (¶48).

In any event, any tension that may exist between the lifetime grant of benefits in the "When You Are Retired And Age 65 and Older" sub-section and the possibility of an unnamed "plan" being ended or

discontinued in the "Converting to a Personal Policy" provision would require the Court to read the former provision, which is specifically addressed to Voluntary insurance at retirement, "to state an exception to" the latter. *See Aeroground*, 738 F.3d at 816.

In addition, it must be noted that the "Converting to a Personal Policy" provision is markedly *unlike* the "reservation of rights" clauses seen in other retiree benefit cases from this Court. *Compare* JA.144 *and* JA.328 *with Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 636 (7th Cir. 2004) (benefits "may be amended, revoked or suspended at the Company's discretion at any time, even after your retirement."); *Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553, 557 (7th Cir. 2011) (where the plan contained "language expressly reserving the right to change or eliminate benefits"); *UMW v. Brushy Creek Coal Co.*, 505 F.3d 764, 767 (7th Cir. 2007) (plan entitled the company "to terminate or alter the plan at any time"); *Rockford Powertrain*, 350 F.3d at 703 ("although the company expects and intends to continue the plan indefinitely, it reserves the right to modify, amend, suspend or terminate them at any time."). Alcoa misleading peppers citations to these cases throughout its brief, but because the language is simply not the same, the analogies fail. This is

decidedly *not* a case where the parties' contracts "included both 'lifetime'
language and reservation-of-rights clauses expressly allowing alteration
or termination of benefits." *See Stone*, 943 F.3d at 387.

Likely realizing that the agreements cannot be held unambiguous
in its favor under this Court's precedent,[11] Alcoa argues that at a
minimum, the District Court should have found them ambiguous. Brief
at pp. 50-51. But this is not well taken either. For one thing, as just
discussed, the argument ignores *Diehl*, never once cited by Alcoa, which
held that similar language was unambiguous. For another, most of the
(limited) Seventh Circuit case law cited by Alcoa does not support its
contention. To wit, while Alcoa points to *Bidlack v. Wheelabrator Corp.*,
993 F.2d 603 (7th Cir. 1993), Brief at p. 50, as the District Court
recognized, the "continued for life" SPD language here is "more definite"
than the language in *Bidlack*, where the Court held that a provision
stating that benefits "shall be continued for the spouse after the death of
the retiree" was ambiguous. RSA.22. Alcoa also quotes the observation
from *Vallone* that "if . . . the reservation of rights clauses . . . did not apply

---

[11] Tellingly, Alcoa also relies in large part on non-precedential cases from
the Eleventh, Third, Tenth, Second, and Eighth Circuits. *See* Brief at pp.
45, 47-48, 50, and 52.

. . . the grant of 'lifetime' benefits would have created an ambiguity[,]" Brief at p. 50 (citing *Vallone*, 375 F.3d at 637), but since *Vallone* had held that the reservation of rights clause *did* apply, Alcoa is quoting non-precedential dictum. *See United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (statement in opinion may be considered dictum where it "was unnecessary" or "not [] integral").

Admittedly, Alcoa correctly points out that *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779 (7th Cir. 2005) held that absent a reservation of rights, the "lifetime" language there created ambiguity. Brief at p. 50. But if there is a conflict between *Bland* and *Diehl*, *Diehl* governs here. Like this case, *Diehl* involved claims under the Labor Management Relations Act and ERISA, and was decided first, *see* 102 F.3d at 302-305, whereas the later-in-time *Bland* decision involved an ERISA only claim. *See* 401 F.3d at 782. Moreover, with respect to the panel that decided it, *Bland*'s conclusion that the "lifetime" language there was "ambiguous," *see id.* at 786-787, is at odds with the court's preceding statement that "[i]n the absence of a reservation of rights clause, interpreting 'lifetime' as being limited by the employer's continuing willingness to provide benefits is *unreasonable*." *Id.* at 786 (emphasis added). Ordinary contract

principles hold that if there is only one reasonable interpretation, then a contract is *unambiguous*. *Ill. Conference of Teamsters & Emp'rs Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir. 1994) (a contract is not ambiguous if its language "lends itself to one reasonable interpretation only").

In any event, as discussed above, this case does not merely present lifetime language coupled with the absence of a reservation of rights. Instead, the explicit grant of "for life" Voluntary life insurance benefits for retiring employees at age 65 stands in stark contrast with the contractual *silence* regarding those same benefits for active employees at age 65. And that particular feature of the agreements resolves any doubts in favor of Plaintiff's reading.

### 2. The "continued for life" agreement remained as an implied term in post-1996 CBAs.

Alcoa additionally argues that the "continued for life" language cannot be held to have persisted as an implied term of the 2001, 2006, 2010, and 2014 agreements, asserting that the post-1996 Active Employee SPDs and CBAs are "plausibly complete without" reading that agreement into them. Brief at pp. 53-54.

This argument fails too. As an initial matter, when compared to their predecessors, the 2003, 2008, 2012, and 2017 Active Employee SPDs are simply *not* "plausibly complete" with respect to Voluntary life insurance. By way of illustration, the 1993 Active Employee SPDs informed retiring employees that they would maintain their Voluntary life insurance "in full to age 65," and that at 65 that benefit would "reduce" on different schedules depending on whether the employee was enrolled before or after September 1, 1965, and thereafter be "continued for life." JA.141; JA.324. *None* of this is stated anywhere in the section on those coverages in the 2003, 2008, 2012, or 2017 versions. D.Ct. ECF No. 102-30 at 22-24; D.Ct. ECF No. 102-31 at 34-38; JA.378-382; D.Ct. ECF No. 102-33 at 34-39. In other words, the contracts tell retiring employee under those post-1996 CBAs nothing about their Voluntary insurance in retirement, *even during the term of the CBA*. Thus, this is plainly a case where the agreements do contain "a yawning void . . . that cries out for an implied term." *See Bidlack*, 993 F.2d at 608.

That term can be readily divined from the fact that the parties never bargained to remove their "continued for life" agreement, but instead agreed to carry forward their existing agreements. For example,

the 2001 Memoranda of Understanding specifically listed the agreed upon "substantive changes to the Summary Plan Descriptions . . . for active hourly employees." D.Ct. ECF No. 102-35 at 39-42; ECF No. 102-34 at 15-17. Therefore, anything *not* listed therein—including the removal of the "continued for life" language—*ipso facto* was *not* an agreed upon "substantive change" to the SPD. *See* JA.401 (where the parties "agree to the following in full and complete settlement of all proposals and issues considered during the 2001 negotiations"); JA.398 (same). Indeed, to now find that the absence of the "continued for life" language in the 2003 Active Employee SPD *did* represent a substantive change from the prior versions would allow the company to achieve through litigation something that it did not do in negotiations. This is a repellent notion, especially since Alcoa does not dispute that the parties *never* negotiated to remove the language for future retirements. *Cf. Stone*, 943 F.3d at 388 (CBAs "generally terminate at some point, giving the parties the opportunity to renegotiate" and "change the scope of benefits for *future* retirees") (emphasis in original).

In addition, objective extrinsic evidence also shows that the "continued for life" agreement persisted well after the 1996 CBAs

expired. As explained above, Alcoa continued to provide Voluntary life insurance benefits after the CBAs expired both before and after the 1996 CBAs, while the retirees themselves continued to regularly pay the premiums for that coverage during that time. JA.464 (¶48). Plainly, this shows that the understanding that those benefits could not be take away at Alcoa's whim was mutual. *See Old Colony Tr. Co.*, 230 U.S. at 118.

In addition, an August 11, 2006 letter from MetLife to retiree Lee Garrett, sent several years after his 2002 retirement—and after the 2001 CBA had expired—explains "[a]t age 65 your Voluntary Life coverage will reduce down to $8,750.00 and *will continue for life*." JA.555 (emphasis added); JA.455 (¶18). No language in that letter indicated that coverage could end because the CBA in effect when Mr. Garret retired was then expired. Since Alcoa had a fiduciary duty "to anticipate inquiries" from participants and have "appropriately trained staff to field inquiries," *see Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 886-887 (7th Cir. 2013), this statement by MetLife is additional evidence that Voluntary life insurance for retirees always continued to be a lifetime benefit. *See* D.Ct. ECF No. 102-30 at 24 (telling employees to "contact MetLife"); D.Ct. ECF

No. 102-31 at 38 (same); JA.382 (same); D.Ct. ECF No. 102-33 at 39 (same).

In sum, this Court has made clear that a "contract may also provide for vesting through implied terms." *Stone*, 943 F.3d at 385. The post-1996 contracts at issue here do exactly that.

## VIII. CONCLUSION

For these reasons, the District Court's rulings should be affirmed.

Dated:  January 27, 2026          Respectfully submitted,

  *s/  Joel R. Hurt*
     Joel R. Hurt

**FEINSTEIN DOYLE PAYNE**
   **& KRAVEC, LLC**
Joel R. Hurt
     *Counsel of Record*
Ruairi McDonnell
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, Pennsylvania 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
jhurt@fdpklaw.com
rmcdonnell@fdpklaw.com

***Counsel for Plaintiffs-Appellees***

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND</u>
## <u>TYPEFACE REQUIREMENTS</u>

This brief complies with the word count and typeface requirements of Federal Rule of Appellate Procedure 32 and Circuit Rule 32 because it contains 13,897 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) as calculated by Microsoft Office Word, and has been prepared in a proportionally spaced typeface using 14-Point Century Schoolbook Style font.

Date:  January 27, 2026                        *s/ Joel R. Hurt*
                                                Joel R. Hurt

                                                *Counsel for Plaintiffs-Appellees*

- 71 -

## **CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25 and Circuit Rule 25, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the Court's CM/ECF system on January 27, 2026 which will effect service on all counsel of record.

Date: January 27, 2026            *s/ Joel R. Hurt*
                                   Joel R. Hurt

                                   *Counsel for Plaintiffs-Appellees*